## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARTHA BRENNAN CAMIRE
9534 CREEK SUMMIT CIRCLE
RICHMOND, VA 23235,

CRAIG JEFFERSON
5455 ABBE WOOD DR.
NEWBURGH, IN 47630,

DAVID LYN SHEPHERD
1006 CENTRAL RD.
ARKADELPHIA, AR 71923,

DANIEL SCHIPPER
945 GRACE ST.
NORTHVILLE, MI 48167,

individually and as representatives of a class of
participants and beneficiaries on behalf of the
Pension Plan for Certain Salaried Employees of
Alcoa USA Corp., the Pension Plan for Certain
Hourly Employees of Alcoa USA Corp., and the
Alcoa Subsidiaries Merged Inactive Plan,

*Plaintiffs*,

  v.

ALCOA USA CORP.
C/O C T CORPORATION SYSTEM
1015 15TH ST. NW
SUITE 1000
WASHINGTON, D.C. 20005

ALCOA CORP.
201 ISABELLA ST.
SUITE 500
PITTSBURGH, PA 15212,

THE ALCOA BENEFITS MANAGEMENT
COMMITTEE
201 ISABELLA ST.
SUITE 500
PITTSBURGH, PA 15212

Civil Action No.

**COMPLAINT—CLASS ACTION**

JURY TRIAL DEMANDED

WILLIAM F. OPLINGER
606 EAST DR.
SEWICKLEY, PA 15143

FIDUCIARY COUNSELORS, INC.
700 12TH ST. NW
SUITE 700
WASHINGTON, D.C. 20005; AND

JOHN DOES 1–5,

*Defendants*.

1.      Plaintiffs Martha Brennan Camire, Craig Jefferson, David Lyn Shepherd, and Daniel Schipper, individually and as representatives of a class of similarly situated participants and beneficiaries of the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation ("Salary Plan"), Pension Plan for Certain Hourly Employees of Alcoa USA Corporation ("Hourly Plan"), and the Alcoa Subsidiaries Merged Inactive Plan (collectively, the "Plans"), bring this action against Defendants Alcoa Corp. ("Alcoa"), Alcoa USA Corp. ("Alcoa USA"), William F. Oplinger, the Alcoa Benefits Management Committee ("Benefits Committee"), and John Does 1–5 (collectively, the "Alcoa Defendants"), and Fiduciary Counselors, Inc. ("Fiduciary Counselors") (collectively, "Defendants"), for breach of fiduciary duties and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      ERISA imposes strict fiduciary standards of conduct on pension plans. Plan fiduciary duties that are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). Fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271

(citing Restatement of Trusts 2d § 170 (1959), II Scott on Trusts §170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)) (citation omitted).

3.      Through four separate transactions completed between 2018 and 2022, Defendants offloaded over $2 billion of Alcoa's pension obligations, which affected over 28,000 Alcoa retirees and their beneficiaries.[1] Defendants offloaded these obligations to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively "Athene"), a private equity-controlled insurance company with a highly risky offshore structure. As a result of these transactions, Plaintiffs and the similarly situated participants and their beneficiaries lost their status as "participants" in the ERISA-governed Plans, and therefore, are no longer subject to ERISA's protections for employee retirement benefits. Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, ERISA requires that a fiduciary obtain the "safest annuity available." 29 CFR § 2509.95-1.

4.      Rather than selecting the safest possible annuity to ensure the continued financial security for Alcoa retirees and their beneficiaries, Defendants selected Athene, a substantially riskier insurer than numerous other traditional annuity providers. Annuities provided by Athene

---

[1] *Alcoa Corporation Takes Additional Actions on U.S. Pension and Other Postemployment Benefit Obligations,* Alcoa, Aug. 8, 2018, https://news.alcoa.com/press-releases/press-release-details/2018/Alcoa-Corporation-Takes-Additional-Actions-on-U.S.-Pension-and-Other-Postemployment-Benefit-Obligations/default.aspx; *Alcoa purchases group annuity contracts for certain U.S. pension plans,* Alcoa, Nov. 17, 2021, https://s29.q4cdn.com/844074237/files/doc_news/2021/11/20211117_PensionAnnuity-VF.pdf; *Alcoa further de-risks certain U.S. pension plans through additional annuity contracts,* Alcoa, Dec. 14, 2021, https://news.alcoa.com/press-releases/press-release-details/2021/Alcoa-Further-De-Risks-Certain-U.S.-Pension-Plans-Through-Additional-Annuity-Contracts/default.aspx; *Alcoa Purchases Group Annuity Contracts for Certain U.S. Pension Plans,* Alcoa, Aug. 8, 2022, https://news.alcoa.com/press-releases/press-release-details/2022/Alcoa-Purchases-Group-Annuity-Contracts-for-Certain-U.S.-Pension-Plans/default.aspx#:~:text=PITTSBURGH%2D%2D(BUSINESS%20WIRE)%2D%2D,United%20States%20retirees%20and%20beneficiaries.

are structured to generate potentially higher expected returns. Athene invests in lower-quality, higher-risk assets without the traditional mix of quality assets to support future benefit obligations, posing a significant risk at a great cost to retirees. Because the market accounts for such risk when pricing investments, it is likely that Alcoa Defendants saved a substantial amount of money by selecting a group annuity contract from Athene over the safest annuity available. In transferring Plaintiffs' pension benefits to Athene, Defendants put Alcoa's retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk which devalued their pensions without proper compensation. Accordingly, in addition to other remedies, Plaintiffs seek to receive the monetary value of the additional risk of their annuity as demonstrated by the marketplace.

5.     To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plans, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transactions and the posting of security and to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

6.     **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.     **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from ERISA-governed pension plans

backed by an established, multi-billion-dollar corporation and one of the largest aluminum producers in the United States, and then placed in the hands of a private-equity controlled insurance company with a highly risky offshore structure and asset portfolio. As a result, Plaintiffs are subject to an increased and significant risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk without appropriate compensation, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plans. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.      **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which, on information and belief, at least one of the alleged breaches took place, and where at least one Defendant resides or may be found.

**PARTIES**

I.      **The Alcoa Plans**

9.      The Plans are defined benefit, employee benefit pension plans under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering employees of Alcoa.

10.      The Plans were established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

11.     The Plans include the Pension Plan for Certain Hourly Employees of Alcoa USA Corporation ("Hourly Plan"), the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation ("Salary Plan"), and the Alcoa Subsidiaries Merged Inactive Plan.

12.     As of 2018, before the first buy-out transactions at issue, the Plans covered 43,400 total participants and held nearly $4 billion in combined assets.[2]

## II.     Plaintiffs

13.     Plaintiff Jefferson resides in Newburgh, Indiana, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). Mr. Jefferson retired in 2015 after working in Alcoa's Procurement department for approximately 24 years. Mr. Jefferson began receiving payments from Athene in 2022.

14.     Plaintiff Brennan Camire resides in Richmond, Virginia, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). Ms. Brennan Camire began receiving pension payments from Alcoa in 2012 after being employed at Alcoa from 1969 to 1972, and again as a Convenience Center Supervisor in Alcoa's Recycling department from 1990 to 1994. Ms. Brennan Camire began receiving payments from Athene in 2018.

15.     Plaintiff Shepherd resides in Arkadelphia, Arkansas, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). In 1979, Mr. Shepherd began working for Reynolds Metals, a company that was purchased by Alcoa around 2000. Mr. Shepherd retired in 2016 after working as an Environmental Manager at Alcoa. Mr. Shepherd began receiving pension payments from Athene in November 2022.

---

[2] Alcoa 2018 Annual Report at 86; 2018 Forms 5500 filed with the U.S. Department of Labor for the Pension Plan for Certain Salaried Employees of Alcoa USA Corp., the Pension Plan for Certain Hourly Employees of Alcoa USA Corp., and the Alcoa Subsidiaries Merged Inactive Plan.

