## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARTHA BRENNAN CAMIRE, CRAIG JEFFERSON, DAVID LYN SHEPHERD, and DANIEL SCHIPPER, individually and as representatives of a class of participants and beneficiaries on behalf of the Pension Plan for Certain Salaried Employees of Alcoa USA Corp., the Pension Plan for Certain Hourly Employees of Alcoa USA Corp., and the Alcoa Subsidiaries Merged Inactive Plan, | Civil Action No. 1:24-cv-01062-LLA

**AMENDED COMPLAINT— CLASS ACTION**

JURY TRIAL DEMANDED |
| *Plaintiffs*, | |
| v. | |
| ALCOA USA CORP., ALCOA CORP., THE ALCOA BENEFITS MANAGEMENT COMMITTEE, WILLIAM F. OPLINGER, FIDUCIARY COUNSELORS, INC., and JOHN DOES 1–5, | |
| *Defendants*. | |

1.      Plaintiffs Martha Brennan Camire, Craig Jefferson, David Lyn Shepherd, and

Daniel Schipper, individually and as representatives of a class of similarly situated participants

and beneficiaries of the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation

("Salary Plan"), Pension Plan for Certain Hourly Employees of Alcoa USA Corporation

("Hourly Plan"), and the Alcoa Subsidiaries Merged Inactive Plan (collectively, the "Plans"),

bring this action against Defendants Alcoa Corp. ("Alcoa"), Alcoa USA Corp. ("Alcoa USA"),

William F. Oplinger, the Alcoa Benefits Management Committee ("Benefits Committee"), and

John Does 1–5 (collectively, the "Alcoa Defendants"), and Fiduciary Counselors, Inc.

("Fiduciary Counselors") (collectively, "Defendants"), for breach of fiduciary duties and other

violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

2.      ERISA imposes strict fiduciary standards of conduct on pension plans. Plan fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). Fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271 (citing Restatement of Trusts 2d § 170 (1959), II Scott on Trusts §170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)) (citation omitted).

3.      Through four separate transactions completed between 2018 and 2022, Defendants offloaded over $2 billion of Alcoa's pension obligations, which affected over 28,000 Alcoa retirees and their beneficiaries. Defendants offloaded these obligations to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively "Athene"), private equity-controlled insurance companies with a highly risky offshore structure. As a result of these transactions, Plaintiffs and the similarly situated participants and their beneficiaries lost their status as "participants" in the ERISA-governed Plans, and therefore, are no longer subject to ERISA's protections for employee retirement benefits. Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, ERISA requires that a fiduciary obtain the "safest annuity available." 29 CFR § 2509.95-1. Importantly, "purchasing an unsafe annuity" is "never justif[ied]." *Id*.

4.      Rather than selecting the safest possible annuity to ensure the continued financial security for Alcoa retirees and their beneficiaries, Defendants selected Athene, a substantially riskier insurer than numerous other traditional annuity providers. Annuities provided by Athene are structured to generate potentially higher expected returns. Athene invests in lower-quality,

higher-risk assets without the traditional mix of quality assets to support future benefit obligations, posing a significant risk at a great cost to retirees. Because the market accounts for such risk when pricing investments, it is likely that the Alcoa Defendants saved a substantial amount of money by selecting group annuity contracts ("GACs") from Athene over the safest annuities available. In transferring Plaintiffs' pension benefits to Athene, Defendants put Alcoa's retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk which devalued their pensions without proper compensation. Accordingly, in addition to other remedies, Plaintiffs seek to receive the monetary value of the additional risk of their annuity as demonstrated by the marketplace.

5.    To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plans, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transactions and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

6.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.    **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from ERISA-governed pension plans backed by an established, multi-billion-dollar corporation and one of the largest aluminum

producers in the United States, and then placed in the hands of a private equity-controlled insurance company with a highly risky offshore structure and asset portfolio. As a result, Plaintiffs are subject to an increased and significant risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk without appropriate compensation, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plans. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.      **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which, on information and belief, at least one of the alleged breaches took place, and where at least one Defendant resides or may be found.

## PARTIES

### I.      The Alcoa Plans

9.      The Plans include the Pension Plan for Certain Hourly Employees of Alcoa USA Corporation, the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation, and the Alcoa Subsidiaries Merged Inactive Plan.

10.     The Plans are defined benefit, employee benefit pension plans under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering employees of Alcoa. The Plans were established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

11.     As of 2018, before the first buy-out transactions at issue, the Plans covered 43,400 total participants and held nearly $4 billion in combined assets.

**II.     Plaintiffs**

12.     Plaintiff Jefferson resides in Newburgh, Indiana, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). Mr. Jefferson retired in 2015 after working in Alcoa's Procurement department for approximately 24 years. Mr. Jefferson began receiving payments from Athene in 2022.

13.     Plaintiff Brennan Camire resides in Richmond, Virginia, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). Ms. Brennan Camire began receiving pension payments from Alcoa in 2012 after being employed at Alcoa from 1969 to 1972, and again as a Convenience Center Supervisor in Alcoa's Recycling department from 1990 to 1994. Ms. Brennan Camire began receiving payments from Athene in 2018.