16.     Plaintiff Schipper resides in Northville, Michigan, and was a participant in both the Salary Plan and the Subsidiaries Merged Inactive Plan under 29 U.S.C. § 1002(7). Mr. Schipper began working for Alcoa in 1979 and retired in 2010. He was the Director of Financial Planning & Analysis in the Engineering Products & Solutions Department at the time of his retirement. Mr. Schipper began receiving pension payments from Athene in November 2022.

### III.    Defendants

17.     Alcoa Corporation (NYSE: AA) ("Alcoa") is a publicly traded aluminum producer headquartered in Pittsburgh, Pennsylvania. As of December 31, 2023, Alcoa employed approximately 13,600 employees in 17 countries worldwide.[3] As of that same date, Alcoa recorded $10.55 billion in net revenue.[4] As alleged herein, Alcoa exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.     Alcoa USA Corporation ("Alcoa USA") is a subsidiary of Alcoa Corp. and is the Plan Sponsor under 29 U.S.C. § 1002(16)(B). Alcoa USA entered into four commitment agreements with Athene under which Alcoa Defendants agreed to purchase group annuity contracts that would transfer certain of Alcoa Defendants' defined benefit pension obligations to Athene. Alcoa USA acts as the plan administrator and plan sponsor.[5] As alleged herein, Alcoa

---

[3] 2023 Alcoa Annual Report at 4.
[4] *Id*. at 4.
[5] Alcoa, Rule IIX—Form E for the Pension Plan for Certain Hourly Employees of Alcoa USA Corp., April 1, 2022, at 30, https://cache.hacontent.com/ybr/R516/16557_ybr_ybrfndt/downloads/PlanIIRuleIIXNBGFormE.pdf.

USA exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     The Alcoa Corp. Benefits Management Committee ("Benefits Committee") had fiduciary responsibility for the Plans.[6] The Benefits Committee is made up of a group of individuals appointed by Alcoa's Board of Directors to oversee the operation of the Plans.[7] The plan administrator (Alcoa USA) "designated the Benefits Management Committee to oversee the operation of the plan[s] and the Benefits Management Committee has… discretionary authority."[8] Accordingly, as alleged herein, the Benefits Committee exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.     William F. Oplinger is a resident of Sewickley, Pennsylvania, and the current President and Chief Executive Officer of Alcoa, having served in that role since September 24, 2023.[9] Prior to becoming Alcoa's CEO and President, Mr. Oplinger was Executive Vice President and Chief Operations Officer of Alcoa, having served in that role since February

---

[6] 2022 Form 5500 for the Pension Plan for Certain Hourly Employees of Alcoa USA Corp., at 55.
[7] Alcoa, Rule IIX—Form E for the Pension Plan for Certain Hourly Employees of Alcoa USA Corp., April 1, 2022, at 35, https://cache.hacontent.com/ybr/R516/16557_ybr_ybrfndt/downloads/PlanIIRuleIIXNBGFormE.pdf.
[8] *Id.* at 30.
[9] *William F. Oplinger,* Alcoa, https://investors.alcoa.com/governance/board-of-directors/person-details/default.aspx?ItemId=d6ae988a-9f0b-4bf1-b6bb-9f2f3453b126.

2023.[10] From November 2016 to February 2023, Mr. Oplinger was Executive Vice President and

Chief Financial Officer of Alcoa.[11] Mr. Oplinger currently serves on the Board of Directors of

Alcoa ("Board").[12] A 2019 Proxy Statement for Alcoa stated: "In 2018, Mr. Oplinger oversaw

the strengthening of the balance sheet through the significant reduction of net pension liability

and debt."[13] And in 2022, it stated that Mr. Oplinger "drove the reduction in [Alcoa's] pension

liabilities through annuitization actions, where gross U.S. qualified pension liabilities fell to $2.6

billion on December 31, 2021, from $4.5 billion at year-end 2020."[14] As of 2016, Mr. Oplinger

was a member of the Benefits Committee. As alleged herein, Mr. Oplinger exercised

discretionary authority or discretionary control respecting management of the Plans, exercised

authority or control respecting management or disposition of the Plans' assets, and/or had

discretionary authority or discretionary responsibility in the administration of the Plans and is a

fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.     Fiduciary Counselors, Inc. ("Fiduciary Counselors") is a privately held

investment consulting firm that acts as an independent fiduciary for pension fund assets, a role

which usually involves reviewing one-time transactions. Fiduciary Counselors became an

independent entity in 2003 and is wholly owned by its senior executives and former employees.

Fiduciary Counselors is headquartered in Washington, D.C. Fiduciary Counselors was hired by

Alcoa Defendants to act as the independent fiduciary over the pension risk transfers ("PRT") at

---

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Notice of 2019 Annual Meeting of Stockholders and Proxy Statement at 53, Alcoa, Mar. 19, 2019.

[14] Notice of 2022 Annual Meeting of Stockholders and Proxy Statement at 54, Alcoa, Mar. 18, 2022, https://s29.q4cdn.com/945634774/files/doc_financials/2021/ar/2022-Proxy-Statement-Bookmarked-FINAL.pdf.

issue here. As alleged herein, Fiduciary Counselors exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

22.     John Does 1–5 are unknown members of the Benefits Committee that exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of Plans assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and are a fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

23.     Each Defendant is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. § 1002(21)(A), 1102(a).

## ERISA'S FIDUCIARY STANDARDS

24.     ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably a duty of loyalty and a duty of prudence. 29 U.S.C. § 1104(a)(1). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A) for the exclusive purpose of:
>
> (i) providing benefits to participants and their beneficiaries; and
>
> (ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

25.     The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, in order to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

26.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered per se violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,* 530 U.S. 238, 241–42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### I.     Pension Risk Transfers ("PRT")

27.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.,* 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's predominant retirement system when ERISA was enacted in 1974.

28.     Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically a monthly payment, after retirement. Generally, employers are responsible for funding the pension plan to pay their benefit obligations to employees and retirees. The amount of retirement benefits provided to employees is based on a formula that takes into account factors such as salary and years of service, among others.

29.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a pension plan, the employer (or plan sponsor) bears that risk. In the event that plan assets are inadequate to satisfy liabilities for benefit payments, the employer has an obligation to make additional contributions to the plan to meet ERISA's funding requirements. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the risk of underperformance falls to the employee rather than the employer.

30.     In recent years, there has been an industry-wide increase in employers seeking to reduce their pension funding risk through PRT transactions.[15] In a PRT transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

31.     A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a fiduciary function, and a critically important one. This decision will have a lasting impact on retirees and their beneficiaries for the rest of their lives. As NISA Investment

---

[15] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 9 (July 2023).

Advisors noted: it "is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."[16]

32.     PRT transactions can take one of two forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through purchase of an annuity contract;" or (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants.[17] As discussed below, the Alcoa transactions at issue involved partial buyouts.

33.     In the United States, the PRT market has exploded in recent years, with total PRT premiums growing from $27.5 billion in 2018 to $51.8 billion in 2022. [18] In 2023, 9 in 10 companies surveyed by MetLife reported that they planned to "completely divest all of their [defined benefit] pension plan liabilities in an average of 4.1 years."[19]

## II.   The Risks Associated with PRT Transactions

### A.   Lack of ERISA and PBGC Protections

34.     An employer that transfers its pension benefit obligations to an annuity provider causes participants to lose protections under ERISA. PRT transactions transfer pension obligations "from ERISA-regulated defined benefit plans to state-law governed insurance

---

[16] Eichorn, David, *Interpretive Bulletin 95-1 Statement and Request to Testify*, July 6, 2023.

[17] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 1 (July 2023).