14.     Plaintiff Shepherd resides in Arkadelphia, Arkansas, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). In 1979, Mr. Shepherd began working for Reynolds Metals, a company that was purchased by Alcoa in 2000. Mr. Shepherd retired in 2016 after working as an Environmental Manager at Alcoa. Mr. Shepherd began receiving pension payments from Athene in November 2022.

15.     Plaintiff Schipper resides in Northville, Michigan, and was a participant in both the Salary Plan and the Subsidiaries Merged Inactive Plan under 29 U.S.C. § 1002(7). Mr. Schipper began working for Alcoa in 1979 and retired in 2010. He was the Director of Financial Planning & Analysis in the Engineering Products & Solutions Department at the time of his retirement. Mr. Schipper began receiving pension payments from Athene in November 2022.

### III.    Defendants

16.    Alcoa Corporation (NYSE: AA) ("Alcoa") is a publicly traded aluminum producer headquartered in Pittsburgh, Pennsylvania. As of December 31, 2023, Alcoa employed approximately 13,600 employees in 17 countries worldwide. As of that same date, Alcoa recorded $10.55 billion in net revenue. As alleged herein, Alcoa exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

17.    Alcoa USA Corporation ("Alcoa USA") is a subsidiary of Alcoa Corp. Alcoa USA is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and Plan administrator under 29 U.S.C. § 1102(a). Alcoa USA entered into four commitment agreements with Athene under which the Alcoa Defendants agreed to purchase GACs that would transfer certain of Alcoa's defined benefit pension obligations to Athene. As alleged herein, Alcoa USA exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.    The Alcoa Corp. Benefits Management Committee ("Benefits Committee") had fiduciary responsibility for the Plans. The Benefits Committee is made up of a group of individuals appointed by Alcoa's Board of Directors to oversee the operation of the Plans. Alcoa USA "designated the Benefits Management Committee to oversee the operation of the plan[s] and the Benefits Management Committee has… discretionary authority." Accordingly, as alleged

herein, the Benefits Committee exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     William F. Oplinger is a resident of Sewickley, Pennsylvania, and is the current President and Chief Executive Officer of Alcoa, having served in that role since September 24, 2023. Since 2018, Mr. Oplinger has been responsible for reducing Alcoa's pension liabilities through annuitizations with insurance providers. From November 2016 to February 2023, when the PRT transactions with Athene occurred, Mr. Oplinger was Executive Vice President and Chief Financial Officer of Alcoa. Mr. Oplinger currently serves on the Board of Directors of Alcoa ("Board"). And from 2013 through at least June 2021, he served as a member of the Benefits Committee. As alleged herein, Mr. Oplinger exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.     Fiduciary Counselors, Inc. ("Fiduciary Counselors") is a privately held investment consulting firm that acts as an independent fiduciary for pension fund assets, a role which usually involves reviewing one-time transactions. Fiduciary Counselors became an independent entity in 2003 and is wholly owned by its senior executives and former employees. Fiduciary Counselors is headquartered in Washington, D.C. Fiduciary Counselors was hired by the Alcoa Defendants to act as the independent fiduciary over the pension risk transfers ("PRT") at issue here. As alleged herein, Fiduciary Counselors exercised discretionary authority or

discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.    John Does 1–5 are unknown members of the Benefits Committee who exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and are fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

22.    Each Defendant is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. § 1002(21)(A), 1102(a).

## ERISA'S FIDUCIARY STANDARDS

23.    ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably a duty of loyalty and a duty of prudence. 29 U.S.C. § 1104(a)(1). The statute states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan; [and]

8

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

24.     The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, in order to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

25.     The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered per se violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.,* 530 U.S. 238, 241−42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

## FACTS APPLICABLE TO ALL COUNTS

### I.     Pension Risk Transfers ("PRT")

26.     "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's predominant retirement system when ERISA was enacted in 1974.

27.     Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically a monthly payment, after retirement. Generally, employers are responsible for funding the pension plan to pay their benefit obligations to employees and retirees. The amount of retirement benefits provided to employees is based on a formula that takes into account factors such as salary and years of service, among others.

28.     A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a pension plan, the employer (or plan sponsor) bears that risk. In the event that plan assets are inadequate to satisfy liabilities for benefit payments, the employer has an obligation to make additional contributions to the plan to meet ERISA's funding requirements. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the risk of underperformance falls to the employee rather than the employer.

29.     Employers have reduced their pension funding risk through PRT transactions. In a PRT transaction, an employer offloads all or part of its pension benefit obligations by purchasing GACs with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

30.     A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a fiduciary function, and a critically important one. This decision will have a lasting impact on retirees and their beneficiaries for the rest of their lives. As one independent expert from NISA Investment Advisors has explained, such a selection is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit.

31.     PRT transactions can take one of two forms: (1) total buyouts, in which the plan sponsor or employer terminates the plan and transfers all of the pension obligations to an insurer through purchase of an annuity contract; or (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants. As discussed below, the Alcoa transactions at issue involved partial buyouts.