[18] Aon, *U.S. Pension Risk Transfer Market Insights*, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights#:~:text=According%20to%20Aon's%20U.S.%20Pension,has%20recorded%20in%20a%20decade.

[19] MetLife, *2023 Pension Risk Transfer Poll*, Oct. 3, 2023, https://www.metlife.com/retirement-and-income-solutions/insights/2023-pension-risk-transfer-poll/#:~:text=For%20our%202023%20Pension%20Risk,divesting%20all%20pension%20plan%20liabilities.

companies."[20] With few exceptions, ERISA-governed defined benefit plans are protected by the

Pension Benefit Guaranty Corporation ("PBGC").[21] When a PRT transaction occurs, affected

pensioners lose both their ERISA and their PBGC protections, and are instead only protected by

state guaranty associations ("SGAs").[22]

35.     ERISA-governed defined benefit plans are required to pay PBGC premiums,

which fund the PBGC so that pensioners will be protected if their plan sponsor becomes

insolvent. Since PRT transactions remove PBGC protections, they also remove PBGC premium

obligations. Not only does this leave affected pensioners uncovered, but it poses a funding risk to

the PBGC, therefore threatening the level of protection offered to those participants still

protected by the PBGC.

36.     SGAs are not pre-funded like the PBGC and thus offer less protection compared

to the PBGC. SGAs are funded by assessments of member insurers in the case of another

insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather

than one standard limit as defined by the PBGC.[23] In most states, this limit is set to $250,000 "in

present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity

provider becomes insolvent.[24]

---

[20] Stein, Norman, *Statement of Norman Stein On Behalf of the Pension Rights Center Before the ERISA Advisory Council On the Subject of 29 Fed. Reg. 2509.95-1 and Risks to Participants of Pension-Risk Transfers*, July 10, 2023, at 2.
[21] Pension Benefit Guaranty Corporation, *PBGC Insurance Coverage*, https://www.pbgc.gov/prac/other-guidance/insurance-coverage#:~:text=Whether%20a%20private%2Dsector%20defined,it%20is%20covered%20by%20PBGC.
[22] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, July 14, 2023, at 33.
[23] *Id*. at 33–34.
[24] National Association of Insurance Commissioners, *Receiver's Handbook for Insurance Company Insolvencies* Chapter 6—Guaranty Funds/Associations, 2024 Ed., at 214.

### B.   Risk of Insolvency and Executive Life

37.     The risk of insurance company failure is not merely hypothetical. The collapse of Executive Life Insurance Company ("Executive Life") in the early 1990s demonstrates the potentially catastrophic consequences of high-risk insurance practices.[25] Similar to the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

38.     In 1991, over 300,000 policyholders relied on Executive Life, which held an A+ rating for financial soundness, for regular payments.[26] But in 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown" before its 1991 seizure by the California insurance commissioner. Following the seizure, the commissioner proceeded to sell Executive Life's investment portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for "roughly 50 cents on the dollar."[27] Losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.[28]

39.     Leon Black was the co-head of brokerage firm Drexel Burnham Lambert.[29]  First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was "one of [Drexel Burnham Lambert's] largest buyers of junk bonds."[30] In contrast to most insurance companies which invested in "stable assets like high-grade bonds, mortgage securities, and government obligations," Executive Life invested in risky junk bonds with high

---

[25] Eichorn, David, *Interpretive Bulletin 95-1 Statement and Request to Testify*, July 6, 2023.
[26] Gretchen Morgenson & Joshua Rosner. *These Are the Plunderers: How Private Equity Runs—and Wrecks—America,* at 32–33, Simon & Schuster (2023).
[27] *Id*. at 33–34.
[28] *Id*. at 107.
[29] *Id*. at 47.
[30] *Id*. at 66.

interest rates. [31] Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse.[32] This risky behavior allowed Executive Life to make higher payouts to policyholders.

40.     By 1990, many of the Executive Life assets meant to fulfill payment obligations "were in distress and trading for far less" than their purchase price.[33] Nevertheless, on December 27, 1990, the NAIC found that Executive Life's California and New York insurers were not in "imminent financial danger," and thus takeovers by state insurance regulators were unnecessary.[34] When questioned on the risky makeup of their bond portfolio, Executive Life often pointed to their "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's.[35]

41.     On April 11, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California "because its precarious financial position made it a threat to its policyholders."[36] Up until a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best, meaning it was still considered "'very good'" despite a decline in position pending review. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, the New York insurance regulator seized Executive Life of New York on April 17, 1991. Just weeks later, parent company First Executive filed for bankruptcy.[37]

---

[31] *Id*. at 66–67.
[32] *Id*. at 67.
[33] *Id*. at 68.
[34] *Id*. at 71–72.
[35] Demick, Barbara, *A.M. Best finds credibility under fire*, Baltimore Sun, July 28, 1991, updated Oct. 25, 2018, https://www.baltimoresun.com/1991/07/28/a-m-best-finds-credibility-under-fire/.
[36] Gretchen Morgenson & Joshua Rosner. *These Are The Plunderers: How Private Equity Runs—and Wrecks—America,* at 75, Simon & Schuster (2023).
[37] *Id*. at 82–84.

### C.   Response to Executive Life and Interpretative Bulletin 95-1

42.   In response to the financial collapse of Executive Life, Congress passed the

Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1993). Through

the amendment, Congress created a right of action to obtain appropriate relief for ERISA

violations involving the "purchase of an insurance contract or insurance annuity," including "the

posting of security" as needed to ensure that participants receive their full benefits, plus

prejudgment interest. 29 U.S.C. § 1132(a)(9).

43.   As noted, the Department of Labor's Interpretive Bulletin 95-1 establishes a

framework for ERISA compliance when choosing an annuity provider in a PRT transaction.[38]

The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the

safest annuity available, unless under the circumstances it would be in the interests of

participants and beneficiaries to do otherwise."[39]

44.   In order to determine the safest available annuity, Interpretive Bulletin 95-1

requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by

considering six factors: (1) the annuity provider's investment portfolio quality and

diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of

the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the

annuity contract and guarantees supporting them; and (6) the availability of additional protection

through state guaranty associations. The fiduciaries must "obtain the advice of a qualified,

---

[38] 29 CFR § 2509.95-1.
[39] *Id*.

independent expert" if they do not possess the necessary expertise to properly evaluate these factors.[40]

### D.   Private Equity Firms

45.     Traditional players in the PRT market include established life and annuity providers such as Prudential, New York Life Insurance Company, and MetLife. However, private equity firms have taken on a growing role in the PRT landscape.  In fact, "private equity firms have significantly heightened their exposure to and influence over the life and annuity insurance industry" overall through both the purchasing of life insurers and their serving as third-party asset managers for insurers.[41] Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, but they can also generate "enormous fees for themselves" for investment management services.[42]

46.     Private equity firms primarily began purchasing insurance companies "to finance their expanding operations."[43] Today, they have moved beyond this business into the lines of private credit and insurance.[44] As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.[45]

---

[40] ERISA Advisory Council, *Statement of the 2023 Advisory Council on Employee Welfare and Pension Benefit Plans to the U.S. Department of Labor Regarding Interpretive Bulletin 95-1*, Aug. 29, 2023.
[41] Sherrod Brown - U.S. Senator for Ohio, *Brown Continues Push on Private Equity Firms' Involvement in the Insurance Industry*, August 5, 2022, https://www.brown.senate.gov/newsroom/press/release/sherrod-brown-continues-push-private-equity-firms-involvement-insurance-industry.
[42] Gretchen Morgenson & Joshua Rosner. *These Are The Plunderers: How Private Equity Runs— and Wrecks—America,* at 34. Simon & Schuster (2023).
[43] Ballou, Brendan, *Plunder: Private Equity's Plan to Pillage America,* at 125. Hatchette Affairs Public Affairs Group (2023).
[44] *Id*. at 119.
[45] *Id*. at 126.