## II.     The Risks Associated with PRT Transactions

### A.     Lack of ERISA and PBGC Protections

32.     An employer that transfers its pension benefit obligations through a PRT transaction causes participants to lose protections under ERISA. With few exceptions, ERISA-governed defined benefit plans are protected by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

33.     ERISA-governed defined benefit plans are required to pay PBGC premiums, which fund the PBGC so that pensioners will be protected if their plan sponsor becomes insolvent. Since PRT transactions remove PBGC protections, they also remove PBGC premium obligations. Not only does this leave affected pensioners uncovered, but it poses a funding risk to the PBGC, therefore threatening the level of protection offered to those participants still protected by the PBGC.

34.     SGAs are not pre-funded like the PBGC and thus offer less protection compared to the PBGC. SGAs are funded by assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity

provider becomes insolvent. Further limitations may be present depending on the state. For instance, in California, pensioners are subject to the so called "California haircut," in which the annuitant automatically loses 20%, as the maximum benefit is only 80% of the present value of the annuity.

### B.    Risk of Insolvency and Executive Life

35.    The risk of insurance company failure is not merely hypothetical. The collapse of Executive Life Insurance Company ("Executive Life") in the early 1990s demonstrates the potentially catastrophic consequences of high-risk insurance practices involving pension plans. Similar to the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages, which caused employers to select Executive Life as an annuity provider.

36.    Over 300,000 policyholders relied on Executive Life, which held an A+ rating for financial soundness, for regular payments. Executive Life's investment strategy proved disastrous. By 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown." A significant percentage of Executive Life's assets were invested in high-risk, high-yield junk bonds sold by brokerage firm Drexel Burnham Lambert ("Drexel"). First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was one of Drexel's largest buyers of junk bonds. Drexel ultimately failed due to its risky bond investment strategy.

37.    In contrast to most insurance companies which invested in safer assets such as high-grade bonds, mortgage securities, and government obligations, Executive Life invested in risky junk bonds with high interest rates. Executive Life's portfolio consisted of 60% junk bonds

in comparison to the industry-standard 24% at the time of its collapse. This risky behavior allowed Executive Life to make higher payouts to policyholders.

38.     By 1990, many of the Executive Life assets meant to fulfill payment obligations were trading far below their purchase price. Nevertheless, on December 27, 1990, the NAIC found that Executive Life's California and New York insurers were *not* in imminent financial danger, and thus takeovers by state insurance regulators were unnecessary. When questioned on the risky makeup of its bond portfolio, Executive Life often pointed to its "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's.

39.     On April 11, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California. Following Executive Life's seizure in 1991, Executive Life's investment portfolio was sold to Leon Black, co-head of Drexel and later co-founder of Apollo Global Management ("Apollo"), for "roughly 50 cents on the dollar." Losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.

40.     Up until a week before the seizure, Executive Life maintained a contingent B-plus rating from AM Best. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, the New York insurance regulator seized Executive Life of New York on April 17, 1991. Just weeks later, parent company First Executive filed for bankruptcy.

41.     In 2012 Executive Life was declared insolvent and in 2013 the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. GABC continues to make payments to annuitants to this day. However, many annuitants experienced

13

losses of 50% or more of their annuity payments. Of note, the Executive Life Restructuring Agreement indicates that GABC is expected to make reduced annuity payments for another 50 years.

**C.    Response to Executive Life and Interpretative Bulletin 95-1**

42.    In response to the financial collapse of Executive Life, Congress passed the Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1993). Through the amendment, Congress created a right of action to obtain appropriate relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," including "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

43.    As noted, in 1995, the Department of Labor's Interpretive Bulletin 95-1 establishes a framework for ERISA compliance when choosing an annuity provider in a PRT transaction. The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." At a minimum, fiduciaries must "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities."

44.    In order to determine the safest available annuity, Interpretive Bulletin 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting it; and (6) the availability of additional protection

through state guaranty associations. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to properly evaluate these factors.

### D.    Private Equity Firms

45.    Traditional players in the PRT market include established life insurance and annuity providers such as New York Life Insurance Company ("New York Life"). However, a new class of annuity providers, backed by private equity firms, has recently taken on a growing role in the PRT landscape. In fact, private equity firms have heightened their influence over the life and annuity industry significantly by purchasing life insurers and serving as their third-party asset managers. Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, but they can also generate significant investment management fees from managing portfolios of their affiliated insurers. As a result, their mission does not align with the best interests of policyholders because they focus on maximizing their immediate financial returns over protecting the long-term retirement assets promised to policyholders.

46.    The United States Department of the Treasury expressed concerns of a potential misalignment between "the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests." The Department of Labor also conducted a review of Interpretive Bulletin 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans (the "Council"). During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

47.     Private equity firms primarily began purchasing insurance companies to finance their expanding operations. As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.

48.     In the wake of the recent surge in life insurer liabilities and annuity sales spurred on by PRT transactions, many life insurers "report razor-thin surpluses relative to the size and risk profile of their balance sheets." The increased use of complex investment strategies has led to a greater use of high-risk assets held in insurers' portfolios, a stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yielding investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem competitively attractive.