47.     Lawmakers and industry experts are concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."[46]

48.     In the wake of the surge in recent years in life insurer liabilities and annuity sales spurred on by PRT transactions, many life insurers "report razor-thin surpluses relative to the size and risk profile of their balance sheets."[47] This "increased use of complex investment strategies[48] has led to the greater prominence of illiquid and volatile assets on insurers' books," a stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies.[49] These high-risk, "high-yield" investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem competitively attractive. In reality, "private-equity returns are no better than those for index funds after fees."[50]

---

[46] Brown, Sherrod, *Letter to the Federal Insurance Office and National Association of Insurance Commissioners re: private equity's involvement in life insurance*, Mar. 16, 2022.

[47] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 6, July 10, 2023.

[48] Such complex investment strategies are discussed in further detail in the context of Athene's practices. *See infra* Facts Applicable to All Counts, § III.A.

[49] Sherrod Brown - U.S. Senator for Ohio, *Brown Continues Push on Private Equity Firms' Involvement in the Insurance Industry*, Aug. 5, 2022.

[50] Hough, Jack, *How Private Equity Stacks Up Against The Stock Market*, at 9, Barron's, Sept. 18, 2023.

## III.  Athene and its Financial Risks

49.      Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. The company was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company intended to conduct insurance business in New York.

50.      Athene is one of the leading players in the PRT market, having completed at least 45 transactions totaling $50.5 billion and covering over 550,000 plan participants.[51] On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. At the time, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue.[52] Following the merger, Athene became a subsidiary of Apollo. As previously indicated, Apollo executives contributed to the collapse of Executive Life.

### A.    Athene's Complex Investment Structures and Ratings

51.      Athene's use of complex investment structures under lax regulatory standards has contributed to its higher risk as an annuity provider.  Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both headquartered in Hamilton, Bermuda. In Bermuda, "capital requirements are lower than insurers, investment limitations [are] virtually non-existent and transparency is minimal to zero."[53] In part, this is due to differing regulatory requirements between the U.S. and offshore jurisdictions.

---

[51] Pension Group Annuities, Athene, https://www.athene.com/pension-group-annuities.

[52] Farman, Madeleine, *Apollo's merger with Athene highlights PE's rush for permanent capital*, S&P Global Market Intelligence, March 25, 2021, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/apollo-s-merger-with-athene-highlights-pe-s-rush-for-permanent-capital-63263065.

[53] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 2, July 10, 2023.

52.     In Bermuda, "'[t]he Bermuda Solvency Capital Requirement (BSCR) requires insurers to hold similar levels of capital against both corporate bonds and [Collateralized Loan Obligations, or "CLOs"], even though some CLO tranches have a larger downside risk than bonds with the same credit rating.'"[54] In the United States, the NAIC's Securities Valuation Office "is responsible for the day-to-day credit quality assessment of securities owned by state regulated insurance companies."[55]

53.     CLOs are dependent on private letter ratings ("PLRs") from private credit rating agencies rather than more stringent public ratings from the Securities Valuation Office. Two such private credit rating agencies from which Athene obtains ratings are Kroll Bond Rating Agency ("KBRA") and DBRS Inc. ("DBRS"). These ratings can be unreliable and misleading. CLOs represent one type of structured debt, where "deals are carved into different slices, or 'tranches,' each with varying risks and returns, which means ratings firms are crucial to their creation."[56] In 2019, the Wall Street Journal ("WSJ") found significant discrepancies among structured securities ratings, including those of CLOs, between the "major" ratings agencies—S&P, Moody's, and Fitch—and the "challenger" ratings agencies—DBRS, KBRA, and Morningstar. The WSJ found that "[a]cross most structured-finance segments, [the challengers] were more likely to give higher grades than [the major ratings agencies] on the same bonds," resulting in the

---

[54] Hatfield, William, qtd. in Micah Hauptman, *Testimony to the Advisory Council on Employee Welfare and Pension Benefit Plans (ERISA Advisory Council)*, July 18, 2023.

[55] *Securities Valuation Office,* National Association of Insurance Commissioners, https://content.naic.org/industry/securities-valuation-office.

[56] Cezary Podkul and Gunjan Banerji, *Inflated Bond Ratings Helped Spur the Financial Crisis. They're Back.*, The Wall Street Journal, Aug. 7, 2019, https://www.wsj.com/articles/inflated-bond-ratings-helped-spur-the-financial-crisis-theyre-back-11565194951.

classification of a bond as a junk bond by major ratings agencies that challenger rating agencies

would rate as a very safe AAA bond.[57]

54.     The NAIC found similar discrepancies: they reported that "[a]s of year-end 2021,

small [credit rating providers] provided PLRs on 83% of the privately rated securities owned by

U.S. insurance companies."[58] The NAIC first looked at securities that had previously been rated

by the Securities Valuation Office but had since migrated to PLRs. Compared to ratings issued

by the Securities Valuation Office, PLRs rated by small credit rating providers were, on average,

2.4 notches higher.[59] Higher ratings suggest lower risk, and result in reduced risk-based capital

requirements than would be required had the Securities Valuation Office rated the security to

account for higher risk. Overall, the NAIC found that "private ratings provided by large [credit

rating providers] were, on average, 1.3 notches lower than those provided by their counterparts

for the same security, while private ratings provided by small CRPs were 1.2 notches higher."

Notably, unlike PLRs, *public* ratings provided by small credit rating providers, were largely

comparable to those provided by other ratings agencies.[60]

55.     In large part, the issue with ratings persists because bond issuers can pay for their

ratings by choosing to only purchase ratings from those agencies which are more likely to issue

---

[57] *Id.* As a corollary, tranches issued by KBRA in the European market had the highest levels of debt relative to equity compared to the major rating agencies and had lower levels of subordination, meaning loan losses get to KBRA CLO tranches more quickly. The percentage of CLOs that needs to be wiped out before each tranche starts losing money is substantially lower in KBRA rated CLO's than its competitors. This is the case with B, BB, BBB, A, AA, and AAA CLO's as rated by KBRA compared to competitors. Jon Sindreu, *Investors Should Fear More Competition Among Ratings Companies*, The Wall Street Journal, Oct. 8, 2019.

[58] *Growth in Private Ratings Among U.S. Insurer Bond Investments and Credit Rating Differences*, National Association of Insurance Commissioners Capital Markets Special Report at 3, https://content.naic.org/sites/default/files/capital-markets-special-reports-PLR-Rating-Differences.pdf.

[59] *Id.*

[60] *Id.* at 5.

higher ratings. According to the WSJ, there is an added "incentive to hire the most lenient rating firm, because interest payments are lower on higher-rated bonds."[61] As major ratings agencies lose out on business to challenger ratings agencies that tend to be more lenient with their ratings, they adjust their processes so that they can continue to compete. These trends among ratings agencies that result in poorer investments receiving propped up ratings are even more concerning given investors' dependence on ratings. Further, ratings are important because a higher rated structured security requires lower levels of capital to be held by the insurer.