## III.    Athene and its Financial Risks

49.     Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. The company was founded in 2009 by Apollo executives as an insurance affiliate. Apollo was founded in 1990 by Drexel alumni Leon Black, Josh Harris, and Marc Rowan. This was the same year Drexel collapsed, entered into bankruptcy, and caused the insolvency of Executive Life. Athene Annuity & Life Assurance Company of New York, a wholly owned subsidiary of Athene Annuity and Life Company, conducts insurance business in New York.

50.     On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. At the time, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo.

16

A.    **Athene's Offshore Practices**

51.    Athene's use of a complex and high-risk investment structure under lax regulatory standards has contributed to its higher risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both headquartered in Hamilton, Bermuda.

52.    In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have greater downside risk than bonds with the same credit rating. Private equity-owned insurance companies like Athene hold some of the riskiest portions of CLOs issued by their own affiliated asset managers.

53.    The reinsurance of PRT liabilities in Bermuda poses unique risks to pensioners. Financial statements must be reported using Statutory Accounting Principles ("U.S. SAP") in the United States, which are the reporting standards applicable to all U.S.-based insurers. Bermuda does not follow the same reporting standards. Under U.S. SAP, insurers must file detailed statutory financial statements that report all purchases and sales of securities. By contrast, under Bermuda accounting standards, Athene's affiliated reinsurers do not report individual securities transactions but rather only in the aggregate. Further, Bermuda accounting standards allow insurers to invest in assets that would not qualify as suitable under U.S. SAP.

54.    Life insurance and annuity companies maintain surpluses to ensure long-term solvency. The amount of an insurer's surplus is critically important. An insurer's surplus, or the difference between its assets and liabilities, acts as the only buffer between solvency and

insolvency. In order to determine whether an insurer is able to pay out policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities.

55.     Athene's surplus-to-liabilities ratio is among the thinnest in the country when compared to that of its peer insurers. As of 2023, Athene's surplus-to-liabilities ratio was 1.4%. In contrast, New York Life's was 12.24% and the national average was over 7%. Despite its staggeringly low surplus-to-liabilities ratio, Athene's total liabilities dramatically increased by 250% between 2018 and 2023. In contrast, one traditional insurer, New York Life, increased its liabilities as a percentage of assets by 30%. Although Athene's total liabilities increased by more than 250%, the amount of surplus maintained to support its liabilities has not kept pace. Athene's dramatic increase in liabilities further adds to the risk assumed by Plaintiffs and similar Alcoa retirees.

56.     Rather than reinsuring through a third-party reinsurer to diversify risk, Athene chooses to cede liabilities to captive reinsurance affiliates. While reinsurance with a third-party reinsurer can increase protections against default, the same is not true when an insurer engages in offshore affiliated reinsurance. Those insurers with captive reinsurance arms use them to back their liabilities with assets that would not be accepted by insurance examiners in their own domiciles. As of year-end 2023, Athene reported over $15 billion in assets reinsured with affiliates. Conversely, New York Life had no offshore affiliated reinsurance and ceded only $3.58 billion to third party arm's length reinsurance companies.

57.     Beyond traditional reinsurance, Athene engages in modified co-insurance ("ModCo") arrangements with its offshore affiliates. ModCo is a type of reinsurance. ModCo arrangements are those in which an insurer (the ceding carrier) that is transferring risk to a

reinsurer retains assets related to the reinsured policies while transferring the regulatory capital requirements associated with the asset risks to the reinsurer.

58.     Here, the ceding carrier (Athene) transferred its regulatory capital requirements or sufficient capital to pay claims of policyholders to its offshore affiliate (Athene Annuity Re Ltd.). For 2022, Athene reported $104 billion in ModCo compared to only $2 billion in surplus. For 2023, Athene reported over $141 billion in ModCo while only maintaining $2.9 billion in surplus. Other insurers, including New York Life and TIAA, reported zero in ModCo with offshore affiliates as of year-end 2022 and 2023.

59.     ModCo arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC") ratio. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. Athene's use of ModCo arrangements has the effect of artificially inflating the RBC ratio, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. This is because, in Bermuda, insurers who hold riskier assets with higher credit spreads (or higher returns) are able to value their liabilities at a lower rate. In offloading capital requirements and asset risks to a captive reinsurer through ultimately circular ModCo transactions, Athene obscures the actual risks associated with the assets involved and is enabled to maintain a lower level of surplus.

60.     Athene also has a very high concentration of risky assets relative to its surplus. For example, Athene reports $21 billion in "other loan-backed and structured securities" as of 2022 against only $2 billion in surplus—*ten times its surplus*. New York Life, on the other hand, reported $11.7 billion in that category—*less than half of its surplus*, which stood at $23.88 billion as of 2022. All of Athene's other loan-backed and structured securities were originated by Apollo. In addition, as of 2022, Athene also held $18 billion in "deposit type contracts," which

are effectively funding agreement-backed loans. Because they are callable by institutional investors, Athene may experience a liquidity crisis to satisfy its pension obligations. Accordingly, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

61.    The International Monetary Fund issued a Global Financial Stability note in December 2023, warning of portfolio liquidation challenges due to the increased use of structured investments. "Greater investment in structured and private credit worsens liquidity mismatches between assets and liabilities, which could make liquidating portfolios more challenging if facing margin calls on derivatives or repurchase agreement contracts or policy surrenders should interest rates continue to rise rapidly."