56.     Both KBRA and DBRS have been the subject of settlements with the SEC with regards to their rating practices resulting in millions of dollars in fines. An SEC investigation into KBRA's CLO and CMBS rating practices was settled in September of 2020 for $2 million.[62] The SEC found that "KBRA failed to establish, maintain, enforce and document the required policies and procedures" surrounding their ratings of CLO Combo Notes, resulting in inaccurate ratings that did not fully account for cash flows payable to noteholders.[63] This failure by KBRA was of great concern to noteholders, and in turn to policyholders: KBRA's ratings "did not assess the probability that the issuers will default, fail to make timely payments, or otherwise make payments in accordance with the terms of the security."[64] The impacts of this failure by KBRA were stark for life insurers: a KBRA-declared BBB- Combo Note would incur a 1.3% RBC charge, but "investing directly in the unrated equity component" of that same security would

---

[61] Cezary Podkul and Gunjan Banerji, *Inflated Bond Ratings Helped Spur the Financial Crisis. They're Back.*, The Wall Street Journal, Aug. 7, 2019, https://www.wsj.com/articles/inflated-bond-ratings-helped-spur-the-financial-crisis-theyre-back-11565194951.
[62] *SEC Charges Rating Agency With Internal Controls Failures in Connection With Ratings of CMBS and CLO Combo Notes,* U.S. Securities and Exchange Commission, Sept. 29, 2020, https://www.sec.gov/news/press-release/2020-235.
[63] *In the Matter of Kroll Bond Rating Agency, LLC*, SEC Administrative Proceeding File No. 3-20097, at 2, Sep. 29, 2020, https://www.sec.gov/files/litigation/admin/2020/34-90037.pdf.
[64] *Id*. at 3.

carry an RBC charge of 30%.[65] KBRA's ratings allowed life insurers to take advantage of an almost 29% reduction in the amount of required capital, which would almost certainly pose a threat to policyholders in the case of insolvency.

57.     Just three years later, KBRA and the SEC settled another investigation into "widespread and longstanding failures by KBRA" to follow standard required recordkeeping procedures in violation of Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) thereunder.[66] Through extensive off-channel communications between KBRA employees at all levels of seniority, the SEC's "ability to carry out its regulatory functions and investigate compliance deficiencies and violations of the federal securities laws" was likely impacted.[67] KBRA paid civil penalties of $4 million to settle the investigation.[68]

58.     Concurrent with its 2023 investigation into KBRA's recordkeeping failures, the SEC conducted a similar investigation into "the longstanding failure" of DBRS to follow federal recordkeeping requirements.[69] The SEC found numerous violations of Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) thereunder: off-channel discussions of internal credit rating practices, including "snapshots of internal DBRS documents and communications" on personal cell phones, as well as discussions of adjustments to the DBRS commercial mortgage-backed securities rating model.[70] Further, the SEC found that company cell phones had been wiped in

---

[65] *Id*. at 4.
[66] *In the Matter of Kroll Bond Rating Agency, LLC*, SEC Administrative Proceeding File No. 3-21776, at 2, 5, Sep. 29, 2023, https://www.sec.gov/files/litigation/admin/2023/34-98654.pdf.
[67] *Id*. at 2.
[68] *SEC Charges Two Credit Rating Agencies, DBRS and KBRA, with Longstanding Recordkeeping Failures,* U.S. Securities and Exchange Commission, Sept. 29, 2023, https://www.sec.gov/news/press-release/2023-211.
[69] *In the Matter of DBRS, Inc.*, SEC Administrative Proceeding File No. 3-21773, at 2, https://www.sec.gov/files/litigation/admin/2023/34-98638.pdf.
[70] *Id*. at 3–4.

2022 under the direction of DBRS without first preserving those records that were required to be retained.[71] DBRS paid $8 million in civil penalties to settle the investigation.[72]

59.     Despite years of documented wrongdoing by KBRA and DBRS involving extensive failures to comply with SEC credit rating policies and procedures, Athene continued to retain both companies for rating services. KBRA and DBRS are both credited with providing private rating services to Athene in Athene's SEC filings every year from 2017 through 2023.[73] Had Defendants properly vetted Athene before selecting them as an annuity provider, these red flags among credit ratings agencies used by Athene since 2017 would have been cause for significant concern.

**B.     Athene's Offshore Practices**

60.     Athene's entangled corporate structure has led to increased exposure to higher risk investments and decreased transparency to investors. Tom Gober is a forensic accountant, Certified Fraud Examiner, and Insurance Examiner who has spent 37 years working both for and with government entities, including Mississippi state regulators, the Department of Justice, the U.S. Attorney's Office, and the Federal Bureau of Investigation. In his extensive study of PRT transactions, Gober has examined life insurers' regulatory filings looking for evidence of liabilities backed by high-quality assets. According to Gober, "the substance of all troubles I've investigated spin out of unregulated affiliates." Gober believes that affiliated transactions, such

---

[71] *Id.* at 4.
[72] *SEC Charges Two Credit Rating Agencies, DBRS and KBRA, with Longstanding Recordkeeping Failures,* U.S. Securities and Exchange Commission, Sept. 29, 2023, https://www.sec.gov/news/press-release/2023-211.
[73] 2017 Athene Holding Ltd. Form 10-K at 98; 2018 Athene Holding Ltd. Form 10-K at 85; 2019 Athene Holding Ltd. Form 10-K at 94; 2020 Athene Holding Ltd. Form 10-K at 104; 2021 Athene Holding Ltd. Form 10-K at 102; 2022 Athene Holding Ltd. Form 10-K at 92; 2023 Athene Holding Ltd. Form 10-K at 86.

as those between Athene and Athene Life Re, are some of the biggest issues facing the PRT space.[74]

61.     Annuity and life insurance companies maintain surpluses to ensure long-term solvency. However, those insurers with captive reinsurance arms use them "to back their liabilities with assets that would not be admitted by examiners in their own domiciles."[75] Such a practice enables the insurer to appear to have more free capital than it does. The lack of oversight in offshore jurisdictions to ensure solvency and protect the best interests of policyholders leaves the reinsurer's management "free to do virtually anything with the extra funds."[76] As a result, captive reinsurance allows insurers to gain multiple advantages, including to "price their annuities more competitively."[77]

62.     Additionally, financial statements must be reported using Statutory Accounting Principles in the United States.[78] Bermuda does not follow the same detailed reporting standards. In an analysis of Athene's transfer activity between its affiliates, Gober found that "Athene Annuity Re Ltd of Bermuda ended up with $87 billion on its books in 2020," and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021.[79] Apollo's practice of reinsuring liabilities with its captive reinsurers opens up excess

---

[74] Pechter, Kerry. *NAIC Eyes Bermuda Triangle Strategy*, Retirement Income Journal, Nov. 4, 2021, https://retirementincomejournal.com/article/naic-eyes-bermuda-triangle-strategy/.
[75] Gober, Thomas, *Testimony to the Department of Labor – Employee Benefits Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans*, at 4, July 10, 2023.
[76] *Id*.
[77] Pechter, Kerry, *NAIC Eyes Bermuda Triangle Strategy,* Retirement Income Journal, Nov. 4, 2021, https://retirementincomejournal.com/article/naic-eyes-bermuda-triangle-strategy/.
[78] Hauptman, Micah, *Testimony to the Advisory Council on Employee Welfare and Pension Benefit Plans*, ERISA Advisory Council, July 18, 2023.
[79] Komisar, Lucy. *Captives of Industry: How Wall Street is Cashing in on Your Insurance*, 100 Reporters, https://100r.org/2022/09/insurance-company-captives/.

capital but does not decrease risk. If "only a fraction" of that reinsurance transferred in 2021 was backed by letters of credit evaluated with Statutory Accounting Principles and consequently disallowed, "Athene would face a funding shortfall." According to Gober, such a shortfall for Athene would spell trouble for Apollo as well: at the time of Gober's calculations, Athene Holding's insurance companies represented an impressive 40% of Apollo's value.[80]

63.    Athene's complex structure has also led to pensioners' increased exposure to higher risk investments. Financial entities that combine U.S. life insurers (Athene), offshore captive reinsurers (Athene Life Re), and asset manager (Athene Asset Management) employ what is called a "Bermuda Triangle Strategy."[81] The insurer (*e.g.,* Athene) firsts builds a block of annuity business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer (*e.g.,* Athene Life Re), "[freeing] up annuity capital for redeployment to its private debt business."[82] The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt, allowing the insurer to "earn[] a spread that includes an illiquidity premium," serving as compensation for the additional risk of holding a less liquid asset.[83] The liquidity premium is captured through "thinly-traded risky assets," notably CLOs.[84] Insurers invest directly in private commercial and residential mortgage loans reported in their financial statements before securitizing them into the CLOs. In contrast, the CLOs are structured products unreported on financial statements.[85] Insurance companies like

---

[80] *Id.*

[81] Nathan Foley-Fisher, et al., *Capturing the Illiquidity Premium,* Feb. 2020, at 6–9; *see also* Kerry Pechter, *NAIC Eyes Bermuda Triangle Strategy,* Retirement Income Journal, Nov. 4, 2021. Apollo manages substantially all of Athene's assets.