62.    Athene's complex structure has also led to pensioners' increased exposure to higher risk investments. Financial entities that combine U.S. life insurers, offshore captive reinsurers, and affiliated asset managers employ what is called a "Bermuda Triangle Strategy." The insurer (*e.g.,* Athene) firsts builds a block of annuity business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer (*e.g.,* Athene Life Re), which frees up capital for use in the organization's private debt business. The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt.

63.    The interdependence among Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. That Athene's separate account and then general account would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely correlated events that are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs

from its own captive in-house reinsurer. An inability to satisfy Athene's general account obligations would cause a downgrade in its credit and prevent it from raising funds in the credit markets.

64.    The true risk resulting from Athene's circular transactions with captive affiliated reinsurers is further illustrated when examining the amount of such reinsurance. Athene Annuity Re Ltd of Bermuda had $87 billion on its books in 2020, and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If a fraction of that reinsurance transferred in 2021 was disallowed, "Athene would face a funding shortfall." A funding shortfall for Athene would detrimentally impact Apollo because Athene insurance companies represent 40% of Apollo's value.

65.    Athene's separate accounts used to first pay pension benefits of Alcoa retirees are not truly "ring-fenced" or insulated from Athene's general liabilities. According to the GACs issued by Athene with Alcoa, the separate accounts hold assets supporting the contracts. However, the separate account assets may be used by Athene to support payment obligations for other GACs issued by Athene. Periodically, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GACs.

66.    Apollo specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies. "Such PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities[.]" Although there are efforts that can be taken to mitigate these conflicts, Apollo has not done so.

67.     Athene's transition out of the life insurance business further contributes to its high risk as an annuity provider. Provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

**B.    Athene's Creditworthiness**

68.     On October 13, 2022, NISA Investment Advisors ("NISA") reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene. The report found that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk. To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%."[1] As shown below, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last, and among "Questionable Candidates" for an annuity provider.

---

[1] Eichorn, David, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

69.　The NISA report demonstrates that Athene is a much riskier annuity provider than traditional providers. This is evident because the measurement of economic loss to beneficiaries choosing Athene is 14%. This figure is significantly larger than the same measure for New York Life, and thus, Athene cannot be considered the "safest available" annuity.

70.　The NISA report noted that Athene had the highest reported spread of 214 basis points ("bps"). The bond market uses spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. All else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. Based on the range of the reported spreads among issuers, the market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed (New York Life), whose market price is 7.4% higher than U.S. Treasuries—a 14% gap.

71.    Interpretive Bulletin 95-1 also makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider." The NISA analysis separately compared the agency rating of Athene to its market-adjusted implied rating based on the bond market. The analysis found that although Athene had an A+ rating (just as Executive Life had before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported annuity providers.



FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

| | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

72.     The reported range in Figure 1 is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

73.     An A+ rating for Athene noted above should not be interpreted as suggesting that Athene is on par with safer annuity providers. As shown, there are levels of safety above A, including AA and AAA. Other insurers maintain higher credit ratings due to their stronger creditworthiness. In light of Athene's market-adjusted implied rating, fiduciaries should not rely on Athene's credit ratings because they are insufficient to appropriately evaluate whether Athene offered the safest annuity available.

74.     The differences in credit ratings among insurers have a material impact on their likelihood of default. Athene has a Moody's rating of A1 (or A+ for S&P) in contrast to New York Life which maintains a credit rating of Aaa (or AAA for S&P). Moody's reported the average cumulative issuer-weighted default rates by issuer credit rating from 1970 through 2021. Over a 20-year time horizon, the default rates for riskier issuers are apparent. The default rates are only 0.7% for Moody's Aaa ratings compared to the default rate of 5.0% for its A ratings. Over a 20-year time horizon, the approximate default rate of Athene's bonds demonstrates that they are over *seven times* riskier than those of a high-credit quality issuer. And the differential among default rates for them would be exponentially greater over a 30-year time horizon. This differential is yet another indicator of the risk that pensioners have assumed with Athene.

75.     Overall, Athene is the least safe annuity provider according to objective measures. The Alcoa Plans' participants whose benefits have been offloaded to Athene receive none of the upside of Athene's inherently risky strategies. The risk posed by Athene could be worthwhile to

Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of failure. But that is not the case for Plan participants.

**C.    Athene's Use of Private Letter Ratings**

76.    Athene depends on private letter ratings ("PLRs") from smaller private credit rating agencies to rate certain of its securities. These private rating agencies apply less stringent standards for ratings than are applied to public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies. There are also significant discrepancies among securities ratings provided by private ratings agencies—Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. In fact, PLRs issued by these small, private ratings agencies averaged 2.4 notches (or grades) higher than ratings provided by the SVO for the same security. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

77.    In 2019, the Wall Street Journal ("WSJ") identified examples of these discrepancies among structured security ratings, including CLOs. The WSJ found that smaller private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. As a result, a bond that would be classified as "junk" by major ratings agencies could be classified as "very safe," and even be assigned an AAA rating by the smaller, private ratings agencies. This resulted in the classification of a bond as "junk" by major rating agencies while the smaller private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. PLRs that carry a higher credit rating than their

SVO designation, for example, result in lower RBC charges, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolio.