[82] Nathan Foley-Fisher, et al., *Capturing the Illiquidity Premium,* Feb. 2020, at 4–5.

[83] *Id.* at 5.

[84] *Id.* at 21.

[85] *Id.*

Athene "hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers."[86] When combined with the favorable regulatory treatment and capital requirements that CLOs are subject to, the risk compounds and leaves Athene at serious risk of insolvency.

64.     In 2011, Liberty Life Insurance Co. was acquired by Athene Holding. According to a former money manager at Liberty prior to the acquisition, Athene's investment strategies are risky and unsustainable. "When you look at the business model these guys use, where they're substantially increasing the risk in the bond portfolio, sooner or later…that has to come home to roost," he said. "All the upside would go to Athene if it worked out, and the downside would go to the annuity holders if it didn't."[87] This imbalance of risk is not in the best interest of annuity holders.

65.     In its Form ADV Part 2A filed with the Securities and Exchange Commission, Apollo specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies. "Such PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities on behalf of the Insurance Company PortCos and resolution of disputes that arise in the future."[88] Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

66.     In response to these trends, the International Monetary Fund issued a Global Financial Stability note in December 2023, warning of portfolio liquidation challenges due to the increased use of structured investments. "Greater investment in structured and private credit

---

[86] *Id*. at 4.
[87] Bloomberg News, *Risk altered as private equity moves into insurance,* Sept. 17, 2013, InvestmentNews, https://www.investmentnews.com/industry-news/archive/risk-altered-as-private-equity-moves-into-insurance-51415.
[88] Apollo Capital Management, L.P., Form ADV Part 2A, June 2, 2023, at 191.

worsens liquidity mismatches between assets and liabilities, which could make liquidating portfolios more challenging if facing margin calls on derivatives or repurchase agreement contracts or policy surrenders should interest rates continue to rise rapidly."[89]

### C.   Private Equity Concerns

67.      Like with other private equity-owned insurers, Athene's rapidly increasing role in the PRT market has caused concern among many industry experts. The goals of private equity do not align with the best interests of policyholders. "Private equity firms' 'focus is on maximizing their immediate financial returns, rather than ensuring that promised retirement benefits are there at the end of the day for policyholders….'"[90] Such a business model "'is not necessarily a natural fit for the insurance business, where a failure can put policyholders at very significant risk.'"[91]

68.      The United States Department of the Treasury expressed similar concerns, writing that it merits further consideration "whether a potential misalignment may exist between the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests."[92] Apollo specifically "was, in many ways, culturally ill suited" to create and run Athene. Its reputation as "cutthroat" and "bare-knuckled" does not align with the historically conservative nature of life insurance, which should be primarily concerned with fulfilling policyholder obligations.[93]

---

[89] Fabio Cortes, et al., *Private Equity and Life Insurers,* International Monetary Fund Global Financial Stability Note, Dec. 2023, at 14.

[90] Ballou, Brendan, *Plunder: Private Equity's Plan to Pillage America,* Hatchette Affairs Public Affairs Group, at 127 (2023).

[91] *Id.*

[92] Department of the Treasury, *Letter from Jonathan C. Davidson, U.S. Department of the Treasury, to Senator Sherrod Brown*, June 29, 2022, https://www.banking.senate.gov/imo/media/doc/fio_85.pdf.

[93] Ballou, Brendan*, Plunder: Private Equity's Plan to Pillage America,* p. 127. Hatchette Affairs Public Affairs Group, 2023.

69.     Under the direction of Section 321 of the SECURE 2.0 Act of 2022, the Department of Labor conducted a review of Interpretive Bulletin 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans "to determine whether updates to Interpretive Bulletin 95-1 [were] warranted."[94] On July 18, 2023, the Council held a meeting at which they consulted with the Employee Benefits Security Administration and received public comments from stakeholders. At the hearing, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.[95] Bill Wheeler and Sean Brennan of Athene testified that Athene is "'the most transparent'" life insurer, which forensic accountant and Certified Fraud Examiner Tom Gober described as "'the opposite of the truth.'"[96]

**D.   Athene's Creditworthiness**

70.     On October 13, 2022, NISA Investment Advisors reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene.[97] To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%."[98] As shown below, NISA quantified the economic loss

---

[94] U.S. Department of Labor Employee Benefits Security Administration, *ERISA Advisory Council*, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council.
[95] ERISA Advisory Council, *Department of Labor Employee Benefits Security Administration Interpretive Bulletin 95-1 Consultation Paper*, at 14 (July 2023).
[96] Pechter, Kerry, *Of Athene, Pension Risk Transfers, and Fiduciaries*, Retirement Income Journal, July 28, 2023, https://retirementincomejournal.com/article/of-private-equity-and-pension-risk-transfers/.
[97] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.
[98] *Id.*

to beneficiaries due to credit risk, placing Athene dead last, and among "Questionable Candidates" for an annuity provider.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

71.     The NISA report demonstrates that Athene is a much riskier annuity provider than traditional providers, as is made evident by the measurement of economic loss to beneficiaries choosing Athene sitting at 14%. This figure is significantly larger than the same measure for New York Life and Prudential, and thus Athene cannot be considered the "safest available" annuity as required by Interpretive Bulletin 95-1.[99]

**E.    Athene's Credit Ratings and Other Red Flags**

72.     Interpretive Bulletin 95-1 makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and

---

[99] *Id.*

analytical search for an appropriate annuity provider."[100] In light of this guidance, NISA Investment Advisors separately compared the agency rating of Athene to the market-adjusted implied rating. NISA Investment Advisors found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. [101] Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate whether Athene offered the safest annuity available.

73.     One measurement of a security's risk factor is option-adjusted spread. Option-adjusted spread measures the difference in yield between a security and its risk-free equivalent, often a U.S. treasury note. By comparing the two yields, investors are able to see the impact that a bond's additional risk would have on its rate of return. Securities with a higher level of risk correspond to a higher option-adjusted spread, while those with lower risk receive a lower option-adjusted spread. Option-adjusted spread is measured in basis points.

74.     The below graph compares the option-adjusted spread as of April 11, 2024, for bonds with a ten-year maturity for Athene and two traditional insurers, Prudential and MetLife.[102]

---

[100] 29 CFR § 2509.95-1.
[101] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, Figure 1, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.
[102] Bloomberg Finance L.P.



75.     The Athene 10-year bond receives the highest option-adjusted spread at 139.1 basis points, meaning it is a much riskier investment. This is 149% higher than the option-adjusted spread for the equivalent Prudential bond and 87% higher than the option-adjusted spread for the equivalent MetLife bond. Given that a 10-year bond underlying an Athene annuity carries over twice as much risk as does an equivalent bond underlying a Prudential annuity, the Athene annuity could not possibly be considered the "safest available" option as is required by IB 95-1.

76.     NISA Investment Advisors previously reported the range of "creditworthiness" among annuity providers, reporting that Athene had the highest reported spread of 214 basis points ("bps").[103] The bond market uses the spread to measure the creditworthiness of bonds

---

[103] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, Figure 1, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

issued by insurers because there is an inverse relationship between spread and credit rating. Accordingly, all else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. Such a demand is one that pensioners are unable to make.