78.     Both KBRA and DBRS have been the subject of investigation by the SEC regarding their inaccurate rating practices, which resulted in millions of dollars in fines. One investigation found that KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

### D.     Athene's Regulatory Investigation

79.     Athene's PRT business has also been subject to regulatory investigation. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. regarding their pension risk transfer business in New York state. Relative to other states, New York state maintains some of the strictest standards on insurers. As a result of the investigation, Athene was ordered to pay a $45 million civil monetary penalty and meet other provisions.

### IV.  Defendants' PRT Transactions with Athene

80.     Through a series of seven PRTs with Athene, Defendants transferred Alcoa's pension liabilities to Athene Annuity and Life Company or Athene Annuity & Life Assurance Company of New York. For purposes of the GACs at issue, these entities are collectively referred to as Athene. The Alcoa Defendants therefore no longer guarantee the pension benefits covered by the transactions. As a result, Defendants caused the Plans' participants to lose the stringent protections provided by ERISA and placed their retirement assets at risk of Athene's insolvency.

81.     The Benefits Committee appointed Fiduciary Counselors as the independent fiduciary over the PRTs. The Plans paid Fiduciary Counselors $227,835 in 2018, $134,399 in 2021, and $115,000 in 2022 for acting in this role. Recognizing that the selection of an insurer in a PRT transaction is a fiduciary act, Fiduciary Counselors admits that plan fiduciaries must take steps to obtain the safest available annuity in accordance with the DOL's Interpretive Bulletin 95-1.[2] Importantly, when serving as a plan's independent fiduciary over the selection of an annuity provider in a PRT transaction, Fiduciary Counselors agrees that it must comply with that guidance to satisfy its fiduciary obligations under ERISA.

82.     The seven PRT transactions are summarized as follows:

a.     Effective August 7, 2018, Alcoa USA and Athene entered into a GAC under which Athene assumed $290 million of Alcoa's pension obligations for 10,500 participants. Alcoa USA entered into the GAC, and all other GACs with Athene, as the named fiduciary of the Plans. Fiduciary Counselors was not a party to any GAC at issue. The GAC was executed on January 29, 2019, and assets were transferred to Athene on that date.

b.     Effective November 23, 2021, Alcoa USA and Athene entered into two GACs under which Athene collectively assumed approximately $1 billion of Alcoa's pension obligations for 11,200 participants. The GACs were executed on May 31, 2022, and assets were transferred to Athene on that date.

c.     Not even one month later, effective December 16, 2021, Alcoa USA and Athene entered into two more GACs under which Athene assumed approximately $500

---

[2] Annuities, Fiduciary Counselors, https://www.fiduciarycounselors.com/services/annuities/.

million of Alcoa's pension obligations for 2,600 participants. The GACs were executed on May 31, 2022, and assets were transferred to Athene on that date.

        d.       Finally, effective August 11, 2022, Alcoa USA and Athene entered into the final two GACs under which Athene assumed an additional $1 billion of Alcoa's pension obligations for 4,400 participants. The GACs were executed on March 17, 2023, and assets were transferred to Athene on that date.

83.      Overall, between August 2018 and August 2022, the Alcoa Defendants' PRTs affected nearly 30,000 Alcoa Plan participants, offloading approximately $2.79 billion of Alcoa's pension liabilities to Athene.

## V.    Defendants Unlawfully Used Athene as the Annuity Provider

84.      The circumstances then prevailing to Defendants demonstrate that they selected or caused to retain Athene as the annuity provider in the PRTs in violation of their strict fiduciary responsibilities by failing to conduct a thorough and independent investigation of available annuity providers for the Plans. Had Defendants conducted an impartial investigation of available annuity providers, they would have discovered that Athene was not the safest available option.

85.      In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of dollars in participants' retirement benefits to Athene. There were numerous factors that would lead a fiduciary to conclude that Athene was not the safest annuity available, including Athene's complex investment structure, focus on private equity, questionable creditworthiness, and use of untrustworthy credit rating agencies. Relative to traditional annuity providers, Athene also

invests in far riskier assets. This risk is compounded by Athene's reinsurance of annuities with offshore affiliates.

86.     Although the Alcoa Defendants hired Fiduciary Counselors as an independent fiduciary to select Athene, the Alcoa Defendants maintained full responsibility as appointing fiduciaries to monitor Fiduciary Counselors to ensure that it carried out its fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective action to protect the plan and its participants when the delegate fails to discharge its duties. The Alcoa Defendants also had a duty to prevent any fiduciary breach by Fiduciary Counselors in the selection of Athene as the annuity provider and to ensure that Fiduciary Counselors was performing its delegated tasks in accordance with ERISA's fiduciary standards. The Alcoa Defendants failed to prudently discharge its fiduciary duties in monitoring Fiduciary Counselors.

87.     Despite clear evidence that Athene was substantially riskier than traditional annuity providers, Defendants placed Alcoa retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk for which they were not compensated. Given these facts, it is evident that Defendants either did not solicit bids from a large number of providers or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Had they done so, they would not have placed retirees' and beneficiaries' retirement assets at risk of Athene's insolvency.