77.     Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. Provision of life insurance by an insurance provider is considered a natural hedge to its annuities business.[104] In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

78.     Athene's PRT business has also been subject to regulatory investigation. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. regarding their pension risk transfer business in New York state.[105] Relative to other states, New York state maintains some of the strictest standards on insurers. As a result of the investigation, Athene was ordered to pay a $45 million civil monetary penalty and meet other provisions.

---

[104] "Life insurance companies' investment policies tend to include longer-maturity, investment-grade bonds that provide stable cash flow to match their long-term liabilities." Nancy Bennett and Paul Navratil, *Solvency and Reserve Standards for U.S. Life Insurance Companies*, American Academy of Actuaries, at 10, July 18, 2023, https://www.actuary.org/sites/default/files/2023-07/American_Academy_of_Actuaries_for_DoL_ERISA_Advisory_Council.pdf.
[105] *In the Matter of Athene Annuity and Life Company and Athene Holding Ltd.,* Consent Order, Apr. 13, 2020, https://www.dfs.ny.gov/system/files/documents/2020/04/ea20200413_consent_order_athene.pdf.

**IV.  Defendants' PRT Transactions with Athene**

79.     As the plan sponsor and employer, Alcoa Defendants were necessary parties to the group annuity contracts with Athene. Through the PRTs with Athene, Alcoa Defendants transferred their pension liabilities to Athene Annuity and Life Company or Athene Annuity & Life Assurance Company of New York.[106] Alcoa Defendants therefore no longer guarantee the pension benefits covered by the transactions, and these pension benefits are no longer subject to ERISA's funding requirement. As a result, Alcoa Defendants caused the Plans' participants to lose the stringent protections provided by ERISA and placed their retirement assets at risk of Athene's insolvency.

80.     According to communications sent by Alcoa to participants, the Benefits Committee appointed Fiduciary Counselors as an independent fiduciary over the PRTs. According to Form 5500's, Alcoa paid Fiduciary Counselors $227,835 in 2018, $134,399 in 2021, and $115,000 in 2022 for acting in this role.[107] Fiduciary Counselors acknowledges the DOL's Interpretive Bulletin 95-1 requirement that plan fiduciaries take steps to obtain the safest available annuity.[108] When selecting an annuity provider, "Fiduciary Counselors assumes full fiduciary responsibility[.]"[109]

---

[106] Athene Annuity and Life Assurance Company of New York is a subsidiary of Athene Annuity and Life Company, which provides annuity benefits to Plan participants who reside in New York.
[107] 2018, 2021, 2022 Form 5500's for the Pension Plans Master Trust for Alcoa USA Corp.
[108] Annuities, Fiduciary Counselors, *available at* https://www.fiduciarycounselors.com/services/annuities/.
[109] *Id.*

81.     On August 8, 2018, Alcoa Defendants announced the signing of a group annuity contract with Athene under which Athene assumed $290 million in defined benefit assets and obligations. The transaction involved 10,500 participants.[110]

82.     On November 17, 2021, Alcoa Defendants announced a second purchase of group annuity contracts from Athene that transferred approximately $1 billion in pension obligations and assets to the insurer. As a result of the transaction, Athene assumed payments for 11,200 U.S. participants.[111]

83.     Not even one month later, on December 14, 2021, Alcoa Defendants announced yet another purchase of group annuity contracts in which Athene assumed $500 million in pension assets and obligations for 2,600 participants.[112]

84.     Finally, on August 8, 2022, Alcoa Defendants announced that they had purchased group annuity contracts with Athene that transferred an additional $1 billion in pension obligations and assets to the insurer. Athene assumed payment obligations for 4,400 U.S. participants as a result of the transaction beginning in November of 2022.[113]

---

[110] "Alcoa Corporation Takes Additional Actions on U.S. Pension and Other Postemployment Benefit Obligations," August 8, 2018, https://www.businesswire.com/news/home/20180808005555/en/Alcoa-Corporation-Takes-Additional-Actions-on-U.S.-Pension-and-Other-Postemployment-Benefit-Obligations.
[111] *Alcoa Purchases Group Annuity Contracts for Certain U.S. Pension Plans,* Alcoa, Nov. 17, 2021, https://news.alcoa.com/press-releases/press-release-details/2021/Alcoa-Purchases-Group-Annuity-Contracts-for-Certain-U.S.-Pension-Plans/default.aspx.
[112] *Alcoa Further De-Risks Certain U.S. Pension Plans Through Additional Annuity Contracts,* Alcoa, Dec. 14, 2021, https://news.alcoa.com/press-releases/press-release-details/2021/Alcoa-Further-De-Risks-Certain-U.S.-Pension-Plans-Through-Additional-Annuity-Contracts/default.aspx.
[113] *Alcoa Purchases Group Annuity Contracts for Certain U.S. Pension Plans,* Alcoa, Aug. 8, 2022, https://news.alcoa.com/press-releases/press-release-details/2022/Alcoa-Purchases-Group-Annuity-Contracts-for-Certain-U.S.-Pension-Plans/default.aspx.

85.     Between August 2018 and August 2022, Alcoa Defendants' PRTs affected nearly 30,000 Alcoa Plan participants, offloading approximately $2.79 billion of pension liabilities to Athene.

86.     As a result of the transactions, the value of the benefits Plaintiffs are receiving is less than the value of the benefit they were receiving from Alcoa. In the investment industry, risk is weighed by the market to determine the value of bonds or annuities. For a bond, the higher the risk, the greater return or spread is required by the market.

87.     Alcoa Defendants benefitted from offloading their pension obligations. Alcoa Defendants financially benefitted from avoiding annual PBGC premiums for retirees who were eliminated from the Plans and experienced a significant reduction in administrative costs. As a result, they strengthened their balance sheets.

## V.     Defendants Imprudently Used Athene as the Annuity Provider

88.     The circumstances then prevailing to Fiduciary Counselors demonstrates that it selected Athene as the annuity provider in the PRTs in violation of their fiduciary responsibilities as an independent fiduciary by failing to conduct a thorough and independent investigation of available annuity providers for the Plans. Had Fiduciary Counselors conducted an impartial investigation of available annuity providers, it would have discovered that Athene was not the safest available option to select as an annuity provider.  There were numerous factors that would lead a loyal and prudent fiduciary to conclude that Athene was not the safest annuity available, including Athene's complex investment structure and offshore practices, focus on private equity, questionable creditworthiness, and use of untrustworthy credit rating agencies.

89.     Although Alcoa Defendants hired Fiduciary Counselors to select Athene as an independent fiduciary, Alcoa Defendants maintained full responsibility as an appointing

fiduciary to monitor Fiduciary Counselors to ensure that it carried out its fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective action to protect the plan and its participants when the delegate fails to discharge its duties. Alcoa Defendants also had a duty to prevent any fiduciary breach by Fiduciary Counselors in the selection of Athene as the annuity provider and to ensure that Fiduciary Counselors was performing its delegated tasks in accordance with ERISA's fiduciary standards. Alcoa Defendants failed to prudently discharge its fiduciary duties in monitoring Fiduciary Counselors.

90.     Despite clear evidence that Athene was substantially riskier than traditional annuity providers, Defendants placed Alcoa retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk for which they were not compensated. Given these facts, it is evident that Defendants either did not solicit bids from a large number of providers or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Had they done so, they would not have placed retirees and beneficiaries' retirement assets at risk of Athene's insolvency.

91.     Defendants violated their strict fiduciary duties by selecting and then causing the offloading billions of dollars of the Plans' participants' retirement assets to Athene in a failure to select the safest annuity provider available. Relative to traditional annuity providers, Athene invests in far riskier assets. This risk is compounded by numerous factors, including Athene's reinsurance of annuities with offshore affiliates. In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of dollars in participants' retirement benefits to Athene.