88.     Defendants' decision to choose or cause Athene to be retained as the annuity provider in the transactions harmed, and will continue to harm, participants and beneficiaries over an extended period through uncompensated risk. The market measures Athene as up to 14% riskier than traditional annuity providers. Investors in the market demand a risk premium in exchange for exposure to higher risk. Plan participants and beneficiaries receive no additional

compensation for taking on the additional risk associated with the transfer of their pension benefits to Athene.

89.    Given the numerous factors that would lead a prudent fiduciary to reject Athene, it is evident that Defendants selected or caused to retain Athene without conducting a sufficiently independent and objective evaluation of available annuity providers. Without such an investigation, Defendants could not determine whether the use of Athene as the Plans' annuity provider was prudent or in the best interest of the Plans' participants.

90.    Interpretive Bulletin 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." On information and belief, the Alcoa Defendants received an economic benefit from using Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life. Even if Athene's pricing was not more favorable to Alcoa than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity.

91.    As the number of PRT transactions has dramatically increased during due to more firms entering the space, Milliman reported that the spread between average and lowest-cost bids has widened, emphasizing the important role of fiduciaries to ensure that low bidders are not taking undue risks.



92.     Other sources confirm the trend of employers in PRT transactions selecting the
lowest-cost annuity provider. Among partial buyouts completed in 2022, Aon reported that
employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions.
As previously noted, the transactions at issue were partial buyouts.

**VI.    The PRT Transactions Diminished the Value of Alcoa Retirees' Pension Benefits.**

93.     The PRT transactions to Athene immediately diminished the present value of
Plaintiffs' and other Alcoa retirees' pension benefits. The market for annuities sets the value for
the same or similar future stream of payments issued by different annuity providers. If an
annuitant receives the same payments, but from an issuer of lower creditworthiness, it is a loss
for the annuitant. This is because the market will assign a lower price to an annuity issued by a
riskier annuity provider to cover a similar stream of future payments to compensate the annuitant
for the additional risk. The price or present value of the future annuity payments is determined by
the rate of return or discount rate. The higher the discount rate to compensate the annuitant for
assuming additional risk, the lower the present value of the annuity.

94.     Accordingly, Alcoa retirees' pension benefits transferred to Athene are worth far
less than they would be worth if issued by a traditional insurer of high credit quality. Because of

these providers' high credit quality, they ensure a greater likelihood for retirees to receive their full pension. If the Athene annuity were purchased on the open market, any rational annuitant, if offered an identical annuity at the same price from these alternative issuers, would choose one from them, rather than the one from Athene—or, equivalently, would insist on paying a lower price for the annuity bought from Athene because of its lesser value. The amount of this decline in value of the pensions of the Alcoa retirees whose pensions have been transferred to Athene is real and substantial in dollar terms.

95.     For instance, the Athene 10- and 20-year annuities had a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. A higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume. Thus, a rational investor—let alone a prudent and loyal fiduciary—if offered an identical annuity from a traditional insurer, would not select Athene.

96.     After the PRT transactions, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantial. Because of the transactions, Plaintiffs are no longer members of the Plans and their retirement benefits are not backed by the Plans, Alcoa, or the PBGC. Their pension benefits were safer when they had these protections under ERISA. Based on Athene's current and future financial position, there is a substantial probability that it will fail to make good on its obligation to pay retirees' pension benefits.

97.     The PRT transactions thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs and other Alcoa retirees will not receive the retirement benefits that they have earned and which they are owed. The selection of Athene injured Plaintiffs the

moment the transactions were executed because, at that moment, the present value of Plaintiffs' promised benefits was substantially and quantifiably diminished.

## CLASS ACTION ALLEGATIONS

98.     Plaintiffs seek class action certification on behalf of all participants in the Plans and their beneficiaries since August 7, 2018, for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

99.     This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.     The proposed class includes approximately 30,000 members and is so large that joinder of all its members is impracticable.

b.     There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

c.     Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plans and were subjected to Defendants' conduct in transferring Alcoa's benefit payments to the Athene entities.

d.     Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plans and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

100.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g).

The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

## COUNT I

### Breach of Fiduciary Duties Against the Alcoa Defendants Regarding Athene

101.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

102.    Each of the Alcoa Defendants acted as a "fiduciary" as defined by ERISA with respect to the Plans and the transactions at issue.

103. ERISA's fiduciary duties apply to the selection of service providers. *See* 29 U.S.C. § 1104(a)(1)(A)–(B). As such, fiduciaries are required to discharge their duties with respect to a plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the plan's participants and beneficiaries and defraying reasonable expenses of administering the plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.*

104. Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

105. The Alcoa Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity provider available. On information and belief, the Alcoa Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving the Alcoa Defendants money and enhancing corporate profits. These Defendants therefore breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because the Alcoa Defendants' goal and motivation was to save

the company money, their search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

106.    The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

107.    The Alcoa Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by these Defendants by virtue of purchasing Athene annuities instead of the safest possible annuities, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

108.    Each of the Alcoa Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Alcoa Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

### The Alcoa Defendants' Knowing Participation in a Fiduciary Breach

109.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

110. An individual whose status as a participant or beneficiary is terminated in a plan through the purchase of an insurance contract or annuity may bring action to obtain appropriate relief when such purchase constitutes a violation of 29 U.S.C. § 1104. 29 U.S.C. § 1132(a)(9). Section § 1132(a)(9) places substantive duties on certain nonfiduciaries and imposes liability on nonfiduciaries who knowingly participate in a fiduciary breach under § 1104.