92.     Defendants' decision to choose or cause Athene to be retained as the annuity provider in the transactions harmed, and will continue to harm, participants and beneficiaries

over an extended period through uncompensated risk. The market measures Athene as up to 14%
riskier than traditional annuity providers, including New York Life and Prudential. Investors in
the market demand a risk premium in exchange for exposure to higher risk. Plan participants and
beneficiaries receive no additional compensation for taking on the additional risk associated with
the transfer of their pension benefits to Athene.

93.     Given the numerous factors that would lead a prudent fiduciary to reject Athene, it
is evident that Defendants selected or caused to retain Athene without conducting a sufficiently
independent and objective evaluation of available annuity providers. Without such an
investigation, Defendants could not determine whether the use of Athene as the Plans' annuity
provider was prudent or in the best interest of the Plans' participants.

94.     Interpretive Bulletin 95-1 instructs fiduciaries that while the cost of the annuity
will inevitably be considered, "cost consideration may not…justify purchase of an unsafe
annuity." Despite this guidance, plan sponsors are still drawn to private equity-backed insurers
who charge a lower price than traditional insurers to assume the same liabilities. Allison
Wielobob, General Counsel for the American Retirement Association and former staff member in
the Employee Benefits Security Administration's Office of Regulations and Interpretations,
cautions that "'the plan sponsor may be focused on getting a good price in a transfer transaction.
But a plan sponsor engaging in a pension risk transfer… is still an ERISA fiduciary, and is
required to act prudently and in the best interests of the plan's participants and beneficiaries.'"[114]

95.     On information and belief, Alcoa Defendants received an economic benefit from
using Athene in the form of reduced premium payments relative to what they would have paid to

---

[114] Iekel, John, *Fiduciary Duty a Factor in Pension Risk Transfers*, American Society of Pension
Professionals & Actuaries, August 30, 2023, https://www.asppa.org/news/fiduciary-duty-factor-
pension-risk-transfers.

an established and reputable insurance provider, such as Prudential or New York Life. Even if Athene's pricing was not more favorable to Alcoa than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity.

96.     As the number of PRT transactions has dramatically increased during due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the important role of fiduciaries to ensure that low bidders are not taking undue risks.[115] This wider range in premiums is shown in Figure 1.



97.     Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. Among partial buyouts completed in 2022, Aon reported that

---

[115] Fiona Ng & Tanner McKerlie et. al., *Pension Risk Transfer: Staying Current in a Rapidly Evolving Market*, Milliman, June 23, 2023, https://www.milliman.com/en/insight/pension-risk-transfer-staying-current-evolving-market.

employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions.[116] As previously noted, the transactions at issue were partial buyouts.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs seek class action certification on behalf of all participants in the Plans and their beneficiaries since April 12, 2018 for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

99.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The proposed class includes approximately 30,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

c.     Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plans and were subjected to Defendants' conduct in transferring Alcoa's benefit payments to the Athene entities.

d.     Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action;

---

[116] Aon, *U.S. Pension Risk Transfer: Market Insights*, at 12, Mar. 2023, https://www.aon.com/insights/reports/2023/us-pension-risk-transfer-market-insights.

have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plans and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests.  Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

100.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent

the interests of the class and is best able to represent the interests of the class under Rule 23(g).

The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been

appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is

recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott*

*v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17,

2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc*., No. 06-4305, 2012 U.S.

Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has

been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among

other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*,

WALL ST. J. (May 15, 2016);[117] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES

(Mar. 29, 2014);[118] Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23,

2015);[119] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16,

2014);[120] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25,

2015);[121] Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k)*

*Plans*, WALL ST. J. (May 18, 2015); [122] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on*

---

[117] *Available at* http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.
[118] *Available at* http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.
[119] *Available at* http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.
[120] *Available at* http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.
[121] *Available at* http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.
[122] *Available at* http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

*Trial*, NPR (Dec. 15, 2014);[123] Mark Miller, *Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014);[124] Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[125]

## COUNT I

### Breach of Fiduciary Duties by All Defendants Regarding Athene

101.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

102.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plans and transactions at issue.

103.    As such, Defendants were required to discharge their duties with respect to the Plans "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plans' participants and beneficiaries and defraying reasonable expenses of administering the Plans, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

104.    Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the

---

[123] *Available at* http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[124] *Available at* http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[125] *Available at* http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

105.    Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity available. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving Alcoa Defendants money and enhancing corporate profits. In so doing, Defendants breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because Alcoa Defendants' goal and motivation was to save the company money, Defendants' search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

106.    The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

107.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by Defendants by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

108.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

**Breach of Fiduciary Duties Against Fiduciary Counselors for Selecting Athene**

109.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

110.    ERISA's fiduciary duties apply to the selection of service providers. See 29 U.S.C. § 1104(a)(1)(A)–(B).

111.    Fiduciary Counselors breached their fiduciary duties by selecting Athene as the Plans' annuity provider for purposes of the transaction, in that it failed to conduct a thorough investigation of alternatives, and failed to adequately evaluate the many deficiencies it would have discovered if it had thoroughly evaluated Athene as an annuity provider. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity available.

112.    Fiduciary Counselors' fiduciary breaches in selecting Athene resulted in harm to Plaintiffs and class members from an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for losses associated with the

monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

113.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**COUNT III**

**Prohibited Transactions—29 U.S.C. § 1106—Against all Defendants**

114.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

115.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

116.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

117.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

118.    Athene was a party in interest because it provided services to the Plans. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plans to engage in transactions resulting in a

direct or indirect sale or exchange of property between the Plans and Athene; furnishing of services between the Plans and Athene; or transfers of Plan assets to or for the use by or benefit of Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

119.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plans.

120.    By using pension trust assets to purchase Athene annuities instead of the safest available annuity so as to increase Alcoa's corporate profits, Defendants dealt with the assets of the Plans in their own interest or for their own account; and acted on behalf of a party (Alcoa) whose interest in using a riskier, lower-cost annuity provider were adverse to the interests of the Plans' participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

121.    The harm suffered by Plaintiffs and class members from these prohibited transactions includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

122.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by Alcoa by virtue of purchasing Athene annuities instead of the safest possible annuity, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

123.     Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**COUNT IV**

**Failure to Monitor Fiduciaries Against Alcoa Defendants**

124.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

125.     Alcoa Defendants had a fiduciary responsibility for overseeing the Plans, which included monitoring any other fiduciaries appointed or hired to manage the Plans on a day-to-day basis, including Fiduciary Counselors.

126.     A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards.

127.     Alcoa Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B), and Interpretive Bulletin 95-1.

128.     Had Alcoa Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or Alcoa Defendants would have decided not to proceed with the transaction. As a result of these monitoring failures, Plaintiffs and class members suffered harm including an increased and significant risk that they will not

receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

129.   Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendants to compensate class members for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

April 12, 2024                                    Respectfully submitted,

                                                 /s/ Lawrence M. Mann
                                                 Lawrence M. Mann (D.C. Bar ID: 43703)
                                                 ALPER & MANN
                                                 9205 Redwood Ave.
                                                 Bethesda, Maryland 20817
                                                 Phone: (202) 298-9191
                                                 Lm.mann@verizon.net
                                                 *Local Counsel for Plaintiffs*


                                                 SCHLICHTER BOGARD LLP
                                                 Jerome J. Schlichter*
                                                 Sean E. Soyars*
                                                 Kurt C. Struckhoff*
                                                 100 South Fourth Street, Suite 1200
                                                 St. Louis, Missouri 63102
                                                 Phone: (314) 621-6115, Fax: (314) 621-5934
                                                 jschlichter@uselaws.com
                                                 ssoyars@uselaws.com
                                                 kstruckhoff@uselaws.com

                                                 **Pro Hac Vice* application forthcoming

                                                 *Attorneys for Plaintiffs*

51