111. Plaintiffs allege, in the alternative to Count I, that, even if any of the Alcoa Defendants are deemed nonfiduciaries for the purpose of the PRT transactions, any such Defendants are liable under Section 1132(a)(9). Each of these Defendants knew of the circumstances that rendered their co-defendants' conduct a breach of fiduciary duties. These Defendants hired Fiduciary Counselors for the purpose of selecting an annuity provider; knew that Fiduciary Counselors' investigation of available annuity providers was not objective or sufficiently thorough; knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for Alcoa; and knowingly accepted that benefit by entering into the PRT transactions with Athene.

## COUNT III

**Breach of Fiduciary Duties Against Fiduciary Counselors for Selecting Athene**

112. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

113. Fiduciary Counselors acted as a "fiduciary" as defined by ERISA with respect to the Plans and the transactions at issue.

114. As the Plans' independent fiduciary for the PRT transactions, Fiduciary Counselors breached its fiduciary duties in selecting Athene as the Plans' annuity provider by failing to comply with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(B) and

Interpretive Bulletin 95-1. Fiduciary Counselors failed to conduct an objective and analytical search for an annuity provider relative to alternative annuity providers of high credit quality. It failed to conduct an independent and thorough investigation of the many deficiencies of Athene that would have led a prudent fiduciary to reject Athene as an annuity provider for the Plans. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity available.

115.    Fiduciary Counselors' fiduciary breaches in selecting Athene resulted in harm to Plaintiffs and class members from an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

116.    Fiduciary Counselors knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, Fiduciary Counselors is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

### COUNT IV

### Prohibited Transactions—29 U.S.C. § 1106—Against all Defendants

117.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

118.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

119.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

120.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

121.    Athene was a party in interest because it provided services to the Plans. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plans to engage in transactions resulting in a direct or indirect sale or exchange of property between the Plans and Athene; furnishing of services between the Plans and Athene; or transfers of Plan assets to or for the use by or benefit of Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

122.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plans.

123.    By using pension trust assets to purchase Athene annuities instead of the safest available annuities so as to increase Alcoa's corporate profits, the Alcoa Defendants dealt with the assets of the Plans in their own interest or for their own account; and acted on behalf of a party (Alcoa) whose interest in using a riskier, lower-cost annuity provider were adverse to the

interests of the Plans' participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

124.    The harm suffered by Plaintiffs and class members from these prohibited transactions includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

125.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by Alcoa by virtue of purchasing Athene annuities instead of the safest possible annuities, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

126.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

127.    Even if the Alcoa Defendants did not act as fiduciaries over the selection of Athene in the PRT transactions, they are still liable as nonfiduciary parties-in-interest, who knowingly participated in prohibited transactions committed by another Defendant. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. The Alcoa Defendants had actual or constructive knowledge that the Plans' PRT transactions

with Athene were unlawful, and thus, knew or should have known that another Defendant was engaged in unlawful transactions by causing the Plans to transfer billions of dollars of pension obligations to Athene.

## COUNT V

### Failure to Monitor Fiduciaries Against the Alcoa Defendants

128.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

129.    The Alcoa Defendants had a fiduciary responsibility for overseeing the Plans, which included monitoring any other fiduciaries appointed or hired to manage the Plans on a day-to-day basis, including Fiduciary Counselors.

130.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards.

131.    The Alcoa Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B) and Interpretive Bulletin 95-1.

132.    Had the Alcoa Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or the Alcoa Defendants would have decided not to proceed with the transactions. As a result of these monitoring failures, Plaintiffs and class members suffered harm including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

133.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendants to compensate class members for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

July 2, 2024                              Respectfully submitted,

                                         /s/ Kurt C. Struckhoff
                                         SCHLICHTER BOGARD LLP
                                         Kurt C. Struckhoff*
                                         Jerome J. Schlichter*
                                         Sean E. Soyars*
                                         100 South Fourth Street, Suite 1200
                                         St. Louis, Missouri 63102
                                         Phone: (314) 621-6115, Fax: (314) 621-5934
                                         kstruckhoff@uselaws.com
                                         jschlichter@uselaws.com
                                         ssoyars@uselaws.com

                                         *Admitted *Pro Hac Vice*

                                         *Attorneys for Plaintiffs*

                                         ALPER & MANN
                                         Lawrence M. Mann (D.C. Bar ID: 43703)
                                         9205 Redwood Ave.
                                         Bethesda, Maryland 20817
                                         Phone: (202) 298-9191
                                         Lm.mann@verizon.net

                                         *Local Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Kurt C. Struckhoff, hereby certify that on July 2, 2024, I caused the foregoing to be filed electronically using the Court's CM/ECF system, which will send notification of such filing to all parties via their counsel of record in the above-captioned case.

/s/ Kurt C. Struckhoff
Kurt C. Struckhoff
