**UNITED STATES DISTRICT COURT
DISTRICT OF DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARTHA BRENNAN CAMIRE, et al., | |
| Plaintiffs, | |
| v. | No. 1:24-cv-01062-LLA |
| ALCOA USA CORP., et al., | |
| Defendants. | |

**MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS [ECF 36]**

# CONTENTS

Authorities ................................................................................................................ iii

Introduction .............................................................................................................. 1

Background ................................................................................................................ 3

    A.   ERISA and Pension-Risk Transfers ............................................................ 3

    B.   Plaintiffs' claims ........................................................................................... 6

Argument .................................................................................................................. 9

    I.   Plaintiffs have Article III standing. ............................................................. 9

        A.   Defendants' selection of Athene caused Plaintiffs actual injuries. .......... 11

            1.   Plaintiffs suffered injury when Defendants deprived them of the annuity product that would have best promoted their financial interests..................... 11

            2.   The value of Plaintiffs' retirement benefits was substantially degraded upon transfer to Athene, and will be restored if Plaintiffs prevail. ................. 12

            3.   Plaintiffs have standing to bring claims for equitable relief related to Defendants' illegal profits derived from Plan assets that they were required to use for Plaintiffs' benefit. ............................................................. 15

            4.   *Thole* did not address the standing of participants whose pensions have been transferred out of an ERISA plan and to a high-risk provider................ 20

        B.   Plaintiffs face a further imminent injury due to substantial risk of loss. ................ 22

            1.   Defendants' factual attack is intertwined with the merits and rebutted. .......... 22

            2.   Plaintiffs allege a substantial risk of further injury........................................... 23

    II.   Plaintiffs state plausible ERISA claims on which relief can be granted. ...................... 30

        A.   Plaintiffs plausibly allege a fiduciary breach in selecting Athene (Counts I, III)... 30

            1.   ERISA required Defendants to conduct a thorough investigation to identify a provider that would best promote Plaintiffs' interest in a secure retirement. ..................................................................................................... 30

            2.   Plaintiffs plausibly allege that Defendants' process for selecting Athene was imprudent and prioritized Alcoa's profits over Plaintiffs' retirement safety. ..................................................................................................... 33

            3.   Defendants' party-specific arguments fail. ..................................................... 35

            4.   Because the selection of an unsafe provider like Athene can *never* comply with ERISA, it is irrelevant whether any superior provider was available...... 37

        B.   Plaintiffs plausibly allege co-fiduciary and non-fiduciary liability (Counts I– III) .......................................................................................................... 39

        C.   Plaintiffs plausibly allege prohibited transactions (Count IV)............................... 40

        D.   Plaintiffs plausibly allege imprudent monitoring (Count V). ................................ 43

i

III.  Plaintiffs have statutory standing under 29 U.S.C. §§ 1132(a)(2) and (3). .................... 44

Conclusion ............................................................................................................... 45

Certificate of Service ............................................................................................... 46

# AUTHORITIES

**Cases**

*AFGE v. OPM*,
    928 F.3d 42 (D.C. Cir. 2019) ............................................................. 30

*Allen v. GreatBanc Tr. Co.*,
    835 F.3d 670 (7th Cir. 2016) ........................................................ 33, 41

*Allen v. Wright*,
    468 U.S. 737 (1984) ........................................................................ 9

*Am. Nat'l Ins. Co. v. FDIC*,
    642 F.3d 1137 (D.C. Cir. 2011) ......................................................... 10

*Attias v. CareFirst, Inc.*,
    865 F.3d 620, 622 (D.C. Cir. 2017) ........................ 10, 24, 25, 27, 28, 29

*Baker v. Carr*,
    369 U.S. 186 (1962) ...................................................................... 10

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ......................................................... 30

*Beck v. PACE Int'l Union*,
    551 U.S. 96 (2007) .......................................................................... 5

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ................................................. 33, 34, 37, 41

*Brundle v. Wilmington Trust, N.A.*,
    919 F.3d 763 (4th Cir. 2019) ............................................................. 42

*Burke v. Boeing Co.*,
    42 F.4th 716 (7th Cir. 2022) ............................................................. 36

*Bussian v. RJR Nabisco, Inc.*,
    223 F.3d 286 (5th Cir. 2000) ............................................ 5, 11, 32, 34, 37

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
    582 U.S. 497 (2017) ...................................................................... 15

*Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*,
    2024 U.S. Dist. LEXIS 97679 (S.D.N.Y. May 31, 2024) ....................... 39, 40

*Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*,
    472 U.S. 559 (1985) ........................................................................ 4

*Chamber of Commerce of the United States v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011) ........................................................... 12

*Christensen v. Harris Cty.*,
    529 U.S. 576 (2000) ...................................................................... 40

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................. 12, 24, 29

*Clinton v. City of N.Y.*,
  524 U.S. 417 (1998) ........................................................................................ 13

*Concha v. London*,
  62 F.3d 1493 (9th Cir. 1995) .......................................................................... 33

*Cunningham v. Cornell Univ.*,
  86 F.4th 961 (2d Cir. 2023), *cert. granted*, No. 23-1007 (U.S. Oct 4, 2024) ................... 39, 41

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) ............................................................................. 12, 26, 30

*David v. Alphin*,
  704 F.3d 327 (2013) ...................................................................................... 15

*Davis v. FEC*,
  554 U.S. 724 (2008) ...................................................................................... 15

*Diduck v. Kaszycki & Sons Contractors, Inc.*,
  974 F.2d 270 (2d Cir. 1992) ........................................................................... 39

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982) ............................................................................. 1

*Edmonson v. Lincoln Nat'l Life Ins. Co.*,
  725 F.3d 406 (3d Cir. 2013) ...................................................................... 16, 17

*FDA v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .............................................................................. 9, 10, 25

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ...................................................................................... 38

*Fish v. Greatbanc Tr. Co.*,
  749 F.3d 671 (7th Cir. 2014) .......................................................................... 42

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ........................................................................ 25

*Fuentes-Fernandez & Co., PSC v. Corvus Grp., Inc.*,
  174 F. Supp. 3d 378 (D.D.C. 2016) ................................................................. 38

*Gollust v. Mendell*,
  501 U.S. 115 (1991) ...................................................................................... 18

*Hale v. United States*,
  No. 13-1390 (RDM), 2015 U.S. Dist. LEXIS 161237 (D.D.C. Dec. 2, 2015) .................... 23

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
  530 U.S. 238 (2000) ................................................................................. 39, 41

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ........................................................................ 23

*Ho v. Garland*,
  106 F.4th 47 (D.C. Cir. 2024) .................................................................... 27, 30

*In re Polaroid ERISA Litig.*,
    362 F. Supp. 2d 461 (S.D.N.Y. 2005) ............................................................. 43

*Jackson v. Smith*,
    254 U.S. 586 (1921) ............................................................................................. 19

*Kayes v. Pac. Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995) ........................................................ 6, 12, 15, 21, 44

*Land v. Dollar*,
    330 U.S. 731 (1947) ............................................................................................. 23

*LaRue v. DeWolff, Boberg & Assocs.*,
    552 U.S. 248 (2008) ............................................................................................. 20

*Lee v. Verizon Communs., Inc.*,
    837 F.3d 523 (5th Cir. 2016) ......................................................................... 22, 23

*Leigh v. Engle*,
    727 F.2d 113 (7th Cir. 1984) ............................................................................... 43

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) ............................................................................................... 4

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
    541 F. Supp. 3d 496 (D.N.J. 2021) ..................................................................... 19

*Marshall v. Carroll*,
    1980 U.S. Dist. LEXIS 17767 (N.D. Cal. Apr. 18, 1980) .................................... 41

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985) ............................................................................................. 20

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ............................................................................................. 10

*Merrimon v. Unum Life Ins. Co. of Am.*,
    758 F.3d 46 (1st Cir. 2014) ................................................................................. 16

*Mertens v. Hewitt Assocs.*,
    508 U.S. 248 (1993) ............................................................................................. 36

*Michoud v. Girod*,
    45 U.S. 503 (1846) ............................................................................................... 18

*Moore v. Virginia Cmty. Bankshares, Inc.*,
    666 F. Supp. 3d 547 (W.D. Va. 2023) ................................................................. 19

*Muir v. Navy Fed. Credit Union*,
    529 F.3d 1100 (D.C. Cir. 2008) ........................................................................... 38

*Nachman Corp. v. Pension Benefit Guar. Corp.*,
    446 U.S. 359 (1980) ..................................................................................... 3, 4, 14

*Nat'l Sec. Sys. v. Iola*,
    700 F.3d 65 (3d Cir. 2012) .................................................................................. 42

*Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co.*,
   513 U.S. 251 (1995) ................................................................................................ 40, 41

*NB v. District of Columbia*,
   682 F.3d 77 (D.C. Cir. 2012) ......................................................................................... 10

*NRDC, Inc. v. United States EPA*,
   383 F. Supp. 3d 1 (D.D.C. 2019) .................................................................................... 9

*Orangeburg v. FERC*,
   862 F.3d 1071 (D.C. Cir. 2017) ............................................................................... 11, 27

*Pender v. Bank of America*,
   788 F.3d 354 (4th Cir. 2015).............................................................................. 15, 16, 18

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
   45 F.4th 816 (5th Cir. 2022) ......................................................................................... 24

*Peters v. Aetna, Inc.*,
   2 F.4th 199 (4th Cir. 2021) .................................................................................... 15, 16

*Pharm. Rsch. & Mfrs. of Am. v. HHS*,
   656 F. Supp. 3d 137 (D.D.C. 2023) ("*PhRMA*") ........................................................ 25, 28

*Pub. Citizen, Inc. v. NHTSA*,
   489 F.3d 1279 (D.C. Cir. 2007) ..................................................................................... 24

*Rankin v. Rots*,
   278 F. Supp. 2d 853 (E.D. Mich. 2003) ......................................................................... 36

*Riley v. Murdock*,
   No. 95-2414, 1996 U.S. App. LEXIS 9964 (4th Cir. Apr. 30, 1996) ...................................... 32

*Robertson v. Allied Sols., LLC*,
   902 F.3d 690 (7th Cir. 2018)......................................................................................... 12

*Rock Springs Plaza II, Inc. v. Investors Warranty of Am., LLC*,
   618 F.Supp.3d 262 (D. Md. 2022) .................................................................................. 13

*Roth v. Jennings*,
   489 F.3d 499 (2d Cir. 2007).......................................................................................... 38

*Russell v. Harman Int'l Indus., Inc.*,
   945 F. Supp. 2d 68 (D.D.C. 2013) ................................................................................. 43

*Sacerdote v. N.Y. Univ.*,
   2022 U.S. Dist. LEXIS 251171 (S.D.N.Y. Oct. 24, 2022) .................................................. 36

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)............................................................................................. 14, 18

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011)....................................................................................... 30

*Stegemann v. Gannett Co.*,
   970 F.3d 465 (4th Cir. 2020)......................................................................................... 34

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................................... 24

*Sweda v. Univ. of Pa.*,
   923 F.3d 320 (3d Cir. 2019) ............................................................................... 33

*Thole v. U.S. Bank. N.A.*,
   590 U.S. 538 (2020) ........................................................... 2, 3, 13, 19, 20, 21

*Trans Union, LLC v. Ramirez*,
   594 U.S. 413 (2021) ............................................................................................. 9

*Turner v. Schneider Elec. Holdings, Inc.*,
   530 F. Supp. 3d 127 (D. Mass. 2021) ............................................................... 41

*Tussey v. ABB, Inc.*,
   850 F.3d 951 (8th Cir. 2017) ............................................................................. 34

*United States Shoe Corp. v. Hackett*,
   793 F.2d 161 (7th Cir. 1986) ............................................................................. 14

*United States v. SCRAP*,
   412 U.S. 669 (1973) ............................................................................................. 9

*US Airways, Inc. v. McCutchen*,
   569 U.S. 88 (2013) ............................................................................................. 16

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State,*
   *Inc.*,
   454 U. S. 464 (1982) ......................................................................................... 10

*Wallace v. Int'l Paper Co.*,
   509 F. Supp. 3d 1045 (W.D. Tenn. 2020) ......................................................... 36

*Whetstone v. Howard Univ.*,
   No. 23-2409 (LLA), 2024 U.S. Dist. LEXIS 164095 (D.D.C. Sep. 12, 2024) ................ 10, 43

**Statutes**

29 U.S.C. § 1001 .......................................................................................... 1, 3, 4, 5

29 U.S.C. § 1002(14)(B) ..................................................................................... 40

29 U.S.C. § 1002(16)(B)(i) ................................................................................... 4

29 U.S.C. § 1002(21)(A) .................................................................................. 4, 35

29 U.S.C. § 1002(21)(A)(i) ................................................................................... 5

29 U.S.C. § 1002(21)(A)(iii) ................................................................................. 5

29 U.S.C. § 1002(35) ............................................................................................ 6

29 U.S.C. § 1002(7) .............................................................................................. 3

29 U.S.C. § 1002(8) .............................................................................................. 3

29 U.S.C. § 1102(a) .............................................................................................. 6

29 U.S.C. § 1104(a)(1) ................................................................................. 4, 11, 31

29 U.S.C. § 1104(a)(1)(A) ...................................................................................... 45

29 U.S.C. § 1105(a) ........................................................................................... 39, 40

29 U.S.C. § 1105(c)(2) ............................................................................................ 36

29 U.S.C. § 1106(a) ................................................................................................ 40

29 U.S.C. § 1106(b) .......................................................................................... 40, 43

29 U.S.C. § 1108(b)(17)(A) ................................................................................... 42

29 U.S.C. § 1109(a) ........................................................................................... 39, 45

29 U.S.C. § 1113(1)(A) .......................................................................................... 15

29 U.S.C. § 1132(a)(2) ..................................................................................... 5, 39, 45

29 U.S.C. § 1132(a)(3) ..................................................................................... 5, 39, 45

29 U.S.C. § 1132(a)(9) ........................................................................... 5, 15, 16, 39, 45

**Rules**

Fed. R. Civ. P. 8 ............................................................................................... 35, 38

Fed. R. Evid. 201 .................................................................................................... 38

**Regulations**

29 CFR § 4041.28(c)(3) ........................................................................................... 5

71 Fed. Reg. 5887 (Feb. 3, 2006) .......................................................................... 42

U.S. Dep't of Labor, Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 ... 1, 4, 5, 7, 17, 31, 32, 34, 38

**Other**

1 J. Story, Commentaries on Equity Jurisprudence (1836) ..................................... 18

DOL Op. Letter No. 76-36, 1976 ERISA LEXIS 92 (Jan. 15, 1976) .......................... 41

Filing Requests for ERISA Advisory Opinions: ERISA Procedure 76-1 .................... 40

James A. Wooten, "*The Most Glorious Story of Failure in the Business*": *The Studebaker-Packard Corporation and the Origins of ERISA*, 49 Buff. L. Rev. 683 (2001) ................................................................................................................... 3

Restatement (Second) of Contracts (1981) ............................................................ 14

Restatement (Second) of Trusts ............................................................................. 18

Restatement (Third) of Trusts ................................................................................. 43

## INTRODUCTION

Plaintiffs provided decades of faithful service as employees of Alcoa Corporation ("Alcoa") and its subsidiaries. In return, Alcoa promised Plaintiffs and their fellow employees that they would enjoy a secure retirement in the form of an Alcoa-backed pension. To protect workers' interests in such promised benefits, the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*., imposes strict trust-law standards on pension plan fiduciaries—duties that are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). Although ERISA does not prohibit an employer from offloading pension obligations to a third party, it does require measures to ensure the continued security of retirees' benefit payments. To comply with ERISA, a plan must obtain the "safest annuity available" after a thorough investigation. U.S. Dep't of Labor, Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1. The choice of annuity must be made with "an eye single to the interests of the participants and beneficiaries," *Bierwirth,* 680 F.2d at 271, meaning an employer-fiduciary cannot prioritize corporate cost savings over the security of retirees' benefit payments.

Alcoa and its co-defendants severely violated ERISA's fiduciary duties in connection with pension-risk transfer transactions covering 30,000 participants in its pension plans. Since 2018, Alcoa has offloaded over $2 billion in pension obligations to Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York (collectively "Athene"), an unduly risky, private equity-controlled insurer. Athene is far from the safest annuity available; it is substantially riskier than numerous traditional annuity providers. Defendants deliberately selected Athene to save Alcoa money at the expense of participants' retirement safety or they failed to thoroughly investigate the merits of using Athene instead of other providers in the market. Either way, Defendants' actions violated ERISA.

Plaintiffs have standing under Article III to bring their claims. When Alcoa substituted

1

Plaintiff's ERISA-protected retirement benefits with annuities from Athene, Plaintiffs suffered immediate financial injuries. First, Defendants' misconduct caused Plaintiffs to lose the opportunity to obtain a preferred product for the provision of their retirement income for the next several decades—an annuity from a safe, traditional insurer. Second, the transfer of Plaintiffs' benefits to a risky provider caused a substantial loss in value in the form of uncompensated risk. Any rational lender would consider a portfolio of loans to borrowers with "sub-prime" credit and a high risk of default to be worth less than a comparable portfolio of loans to borrowers with impeccable credit and a low risk of default. But the lender may still be willing to take on the sub-prime portfolio if it receives compensation for the default risk in the form of a higher interest rate. In contrast, Plaintiffs here had no say in the selection of Athene. Athene's high risk of default was foisted upon them against their will, exposing them to a much higher risk of default than they would have faced if Defendants selected a financially sound annuity provider. Yet unlike the bank that collects higher interest to compensate it for risk exposure, Plaintiffs here received no additional benefits, resulting in an uncompensated loss of value. Third, even if Plaintiffs had not yet incurred a direct financial injury (and they have), ERISA plaintiffs need not show a direct financial loss to assert claims for equitable relief to remedy the fiduciary breaches asserted. Finally, even if none of those grounds established Plaintiffs' standing, Plaintiffs face further imminent injury due to a substantial probability that Athene's financial condition will cause Plaintiffs additional harm up to and including a loss of benefits.

Defendants seek to avoid an adjudication of the merits, primarily urging the Court to dismiss for a lack of subject-matter jurisdiction under *Thole v. U.S. Bank. N.A.*, 590 U.S. 538 (2020). But *Thole* merely held that participants lacked standing to assert ERISA claims to recover their *plan's* damages when the plaintiffs themselves were not affected by the alleged misconduct, in

that case because they remained in a plan governed by ERISA, the benefits of which continued

to be guaranteed by an enormous and financially stable bank and backstopped by the Pension

Benefit Guaranty Corporation ("PBGC"), a government run insurance program for ERISA

defined benefit plans. Thus, the Court expressly did not address whether a "substantially

increased" risk of a loss of benefits would establish standing, because no such risk was present.

*Thole*, 590 U.S. at 546. In contrast to *Thole*, Plaintiffs here have already sustained economic

injury due to a present loss of value, and remain exposed to a substantial risk of future loss. To

the extent Defendants address the merits, they merely raise factual disputes to be resolved at a

later stage. For these reasons, explained further below, the Court should deny the motion.

## BACKGROUND

### A.    ERISA and Pension-Risk Transfers

Congress enacted ERISA to protect "the interests of participants in employee benefit plans

and their beneficiaries." 29 U.S.C. § 1001(b).[1] A central goal of the statute is to "mak[e] sure that

if a worker has been promised a defined pension benefit upon retirement . . . he actually will

receive it." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980). Before

ERISA's enactment, that was not always the case. In fact, ERISA's origins trace to an insolvent

defined benefit plan sponsored by Studebaker-Packard Corporation. James A. Wooten, "*The*

*Most Glorious Story of Failure in the Business*": *The Studebaker-Packard Corporation and the*

*Origins of ERISA*, 49 Buff. L. Rev. 683 (2001) ("No single event is more closely associated with

ERISA than the shutdown of the Studebaker plant in South Bend, Indiana.").[2] When Studebaker

---

[1] A "participant" is "any employee or former employee . . .  who is or may become eligible to receive a
benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). A "beneficiary" is "a person
designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to
a benefit thereunder." 29 U.S.C. § 1002(8).

[2] https://digitalcommons.law.buffalo.edu/journal_articles/148/.

closed its plant, the pension plan did not have enough assets to meet its obligations. *Id*. at 683–84. Employees younger than 60 got pennies on the dollar or nothing at all. *Id*. at 684.

In enacting ERISA, Congress recognized that the lack of "adequate safeguards" in the law had caused "many employees with long years of employment" to lose "anticipated retirement benefits." *See* 29 U.S.C. § 1001(a). "[T]o prevent the 'great personal tragedy' suffered by" these workers, ERISA established minimum funding standards and a plan termination insurance program, administered by the PBGC. *Nachman*, 446 U.S. at 374–75; *see* 29 U.S.C. §§ 1001(b)–(c), 1302(a). As the Supreme Court summarized: "Congress provided for a minimum funding schedule and prescribed standards of conduct for plan administrators to make as certain as possible that pension fund assets would be adequate. But if a plan nonetheless terminates without sufficient assets to pay all vested benefits, the PBGC is required to pay them." *Id.* at 375.

Plan fiduciaries are subject to "strict standards of trustee conduct . . . derived from the common law of trusts—most prominently, a standard of loyalty and a standard of care." *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985); *see* 29 U.S.C. § 1104(a)(1)(A)–(B). Fiduciary duties generally attach to conduct involving plan administration, including the disposition of plan assets. *See* 29 U.S.C. § 1002(21)(A).

Fiduciary duties do not apply to so-called "settlor" functions, such as the decision of an employer (or "plan sponsor," *see* 29 U.S.C. § 1002(16)(B)(i)), to fully or partially terminate a pension plan. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890–91 (1996). The employer may accomplish the termination through a pension-risk transfer or PRT, offloading its obligations by using plan assets to purchase an annuity contract from an insurer, who assumes responsibility for future benefit payments. *See* U.S. Dep't of Labor, Interpretive Bulletin No. 95-1, 60 Fed. Reg. 12328 (Mar. 6, 1995); 29 CFR § 2509.95-1(b). The choice of an insurer to provide the annuity is

a fiduciary act because it involves an exercise of discretion over the disposition of plan assets. *See* 29 U.S.C. § 1002(21)(A)(i); *Beck v. PACE Int'l Union*, 551 U.S. 96, 102 (2007) ("ERISA imposed on Crown a fiduciary obligation in its selection of an appropriate annuity provider when terminating through annuities") (citing 29 CFR §§ 2509.95-1, 4041.28(c)(3)).

The choice of an annuity provider is fraught with conflicts of interest. 29 CFR § 2509.95-1(e). The employer has an incentive to select a lower-cost provider, to maximize its financial interest, which directly conflicts with the participants' interests in maximizing the safety of their benefits. Thus, acting solely in the interest of the participants generally requires a fiduciary to take steps calculated to obtain "the safest annuity available." 29 CFR § 2509.95-1(c); *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000) (declining to adopt "safest available" standard but holding that fiduciary must use measures to identify the provider that "best promotes participants' and beneficiaries' interests").

A significant aspect of ERISA's protective function is to grant participants affected by a breach of fiduciary duty "appropriate remedies . . . and ready access to the Federal courts." 29 U.S.C. § 1001(b). To that end, ERISA's civil enforcement provision grants several rights of action to plan participants. *See* 29 U.S.C. § 1132(a)(2), (a)(3), (a)(9). After the collapse of Executive Life, an insurer used by many employers to offload pensions, Congress passed the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401 (Oct. 22, 1994), which amended § 1132(a) to confirm that participants can seek relief when a PRT violates ERISA:

> A civil action may be brought . . . in the event that the purchase of an insurance contract or insurance annuity in connection with the termination of an individual's status as a participant covered under a pension plan with respect to all or any portion of the participant's pension benefit under such plan constitutes a violation of part 4 of this title or the terms of the plan, by the Secretary, by any individual who was a participant or beneficiary at the time of the alleged violation, or by a fiduciary, to obtain appropriate relief, including the posting of security if necessary, to assure receipt by the participant or beneficiary of the

5

amounts provided or to be provided by such insurance contract or annuity, plus reasonable prejudgment interest on such amounts.

29 U.S.C. § 1132(a)(9). This provision allows a court to order "the purchase of a back-up annuity to remedy the breach." *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1455 (9th Cir. 1995).

### B.    Plaintiffs' claims

Plaintiffs are four retired employees of Alcoa Corporation or its affiliates who participated in Alcoa-sponsored retirement plans ("Plans").[3] Am. Compl. ("AC") ¶¶ 11–15 (ECF 28). The Plans are defined benefit pension plans, meaning participants' benefits are fixed by the terms of the plan. AC ¶¶ 10, 27; *see* 29 U.S.C. § 1002(35). The Plans have been among the largest in the United States, holding roughly $4 billion for the benefit of 43,000 participants. AC ¶ 11.

Defendants are allegedly the Plans' fiduciaries. *Id*. ¶¶ 16–22. The "Alcoa Defendants" include Alcoa; Alcoa USA Corporation, the Plans' sponsor, administrator, and named fiduciary with authority to control and manage the operation and administration of the plans, *see* 29 U.S.C. §§ 1002(16), 1102(a); Alcoa Corp. Benefits Management Committee ("Committee"), which was appointed by Alcoa USA to oversee the Plans' day-to-day operations and whose members are appointed by Alcoa's Board of Directors; and Alcoa CEO and Committee member William P. Oplinger. AC ¶¶ 16–19. Alcoa Defendants hired Defendant Fiduciary Counselors, Inc. as an ostensibly "independent" fiduciary to the Plans. *Id*. ¶¶ 20, 81.

Plaintiffs' claims arise from a series of PRT transactions affecting participants in the Alcoa Plans. *Id*. ¶ 29 (describing a PRT). The PRTs here occurred between 2018 and 2022 and removed a total of roughly 30,000 Plan participants from the ERISA-governed plans, transferring $2.8 billion in pension obligations to Athene. *Id*. ¶¶ 3, 80–83.

---

[3] The plans are the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation ("Salary Plan"), Pension Plan for Certain Hourly Employees of Alcoa USA Corporation ("Hourly Plan"), and the Alcoa Subsidiaries Merged Inactive Plan ("Inactive Plan"). AC ¶¶ 1, 9–11.

The Amended Complaint alleges that Defendants' conduct in selecting Athene as annuity provider violated ERISA and guidance from the Department of Labor. The Secretary of Labor has regulatory and enforcement authority under ERISA. 29 U.S.C. §§ 1135, 1136(a). In Interpretive Bulletin 95-1 ("IB 95-1"), DOL concluded that ERISA requires a fiduciary selecting an annuity provider in connection with a PRT to engage in "a thorough and analytical search" to obtain "the safest annuity available," and stated that a desire to reduce costs cannot "justify [the] purchase of an unsafe annuity." 29 CFR § 2509.95-1, 60 Fed. Reg. 12328, 12329 (Mar. 6, 1995).

Far from "the safest annuity available," Athene is a highly risky private equity-controlled insurance company with an opaque offshore structure. AC ¶¶ 4, 49–67. Unlike traditional insurers, Athene was founded only recently in 2009 by executives of Apollo Global Management, a large private equity firm. *Id.* ¶ 49. Traditional insurers diversity risk through reinsurance with unaffiliated companies. Athene uses captive reinsurers who are based in Bermuda, which has relaxed regulatory requirements, allowing Athene to conduct circular transactions without decreasing risk. *Id.* ¶ 51–53. Athene's surplus-to-liabilities ratio is only 1.4%, five times smaller than the industry average of 7%. *Id.* ¶¶ 54–55. Due to its risky practices, Athene is at high risk of a funding shortfall. *Id.* ¶¶ 56–64. A study of the bond market by NISA Investment Advisors, a professional bond buyer, found that Athene's debt had the highest risk among nine major insurers. *Id.* ¶ 70. Other providers in the market have significantly higher credit ratings than Athene. *Id.* ¶¶ 71–74. To justify the greater risk of Athene's debt, market purchasers of Athene's debt require a yield that is 14% higher than the yield on the debt of the safest insurers in the market. Thus, retirees exposed to the risk of Athene's annuities, who do not receive additional yield as compensation for added risk, suffer a loss of value of 14%, far greater

than any other insurer in NISA's study. *Id*. ¶ 69. Defendants likely chose Athene to save Alcoa

money; a safer annuity would have been more expensive. *Id*. ¶¶ 4, 90, 94–95.

Because their pension benefits were transferred to Athene, Plaintiffs are no longer protected

by ERISA's stringent fiduciary standards for the management of plan assets. *Id*. ¶ 96. Nor can

Plaintiffs count on Alcoa's resources to remedy a funding deficit, because Alcoa has offloaded

its obligations. Plaintiffs also have lost the backing of the federal PBGC, which has a large pool

of money to cover vested pension benefits in the event of plan or employer insolvency. *Id*. ¶ 32.

PBGC coverage limits currently range from over $7,000 per month for a single life annuity (age

65) to over $17,000 per month (age 75). https://www.pbgc.gov/wr/benefits/guaranteed-

benefits/maximum-guarantee. In the event of Athene's insolvency, Plaintiffs and class members

would have to rely on state guaranty associations that typically cover only $250,000 in total

lifetime benefits and, unlike the PBGC, have no funds in hand, but have to begin raising them

when a default occurs. AC ¶ 34. A 75-year-old retiree who would be eligible for $17,000 per

month from the PBGC would exhaust the lifetime SGA limit in only 15 months.

Based on the above facts, Plaintiffs' amended complaint asserts five causes of action. Count

I asserts that the Alcoa Defendants breached their fiduciary duties in selecting Athene. *Id*.

¶¶ 101–108. Count II asserts in the alternative that if any of the Alcoa Defendants did not act as

an ERISA "fiduciary" in connection with the transactions at issue, they remain subject to liability

for knowing participation in any co-defendant's breach. *Id*. ¶¶ 109–111. Count III asserts that

Fiduciary Counselors breached its fiduciary duties in selecting Athene. *Id*. ¶¶ 112–116. Count

IV asserts that Defendants' selection of Athene caused transactions prohibited by ERISA. *Id*.

¶¶ 117–127. Count V asserts that the Alcoa Defendants breached their duty to monitor other

fiduciaries. *Id*. ¶¶ 128–132. On behalf of themselves and a proposed class of the 30,000 Alcoa

retirees affected by the transactions at issue, Plaintiffs seek appropriate relief, including disgorgement of all profits that Defendants realized by virtue of its ERISA violations, and an order requiring Defendants to post adequate security to assure that class members receive all benefits covered by Athene annuities. *Id*. ¶ 98, p. 44; *see* 29 U.S.C. §§ 1132(a)(3), (a)(9).

## ARGUMENT

### I.   Plaintiffs have Article III standing.

To establish standing, a plaintiff must show: "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Trans Union, LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Defendants focus on "injury in fact" Mem. Support Mot. Dismiss at 12 ("Mot.") (ECF 36-1) (emphasis added).

"An injury in fact must be 'concrete,' meaning that it must be real and not abstract." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). The injury also must be particularized, meaning it affects "the plaintiff in a personal and individual way" and is not "a generalized grievance." *Id.* "An injury in fact can be a physical injury, a monetary injury, an injury to one's property, or an injury to one's constitutional rights, to take just a few common examples." *Id.* And "the injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* But the injury need not be large—"an *identifiable trifle* is enough." *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973) (emphasis added); *NRDC, Inc. v. United States EPA*, 383 F. Supp. 3d 1, 11 (D.D.C. 2019).

Application of these requirements is not a "mechanical exercise," *Allen v. Wright*, 468 U.S. 737, 751 (1984), and is properly guided by the underlying purposes of the standing doctrine. "At bottom, 'the gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the

presentation of issues upon which the court so largely depends for illumination.'" *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "The requirement that the plaintiff possess a personal stake helps ensure that courts decide litigants' legal rights in specific cases, as Article III requires, and that courts do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *All. for Hippocratic Med.*, 602 U.S. at 379 (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U. S. 464, 487 (1982)).

At the pleading stage, Plaintiffs bear only a "light burden" and face a "low bar to establish their standing." *Attias v. CareFirst, Inc.*, 865 F.3d 620, 622, 627 (D.C. Cir. 2017). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice." *NB v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012). The court "will 'assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Whetstone v. Howard Univ.*, No. 23-2409 (LLA), 2024 U.S. Dist. LEXIS 164095, at *6 (D.D.C. Sep. 12, 2024) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)) (cleaned up). And the court assumes "that plaintiffs will prevail on the merits of their claim." *Attias*, 865 F.3d at 629.

Here, Plaintiffs have suffered injury-in-fact on several independent grounds, any of which is enough to allow the case to proceed. Plaintiffs have suffered actual injury because Defendants' misconduct in selecting Athene: (1) denied Plaintiffs what they should have received—a safe annuity that provides full security for the pension benefits on which Plaintiffs must rely for a secure retirement; (2) caused Plaintiffs a direct financial injury, because their risky Athene-backed pensions are devalued in the financial marketplace compared to what they would be worth if backed by a safe annuity provider such as New York Life; and (3) resulted in Alcoa

retaining Plan assets for its own benefit, in violation of Defendants' duty to use the funds for

Plaintiffs' benefit by purchasing an annuity that would adequately protect Plaintiffs' benefits.

While those actual injuries easily clear the "low bar" that Plaintiffs face at this stage, *Attias*, 865

F.3d at 622, Plaintiffs remain exposed to a significantly increased risk of an additional imminent

injury based on the substantial probability that Athene will fail to pay all of Plaintiffs' benefits.

**A.    Defendants' selection of Athene caused Plaintiffs actual injuries.**

   **1.    Plaintiffs suffered injury when Defendants deprived them of the annuity
          product that would have best promoted their financial interests.**

"The lost opportunity to purchase a desired product is a cognizable injury." *Orangeburg v.

FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017). Receiving an alternative product—which may, of

course, be inferior—does not defeat standing. *Id.*

   In choosing an annuity provider to implement the PRT, Defendants had a legal duty to act

on Plaintiffs' behalf to purchase the annuity that would "best promote[]" Plaintiffs' interests.

*Bussian*, 223 F.3d at 302; 29 U.S.C. § 1104(a)(1). Plaintiffs' interests would have been best

promoted by obtaining the safest available annuity product from a traditional life insurer, to

ensure that their hard-earned pensions would remain adequately protected for the next several

decades. Defendants' misconduct in selecting Athene, a high-risk annuity provider offering an

inferior annuity product, caused Plaintiffs to lose the opportunity to have the safest available

annuity product purchased on their behalf, in violation of ERISA. That lost opportunity alone is a

cognizable injury that establishes Plaintiffs' standing. *Orangeburg*, 862 F.3d at 1078.

   Although *Orangeburg* addressed a government agency's "action that prevented the

consumers from purchasing a desired product," *id.* at 1077–78, whether a particular harm

qualifies as injury-in-fact for standing purposes does not depend on the identity of the defendant.

If anything, standing requirements are *more* demanding— "especially rigorous"—when the

defendant is a government agency. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Thus, a lost opportunity is just as much an injury-in-fact when caused by a private actor as it is

when caused by the government. *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464

(2017) (plaintiffs suffered injury in fact because they "lost a chance to obtain a settlement");

*Robertson v. Allied Sols., LLC*, 902 F.3d 690, 697 (7th Cir. 2018) ("Article III's strictures are

met not only when a plaintiff complains of being deprived of some benefit, but also when a

plaintiff complains that she was deprived of a chance to obtain a benefit.").

Moreover, "if the court affords the relief requested, the [injury] will be removed." *Chamber

of Commerce of the United States v. EPA*, 642 F.3d 192, 201 (D.C. Cir. 2011). If Plaintiffs

prevail on their claim that Defendants' selection of Athene violated ERISA, the court can, among

other remedies, require Defendants to purchase "a back-up annuity to remedy the breach."

*Kayes*, 51 F.3d at 1455. The back up annuity will enhance the security of Plaintiffs' pensions,

effectively replicating the result that would have occurred if Defendants had complied with

ERISA by obtaining the safest available annuity in the first place.

### 2. The value of Plaintiffs' retirement benefits was substantially degraded upon transfer to Athene, and will be restored if Plaintiffs prevail.

Defendants contend that there can be no injury unless and until retirees have suffered an out-

of-pocket loss in the form of "missing" benefit payments. Mot. at 14. But financial injuries are

not limited to out-of-pocket losses; exposure to greater risk is a financial harm that decreases an

asset's value. Given Athene's enhanced risk of default, the financial market reduces the value of

the future stream of income from Athene relative to a large traditional insurer, as shown by the

fact that market purchasers require a much higher yield for Athene's bonds than those issued by

traditional insurers such as New York Life. AC ¶ 88. Thus, the transactions at issue have caused

the value of Plaintiffs' benefits to be significantly degraded relative to the same monthly benefit

through an annuity from a traditional insurer. That establishes injury-in-fact, even though the

default risk has not yet materialized, because the exposure to risk reduces the value of Plaintiffs'

assets. *Clinton v. City of N.Y.*, 524 U.S. 417, 431 (1998) ("The revival of a substantial contingent

liability immediately and directly affects the borrowing power, financial strength, and fiscal

planning of the potential obligor.").

Defendants contend that devaluation is not an injury because Plaintiffs cannot sell their

pensions like they could other property. Mot. 16. But damage to property or assets causes an

immediate injury by reducing the owner's net worth, before the owner ever considers selling the

asset, and even if the owner *never* would or could sell the asset.

Real-world examples and case law support the conclusion that exposure to enhanced risk

and devaluation of contract rights are concrete injuries-in-fact. All else equal, a home exposed to

a substantial risk of being destroyed by a hurricane has a lower market value than the identical

home outside a hurricane zone. Lenders demand higher interest rates to make unsecured loans to

riskier borrowers, which compensates the lender for the risk of nonpayment.

Article III does not require a party to wait for default to sue over the degraded value of a

contractual right like Plaintiffs' retirement benefits. *See Thole v. U.S. Bank N.A.*, 590 U.S. 538,

542–43 (2020) (pension benefits are contractual). An employer's transfer to a third-party annuity

provider of the promise to pay retirement income is analogous to the assignment of duties under

a contract. And it is black-letter law that "allowing the transfer of rights and duties under a

contract can place significant burdens upon the obligor" and "present[] entirely different risks

and costs than [the obligor] initially bargained for," which in turn can empower that party to sue

to void the transfer. *Rock Springs Plaza II, Inc. v. Investors Warranty of Am., LLC*, 618

F.Supp.3d 262, 272, 274–75 (D. Md. 2022) (concluding that party had a right to certain

information about assignee even though the assignee had satisfied its obligations by making timely payments); *United States Shoe Corp. v. Hackett*, 793 F.2d 161, 162–63 (7th Cir. 1986) ("When events beyond the guarantor's control dramatically increase the risk, the assumptions on which the contract was founded are undercut. . . . [G]uarantors would not ordinarily tolerate a big increase in the risk they face without seeking something in return. When there is such an increase, . . . courts treat the guaranty as if the right to revoke had been timely exercised."); *see also* Restatement (Second) of Contracts § 317(2)(a) (assignment that would "materially increase the burden or risk imposed" on other party is impermissible).

Just as a case or controversy exists when a contracting party devalues a counter-party's rights by imposing risk on him through assignment or delegation to a third party, so too it exists here, where Defendants have devalued Plaintiffs' retirement benefits by imposing risk on them through the transfer to a third party of the legal duty to pay pension benefits—a legal duty grounded both in ERISA and the contractual rights established by the Plan documents. Courts have long adjudicated invalid delegation cases without requiring the plaintiff to "wait and see" if the delegee defaults. Plaintiffs likewise should not be required to wait for disaster to strike—they have already been injured because Athene's heightened risk devalued their pensions.

ERISA's text further supports a finding that Plaintiffs need not await Athene's default to bring suit. Congressional judgment is "instructive and important" in assessing whether a particular harm qualifies as an Article III injury. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340-41 (2016). A central goal of ERISA is ensuring that workers will receive their promised pension benefits. *Nachman*, 446 U.S. at 375. Section 1132(a)(9) was "designed to overturn" a line of cases that undermined that goal by holding that PRTs deprived plan participants of "standing under ERISA to challenge the decision of the plan fiduciary to dispose of plan assets by

14

purchasing annuities." *Kayes*, 51 F.3d at 1455 (citation omitted). The plain language of this provision expressly authorizes pre-default, prospective relief "to assure receipt by the participant or beneficiary of the amounts provided or *to be provided* by such insurance contract or annuity." 29 U.S.C. § 1132(a)(9) (emphasis added). If a participant were required to await the insurer's default to bring suit, § 1132(a)(9) would be unconstitutional on its face.

Defendants' standing theory is also incompatible with ERISA's limitations period. Fiduciary breach claims are generally subject to a statute of repose that expires six years after the "last action" constituting part of the ERISA violation. 29 U.S.C. § 1113(1)(A). Statutes of repose reflect "a legislative judgment that a defendant should be free from liability after the legislatively determined period of time," *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 505 (2017). Plaintiffs and other retirees in the class may have to rely on Athene's ability to pay their pensions for the next several decades. If this suit were dismissed without prejudice as Defendants request and Athene defaults six years and a day after the last PRT, Plaintiffs' only judicial remedy would be against an insolvent party, while Defendants would be immunized. *See David v. Alphin*, 704 F.3d 327, 342–43 (4th Cir. 2013) (repose period ran from date fiduciary *selected* investments). Congress' judgment in authorizing pre-collapse suits in § 1132(a)(9) and requiring plaintiffs to promptly assert their rights under § 1113 further supports Plaintiffs' standing.

### 3. Plaintiffs have standing to bring claims for equitable relief related to Defendants' illegal profits derived from Plan assets that they were required to use for Plaintiffs' benefit.

Standing requirements apply to "each form of relief" that is sought. *Davis v. FEC*, 554 U.S. 724, 734 (2008). While a financial loss is often needed to establish standing to bring claims for damages, "a financial loss [is] not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA." *Peters v. Aetna, Inc.*, 2 F.4th 199, 219 (4th Cir. 2021) (quoting *Pender v. Bank of America*, 788 F.3d 354, 365–66 (4th Cir. 2015)); *Edmonson v. Lincoln Nat'l Life Ins.*

*Co.*, 725 F.3d 406, 417 (3d Cir. 2013); *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 52–53 (1st Cir. 2014) (holding that insurer's misuse of plaintiffs' assets in violation of ERISA "would constitute a tangible harm even if no economic loss results").

This precept is "fundamental in the disgorgement context because '[r]equiring a financial loss for disgorgement claims would effectively ensure that wrongdoers could profit from their unlawful acts as long as the wronged party suffers no financial loss.'" *Peters*, 2 F.4th at 219–20 (quoting *Pender*, 788 F.3d at 366). Requiring a showing of financial loss for standing "would be contrary to the nature of a disgorgement claim, principles of trust law, and principles of ERISA." *Edmonson*, 725 F.3d at 417. Instead, "Article III standing for a disgorgement claim under ERISA revolves around whether a plaintiff's 'legally protected interest' has been harmed." *Peters*, 2 F.4th at 219 (quoting *Pender*, 788 F.3d at 366). A financial injury is also "unnecessary to establish standing for surcharge and declaratory and injunctive relief." *Id.* at 220.

Here, Plaintiffs seek declaratory and injunctive relief, including an order requiring Defendants to post adequate security in the form of a fund to assure receipt of Plaintiffs' benefits, and disgorgement by the Alcoa Defendants of any illegal profits. Compl., pp. 31–32; 29 U.S.C. § 1132(a)(9). While Plaintiffs have shown a financial injury for the reasons discussed, even if they had not, they would have standing to pursue the claims and remedies that they seek because Defendants' misuse of plan assets harmed the concrete interests that ERISA protects.

ERISA's principal function is to "protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013). The statute aims to "mak[e] sure that if a worker has been promised a defined pension benefit upon retirement . . . he actually will receive it." *Nachman*, 446 U.S. at 375. To deter abuses such as misuse of pension funds that had caused workers to lose promised benefits, Congress established strict fiduciary standards and provided

16

for appropriate judicial relief. *See* 29 U.S.C. §§ 1001(a)–(b), 1104(a)(1), 1109(a), 1132(a)(3). Those duties required Defendants to act "solely in the interest of the participants," *id.*, § 1104(a)(1), and to use plan assets not to benefit Alcoa, but "for the exclusive purposes of providing benefits to participants" and defraying reasonable expenses, *id.*, § 1103(c)(1).

In accordance with ERISA's purpose of ensuring that Plaintiffs will receive their promised benefits, fulfilling the fiduciary duties required Defendants "to obtain the safest annuity available." 29 CFR § 2509.95-1(c). Instead, Defendants selected a provider that was far riskier than others available in the market, to enhance Alcoa's profits. AC ¶¶ 4, 90, 94–95, 105. The cost savings that Alcoa realized by selecting Athene is money that should have been used for Plaintiffs' benefit in purchasing an ERISA-complaint annuity, establishing an equitable right to the wrongfully retained assets. *See Edmonson*, 725 F.3d at 417 (plaintiff had standing to pursue disgorgement based on defendant's "use of assets that belonged to her."). By retaining those assets for Alcoa's benefit instead of using them for Plaintiffs' benefit, Defendants violated Plaintiffs' concrete interest in the security of their retirement benefits. The injury can be redressed by imposing a constructive trust, requiring Alcoa to disgorge illegal profits, or requiring Alcoa to use the illegally retained assets to purchase a back-up annuity. Doing so would restore Plaintiffs to the position they would have occupied if Defendants had used the assets for Plaintiffs' benefit as ERISA required. 29 U.S.C. §§ 1132(a)(3), 1132(a)(9).

*Peters*, *Edmonson*, and *Merrimon* are consistent with historical practice predating Article III showing that a breach of fiduciary duty is an actionable injury, even if there has not been and never will be a financial loss.[4] Because "standing derives from the case-or-controversy

---

[4] To be clear, Defendants' misuse of assets that they were required to use for Plaintiffs' benefit in purchasing a safe annuity is an injury separate from the fact of a breach of fiduciary duty (and is also distinct from the lost-opportunity and lost-value injuries discussed in I.A.1–2). But historical practice confirms that a breach of fiduciary duty is an actionable injury even without financial loss, and the

requirement," which "in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 340–41. "In addition, because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Id.* at 341. Not only has Congress identified the breach of a fiduciary duty in selecting an annuity provider as an actionable harm (§ 1132(a)(9)), but historical practice also shows that a breach of fiduciary duty is an actionable injury regardless of financial loss. *Pender*, 788 F.3d at 367 ("Under traditional trust law principles, when a trustee commits a breach of trust, he is accountable for the profit regardless of the harm to the beneficiary.") (citing Restatement (Second) of Trusts § 205, cmt. h). At common law, in "every relation in which there may arise a conflict between the duty which the vendor or purchaser owes to the person with whom he is dealing . . . and his own individual interest," the plaintiff may sue "without any further inquiry" into the transaction's terms. *Michoud v. Girod*, 45 U.S. 503, 553, 559 (1846). A beneficiary could sue his trustee for self-dealing "without showing essential injury" from the transaction, "however innocent the purchase." 1 J. Story, Commentaries on Equity Jurisprudence § 322, at 318 (1836).

A contemporary illustration of this principle is *Gollust v. Mendell*, 501 U.S. 115 (1991), involving private enforcement against corporate insiders for short swing profits—a form of fiduciary breach. The Court interpreted the statutory right to sue in light of constitutional concerns that would be presented if a plaintiff with no personal financial stake could sue, *id.* at 125–26, and held that a shareholder who, after filing suit, became a shareholder of the parent corporation, could maintain the action, despite having only a slight financial interest in the

---

plaintiff can bring suit to recover the fiduciary's illegal profits.

outcome. *Id.* at 127. The Court further noted that "[a] bondholder's sufficient financial interest may be even more attenuated, since any recovery by the issuer will increase the value of the bond *only because the issuer may become a slightly better credit risk.*" *Id.* (emphasis added).

Surely if a bondholder's interest in the creditworthiness of a corporate bond issuer is sufficient to satisfy Article III, a retiree's interest in the reliability of the company issuing the annuity on which the plaintiff's financial security in retirement may depend must be enough.[5]

Defendants may say that these decisions and analysis were somehow "overruled" by *Thole.* But the *Thole* majority did not address these principles at all, and mentioned *Gollust* only for the uncontroversial point that a plaintiff must have a stake in the outcome, which the plaintiffs in *Thole* did not. 590 U.S. at 543. *Thole*'s conclusion that the plaintiffs lacked standing turned on the key fact that pension plan participants lack the kind of beneficial interest in plan assets that a trust beneficiary has in a trust's assets. *Id*. at 542–43. The reason is that the security of the pension depends on the employer's promise to pay the pension no matter what happens to plan assets. *Id.* ("a defined-benefit plan is more in the nature of a contract. The plan participants' benefits are fixed and will not change, regardless of how well or poorly the plan is managed. The benefits paid . . . in a defined-benefit plan are not tied to the value of the plan."). Plan losses, therefore, are not injury to plan participants. As Justice Thomas put it in his concurrence: "none of the rights identified by petitioners belong to them." *Id.* at 548. But the rights plaintiffs assert here to a secure annuity in place of their ERISA-covered pension *do* belong to them.[6]

---

[5] Other examples abound, in diverse fields such as misappropriation of intellectual property, trespass and conversion, insider trading, and fiduciary fee disgorgement. *See, e.g., Jackson v. Smith*, 254 U.S. 586, 587 (1921) (fiduciary liable "for all the profits obtained by him" and his confederates, "although the [plaintiff] estate may not have been injured thereby").

[6] Similarly, courts addressing fiduciary breaches in defined contribution plans have distinguished *Thole* because assets are held in individual accounts. *See, e.g., Moore v. Virginia Cmty. Bankshares, Inc.,* 666 F. Supp. 3d 547, 556 (W.D. Va. 2023); *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.,* 541 F. Supp. 3d 496, 506-07 (D.N.J. 2021). Here too, Plaintiffs have individual rights to be paid under the Athene annuity.

19

### 4. *Thole* did not address the standing of participants whose pensions have been transferred out of an ERISA plan and to a high-risk provider.

Defendants' assertion that *Thole* is "on all fours" ignores critical distinctions. Mot. at 13. Most fundamentally, the plaintiffs in *Thole* had not had their pensions offloaded to a high-risk third party; they continued to participate in an ERISA-governed defined benefit plan and their pensions remained backed by a financially strong employer and the PBGC. Thus, the Court did not address whether the plaintiffs would have had standing if they had plausibly alleged that the defendant "substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits." *Thole*, 590 U.S. at 546; *see also id.* at 546 n.2 (stating that Court "need not decide" viability of an "increased-risk-of-harm theory of standing" that plaintiffs never pressed). Thus, *Thole* did not in any way address whether the plaintiffs would have had standing if their pensions were transferred to a substantially riskier entity. And the *Thole* plaintiffs did not claim financial harm. In contrast to *Thole*, Plaintiffs allege that Defendants' selection of Athene caused a substantially increased risk of default on Plaintiffs' future benefits, and a current loss of value. AC ¶¶ 4, 74–75, 87, 93–97.

Defendants also rely on the mistaken premise that this case is like *Thole* because winning or losing this suit would not affect Plaintiffs' benefits. Mot. at 12, 15. But the available remedies in *Thole* were different from those here. The *Thole* plaintiffs brought suit under 29 U.S.C. § 1132(a)(2), and sought to recover losses to *the plan* itself. 590 U.S. at 541 ("The plaintiffs requested that U.S. Bank repay the plan approximately $750 million in losses that the plan allegedly suffered."). Section 1132(a)(2) claims may only "be brought in a representative capacity on behalf of the plan as a whole." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985). Section 1132(a)(2) "does not provide a remedy for individual injuries distinct from plan injuries." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008); *see* 29 U.S.C.

§§ 1109(a), 1132(a)(2) (monetary relief under § 1109(a) limited to "losses *to the plan*") (emphasis added). Indeed, Defendants acknowledge that a § 1132(a)(2) claim can "seek only recovery to the plan." Mot. at 25. Because the *Thole* plaintiffs' monthly pension benefits were fixed by the terms of the plan, they had "no concrete stake" in the outcome—recovering *the plan's* losses would not enhance their individual benefits whatsoever. 590 U.S. at 541–42.

In contrast, Plaintiffs here are not seeking to recover a *plan's* losses. Indeed, Defendants contend that Plaintiffs *cannot* pursue a § 1132(a)(2) claim because they have not alleged harm to the Plans. Mot. at 25.[7] Because Plaintiffs have been ejected from their plans, they can *only* seek relief in which they have a personal interest. *Cf. Thole*, 590 U.S. at 548 (Thomas, J., concurring) ("[N]one of the rights identified by petitioners belong to them."). Unlike the *Thole* plaintiffs, Plaintiffs here have a "concrete stake" in the outcome because obtaining a remedy will materially enhance the security and value of Plaintiffs' benefits. As discussed, the transfer to Athene exposed Plaintiffs' pensions to a level of risk that significantly reduced the value of those benefits relative to what the value would be if backed by a safe, ERISA-compliant provider. An asset exposed to a substantial risk of loss is necessarily worth less than it would be if the risk were eliminated. Ordering "the purchase of a back-up annuity," *Kayes*, 51 F.3d at 1455, will "assure receipt . . . of the amounts . . . to be provided," 29 U.S.C. § 1132(a)(9), thereby eliminating the risk that is currently reducing the value of Plaintiffs' benefits. Thus, if Plaintiffs prevail, the security and value of their pensions will be enhanced by eliminating undue risk of loss and restoring the security and value of the pensions to what they would have been worth if Defendants had complied with ERISA by selecting a safe annuity provider. Accordingly,

---

[7] Although Defendants assert that the lack of alleged harm to the plan implicates Article III standing, Mot. at 25, Defendants' argument goes to the merits question of whether Plaintiffs have sufficiently alleged the damages element of a § 1132(a)(2) claim. After all, the *Thole* plaintiffs alleged $750 million in plan losses but still lacked standing. 590 U.S. at 541.

Plaintiffs have the concrete personal stake in the outcome that was missing in *Thole*.

While *Thole* sheds no light on the standing of participants subject to a pension-risk transfer, another case cited by Defendants involved a PRT. *See Lee v. Verizon Communs., Inc.*, 837 F.3d 523 (5th Cir. 2016). In *Lee*, there were two distinct groups of plaintiffs: a "Transferee" class, "comprising Plan participants whose retirement-benefit obligations were transferred to the annuity," and a "Non-Transferee Class" *i.e.*, "Plan participants whose retirement-benefit obligations *remained* with the Plan" and were unaffected by the PRT. *Lee*, 837 F.3d at 531 (emphasis added). The court found that the *non-transferee* participants—the individuals whose pensions remained backed by their employer, like *Thole*—lacked standing because there was no "imminent risk of default by the plan." *Id.* at 546. But the court did not question that the *transferee* participants—like Plaintiffs here—had standing due to having their pension obligations transferred to a third-party insurer. *Cf. id.* at 533 (noting that only "the claim by the *Non-Transferee* Class" was dismissed "for lack of standing") (emphasis added). The court thus proceeded to address the claims of the Transferee Class *on the merits*. *Id.* at 533–43. Thus, while *Thole* and *Lee* hold that participants who *remain* in defined benefit plans backed by their employers and the PBGC lack standing (at least absent an imminent default), neither case provides any support for Defendants' argument that participants who have been ejected from an ERISA-covered plan and had their benefits transferred to a high-risk insurer lack standing. Indeed, *Lee* only *supports* a finding that Plaintiffs *have* standing. And Plaintiffs' allegations of injury are much stronger than the *Lee* transferees, who did not allege that the selected provider (Prudential, a longstanding traditional insurer) was an unsafe or imprudent choice. *Id.* at 539–42.

**B.    Plaintiffs face a further imminent injury due to substantial risk of loss.**

**1.    Defendants' factual attack is intertwined with the merits and rebutted.**

In arguing that Plaintiffs "have failed to *allege*" an "imminent" injury, Mot. 17, Defendants

rely on materials outside of the pleadings to dispute whether certain financial metrics and Athene's use of captive offshore reinsurers shows a substantial risk of non-payment. Mot. at 18–23 & nn. 8–10. These arguments are inextricably intertwined with the merits questions of whether Athene's riskiness relative to other insurers made it an imprudent or disloyal choice under ERISA, as well as the question of the proper remedies to mitigate Athene's riskiness. When disputed jurisdictional facts "are inextricably intertwined with the merits of the case," the court "should usually defer its jurisdictional decision until the merits are heard." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197–98 (D.C. Cir. 1992) (citing *Land v. Dollar*, 330 U.S. 731, 739 (1947) ("[T]he District Court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits.")); *Hale v. United States*, No. 13-1390 (RDM), 2015 U.S. Dist. LEXIS 161237, at *8, 20–21 (D.D.C. Dec. 2, 2015) (deferring resolution of disputed jurisdictional facts which were "indistinguishable from the central question on the merits"). These disputed jurisdictional/merits questions can only be resolved on a full record after discovery.

Defendants also suggest that Plaintiffs must furnish "evidentiary support to establish standing." Mot. at 20. Plaintiffs have thus attached evidence refuting Defendants' assertions. *See* Decl. of Thomas D. Gober. Although Plaintiffs' allegations alone establish standing, the testimony of Mr. Gober, a 39-year insurance fraud investigator with vast experience relevant to PRTs, further demonstrates that Athene exposes Plaintiffs to much greater risk than numerous traditional insurers and poses a substantial probability of a loss of benefits.

### 2.    Plaintiffs allege a substantial risk of further injury.

Defendants contend *Lee* requires Plaintiffs to allege that Athene is on the brink of collapse to establish an "imminent" injury. Mot. 17. But as discussed, *Lee*'s holding applied only to participants who remained in the plan, not to "transferees" like Plaintiffs who were ejected from the plan. 837 F.3d at 546. If the Fifth Circuit had any doubt that the plaintiffs whose pensions

were transferred to an insurer suffered Article III injury, it would have analyzed standing before turning to the merits, but did not. *Perez v. McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 820 (5th Cir. 2022) (court has "independent obligation to assure that standing exists" even if not raised by parties) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)).

Plaintiffs satisfy Article III imminence requirements. The D.C. Circuit has "frequently upheld claims of standing based on allegations of a 'substantial risk' of future injury." *Attias*, 865 F.3d at 627 (collecting cases). "[T]he proper way to analyze an increased-risk-of-harm claim is to consider the ultimate alleged harm—such as death, physical injury, or property damage from car accidents—as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to an individual citizen sufficiently 'imminent' for standing purposes." *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1298 (D.C. Cir. 2007).

Although Defendants contend that this standard "compels a *very strict understanding* of what increases in risk and overall risk levels can count as substantial," Mot. at 19, that statement was limited to "cases involving *consumer challenges to an agency's regulation* (or lack of regulation)," *NHTSA*, 489 F.3d at 1295–96; *see id.* at 1296 (issue is whether "*the agency action* causes" such risk) (emphases added). Because "[m]uch government regulation slightly increases a citizen's risk of injury—or insufficiently decreases the risk compared to what some citizens might prefer," a narrow standing rule is essential for such claims. *Id.* at 1295. Otherwise, "virtually any citizen" could seek judicial review of "virtually *any* action" by any agency. *Id.*

Indeed, Defendants rely on numerous cases against government agencies, where standing requirements are "especially rigorous" to ensure that citizens do not use the "judicial process" to "usurp the powers of the political branches." *Clapper*, 568 U.S. at 408. Moreover, the plaintiffs in Defendants' cases had only tangential or generalized interests in the regulated subject. *Food &*

*Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 909 (D.C. Cir. 2015) ("consumers of poultry" sought

to enjoin agency regulations based on "fear" of a potential "increase in foodborne illness");

*Pharm. Rsch. & Mfrs. of Am. v. HHS*, 656 F. Supp. 3d 137, 143, 157 (D.D.C. 2023) ("*PhRMA*")

(plaintiffs were "a collection of organizations with various interests in American healthcare"

such as ensuring "the safety of the U.S. drug supply" and combating "misuse of prescription

drugs"). In other words, the plaintiffs were essentially "citizens . . . 'roam[ing] the country in

search of governmental wrongdoing'" and seeking advisory opinions on issues affecting only

abstract social interests but no concrete personal interests. *All. for Hippocratic Med.*, 602 U.S. at

379; *PhRMA*, 656 F. Supp. 3d at 157. The plaintiffs in those cases could *only* rely on "fear" of

potential future injury because they had not sustained any financial or other type of injury.

    In contrast to an abstract fear of future government action, Plaintiffs here have already

sustained actual injuries at the hands of private parties as described in I.A. That is enough to

satisfy Article III regardless of whether any *additional* injury is imminent due to Athene's

likelihood of default. Unlike Defendants' cases, Plaintiffs are not seeking judicial review of

future government decisions based on a remote and speculative possibility that some consumer

somewhere might be injured in a car accident or become sick due to contaminated poultry.

Plaintiffs bring suit to protect their own pension benefits from a present and substantial risk of

loss. *Cf. Attias*, 865 F.3d at 626–27 ("Nobody doubts that identity theft, should it befall one of

these plaintiffs, would constitute a concrete and particularized injury.").

    "The remaining question, then, keeping in mind the light burden of proof the plaintiffs bear

at the pleading stage, is whether the complaint plausibly *alleges* that the plaintiffs now face a

substantial risk of" harm due to Defendants selecting Athene. *Id.* at 627. Defendants mistakenly

contend that the "only harm that could affect [Plaintiffs] is not receiving their benefits" at all due

to a collapse of Athene. Mot. 21–22. Even if Athene's financial problems cause only a slightly delay in issuing a single check, a minor injury is enough for standing. *Czyzewski*, 580 U.S. at 464 ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Plaintiffs plausibly allege such a risk. First, Athene poses a substantially increased risk of default relative to any traditional insurer that Defendants could have selected in compliance with ERISA. AC ¶¶ 68–74. Athene's credit rating is dramatically lower than other annuity providers, while Athene's debt carried the very highest risk among nine major insurers, so much so that purchasers of its debt require a 14% higher yield. *Id*. ¶¶ 70–74. Athene's significantly higher credit risk makes it a poor candidate to be hired for a PRT. *Id*. ¶ 68.

Second, the increased risk posed by Athene's private equity-controlled in-house reinsurers and opaque offshore structure carries a substantial probability of additional financial harm to Plaintiffs. *Id*. ¶¶ 4, 49–67. The only buffer between solvency and insolvency is an insurer's surplus of assets over liabilities. *Id*. ¶ 54. Athene's surplus is razor thin: only 1.4%, a fraction of the national average of 7%, and NY Life at 12.24%. *Id*. ¶ 55. Athene uses Bermuda-based captive reinsurers, which do not diversity risk, and takes advantage of Bermuda's comparatively lax regulations to hold riskier investments, such as collateralized loan obligations. *Id*. ¶¶ 51–53, 56. Athene also engaged in over $100 billion in risky modified coinsurance or ModCo arrangements with its offshore affiliates in recent years. *Id*. ¶¶ 57–58. By comparison, NY Life reported $0 in ModCo. *Id*. ¶ 58. Athene uses ModCo to artificially inflate its Risk Based Capital ratio and hold lower surplus. *Id*. ¶ 59. Athene holds a high concentration of risky assets relative to surplus, such as over $21 billion in "loan-backed and structured securities" and $18 billion in "deposit type contracts," compared to only $2 billion in surplus. *Id*.  ¶ 60. These assets put Athene at a high risk of a liquidity crisis. *Id*. ¶¶ 60–61. These factors create a greatly heightened

risk of failure and a high risk of a funding shortfall. *Id.* ¶¶ 62–64. Plaintiffs thus easily satisfy

their "light burden" at this stage by alleging a substantial risk of harm. *Attias*, 865 F.3d at 627.

Defendants merely raise factual disputes. They rely on extraneous exhibits to dispute the

risk level of Bermuda-based reinsurance and to dispute whether each of the cited statistics shows

that Plaintiffs are likely to stop receiving their benefits. Mot. 19–21. But the complaint must be

read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation,

is plausible." *Ho v. Garland,* 106 F.4th 47, 50–51 (D.C. Cir. 2024). Regardless of whether bond

prices standing alone predict an "imminent impairment of benefits," Mot. 19–20, all of the facts,

considered *together*, plausibly allege a substantially probability of harm. *Attias*, 865 F.3d at 627.

If more "evidentiary support" were needed to establish standing as Defendants contend,

Mot. 20, Plaintiffs have provided it. After analyzing Athene's finances in detail relative to

traditional insurers in the market, Decl. ¶¶ 6–57, Mr. Gober analyzes common characteristics of

insurers that have failed in the past, like Executive Life, as well as more recent failures, *id*. ¶¶ 8,

58–72. He concludes that Athene's practices and financial metrics—particularly inadequate

surplus, rapid growth in liabilities, and use of affiliated reinsurance—bear many similarities to

other failed insurers. *Id*. ¶¶ 73–80. Athene's riskiness is exacerbated by the recent dramatic rise

in interest rates. *Id.* ¶ 50. The strain of the current interest-rate environment on the private equity

model, which relies heavily on debt to finance acquisitions, is shown by the fact that nearly 25%

of the companies owned by Athene's parent, Apollo Global Management, have defaulted since

2022. *Id*. This evidence cements the conclusion that Plaintiffs face substantial risk.

Defendants further contend that Plaintiffs need to allege "the expected timing" of Athene's

default. Mot. 28. Not so. "Standing depends on the probability of harm, not its temporal

proximity." *Orangeburg*, 862 F.3d at 1078. "[E]ven if it is impossible to pinpoint when a harm

will occur, the harm is imminent if it is likely to happen *at any moment* and *with no notice*."
*PhRMA*, 656 F. Supp. 3d at 153 (internal quotation marks omitted). "In such cases, at least one
aspect of an injury's timing is clear: The whole risk bears on the plaintiff." *Id.*

In *Attias*, for example, the plaintiffs were victims of a data breach that resulted in hackers
obtaining their personal information. Even though it was impossible to predict when the hackers
might decide to use the information to commit identify theft, the court of appeals concluded that
"a substantial risk of harm exists already, simply by virtue of the hack and the nature of the data
that the plaintiffs allege was taken." *Attias*, 865 F.3d at 629. The risk was enough for standing.

In contrast, in *PhRMA*, the alleged risk of future injury from a potential agency action was
still subject to numerous "regulatory processes and approvals," meaning it would require
speculation to determine if, when, and how the agency might act. 656 F. Supp. 3d at 151. By
their nature, "complex bureaucratic processes" are "difficult to predict." *Id*. at 152.

The prospect of future injury here is more like *Attias* than *PhRMA*. Athene is the proverbial
ticking time bomb: its default may happen "at any moment and with no notice." *PhRMA*, 656 F.
Supp. 3d at 153. Only a razor-thin surplus stands between Plaintiffs and financial hardship. AC
¶ 55. A liquidity crisis for Athene, which would cause Plaintiffs' pension checks to bounce, *id*.
¶¶ 60–61, could also happen at any time and without warning. "The whole risk bears on"
Plaintiffs, meaning they satisfy the imminence standard. *PhRMA*, 656 F. Supp. 3d at 153.

Defendants' attempt to show that future harm depends on a "protracted chain" of
"conjectural links" falls flat. Mot. 23. Defendants claim without any citation that harm would
require (1) catastrophic losses, (2) failure to mitigate losses, and (3) inability to secure alternative
funding. Mot. 21–22. But they do not define what constitutes a "catastrophic" loss or explain
how Athene would supposedly "mitigate" losses to avoid any harm. Defendants' suggestion that

only "catastrophic" losses would harm Plaintiffs ignores that Athene has an extremely thin surplus, which is dwarfed by tens of billions in holdings with a high risk of sparking a liquidity crisis. AC ¶¶ 54–64. Because Athene is dramatically under-reserved, in a liquidity crisis, it would be almost entirely dependent on IOUs from its in-house re-insurers—in other words, itself. *Id.* ¶ 63. Defendants' assumption that Athene could easily "secure alternative funding" ignores the swift damage to Athene's credit rating that would result from an inability to satisfy its obligations, preventing it from raising funds in the credit markets.

In short, "[n]o long sequence of uncertain contingencies involving multiple independent actors has to occur before the plaintiffs in this case will suffer any harm; a substantial risk of harm exists already," by virtue of Athene's thin surplus and risky strategies. *Attias*, 865 F.3d at 629. The harm may occur at any time and without warning. Thus, the risk here is far more substantial than in cases cited by Defendants like *Clapper* and *PhRMA*, where the prospect of future harm required speculation as to how numerous governmental actors would make discretionary decisions. *Clapper*, 568 U.S. at 411–14. Indeed, it is far more speculative to assume that an adverse event would cause Plaintiffs *no* harm whatsoever because Athene would somehow seamlessly "mitigate" the loss to avoid any disruption in benefit payments.

Defendants contend that no injury would result from Athene's failure because "when an insurer fails, SGAs protect retirees' benefits." Mot. 22. That is absurd. Executive Life annuitants experienced massive losses, with reduced payments spread over many decades. AC ¶¶ 39–41. "SGAs are not pre-funded" and would not even begin to raise the needed funds until after the insurer fails. *Id.* ¶ 33. By the time the SGA raises funds and begins to cover the shortfall, Plaintiffs would have experienced a financial loss due to the delay in payment alone, which would prevent paying bills or depositing the funds in an interest-bearing or investment account.

*Cf. Czyzewski*, 580 U.S. at 464 (loss of $5 enough for standing). Because Plaintiffs would have suffered a financial loss long before receiving any SGA payment, it is irrelevant whether Plaintiffs "actually have benefits that exceed" the $250,000 state guaranty limit in most states. Mot. 22. In any event, a $250,000 *lifetime* SGA cap is plainly inadequate to prevent loss—a 60-year-old with a $40,000/year pension would receive nothing after age 66.

Defendants' attempt to distinguish Athene Iowa from Athene New York also fails. Mot. 24. "Athene" includes both entities because there is no material difference in their operations. AC ¶ 3; *see also* Gober Decl. ¶ 11. Defendants cite no contrary evidence.

## II.      Plaintiffs state plausible ERISA claims on which relief can be granted.

The Amended Complaint also contains sufficient factual matter, accepted as true, to raise a plausible inference that Defendants violated ERISA. *Ho*, 106 F.4th at 50–51. Because the plausibility standard is not a "probability requirement," "[a] complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). "Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage." *AFGE v. OPM*, 928 F.3d 42, 57 (D.C. Cir. 2019) (citation omitted).

### A.      Plaintiffs plausibly allege a fiduciary breach in selecting Athene (Counts I, III).

#### 1.      ERISA required Defendants to conduct a thorough investigation to identify a provider that would best promote Plaintiffs' interest in a secure retirement.

ERISA's trust-law based standards require fiduciaries to discharge their duties "solely in the interest of the participants" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29

U.S.C. § 1104(a)(1)(B).[8] In Interpretive Bulletin 95-1, the Department of Labor concluded that a fiduciary in the PRT context must "take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." 29 C.F.R. § 2509.95-1(c). In addition, fiduciaries must "conduct an objective, thorough and analytical search" and "evaluate a number of factors relating to a potential annuity provider's claims paying ability and creditworthiness." *Id.* A decision "to purchase more risky, lower-priced annuities in order to ensure or maximize a reversion of excess assets that will be paid solely to the employer-sponsor" is a clear fiduciary breach. 29 C.F.R. § 2509.95-1(d).

Defendants' arguments against IB 95-1 lack merit. Mot. 33–35. First, Defendants contend that IB 95-1 does not actually require the "safest" annuity, because a fiduciary may conclude that "more than one annuity provider is able to offer the safest annuity available." Mot. 33–34 (quoting 29 C.F.R. § 2509.95-1(c)). That is immaterial. Plaintiffs are not claiming that Defendants violated ERISA because they failed to select the absolute "safest" among several insurers of reasonably equivalent safety. Rather, Athene was not close to the safest annuity available. AC ¶¶ 4, 69–70, 85. Thus, even if "more than one provider" could "offer the safest annuity available," Defendants could *not* have concluded that Athene was in that ballpark.

Second, Defendants seize on DOL's statement that there could be "situations where it may be in the interest of the participants and beneficiaries to purchase other than the safest available annuity." Mot. 34 (quoting 29 C.F.R. § 2509.95-1(d)). But Defendants misleadingly omit the next sentence, which clarifies that "[s]uch situations may occur where the safest available annuity is only marginally safer, but disproportionately more expensive than competing annuities." 29 C.F.R. § 2509.95-1(d). Again, the claim here is not about marginal degrees of

---

[8] Defendants' argument that "a decision to pursue a PRT" is not actionable is a straw man. Mot. 26–27. Plaintiffs acknowledge that "ERISA does not prohibit" the decision to pursue a PRT. AC ¶ 3.

safety—Athene is not a safe annuity at all. In that regard, IB 95-1 is unequivocal: a desire to

avoid the "increased cost" of a safe annuity "could *never* justify putting the benefits of

annuitized participants and beneficiaries at risk by purchasing an unsafe annuity." 29 C.F.R.

§ 2509.95-1(d) (emphasis added). Yet Defendants did exactly that. AC ¶¶ 4, 90, 105.

Third, Defendants suggest that courts have "squarely rejected" a duty to "choose the single

safest annuity provider" in all circumstances. Mot. 35. Defendants again miss the point. Plaintiffs

do not claim that Defendants violated ERISA by failing to choose the absolute "safest" among

several providers of reasonably comparable safety. In fact, the only published case on the issue is

consistent with IB 95-1.[9] While the Fifth Circuit did not adopt a *requirement* that a fiduciary

must always select the "safest" available annuity, it nevertheless recognized a duty to take steps

to identify the provider that "best promotes participants' and beneficiaries' interests." *Bussian v.*

*RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000). Participants' "primary interest" is in

maximizing safety; they "gain nothing from an annuity offered at a comparative discount by a

provider that brings to the table a heightened risk of default." *Id.* at 298. Such an annuity imposes

an "uncompensated risk" of default on the participants, while the employer benefits from "a

lower price and larger reversion." *Id*. Thus, "an annuity's price cannot be the motivating factor

until the fiduciary reasonably determines . . . that the providers under consideration are

comparable in their ability to promote the interests of participants and beneficiaries." *Id*. at 302.

Only after making that determination may the fiduciary then consider "which provider offers its

annuity at a lower price." *Id*. "Without such a prior determination, consideration of an annuity's

price, because it directly benefits the employer, can be taken as evidence that a fiduciary has

---

[9] Defendants also cite an unpublished *per curiam* decision arising from an annuity purchase that occurred long before DOL issued IB 95-1. *Riley v. Murdock*, No. 95-2414, 1996 U.S. App. LEXIS 9964, at *4 (4th Cir. Apr. 30, 1996). The court merely stated without analysis that applying the "safest available" standard was not warranted under "the circumstances of *this case*." *Id*. (emphasis added)

placed an interest in a reversion above the interests of plan beneficiaries." *Id.*

*Bussian* is wholly consistent with IB 95-1. It recognizes that a fiduciary's ultimate objective must be to select a provider that will best promote participants' interest in maximizing the safety of their benefits. Athene is not remotely comparable to other providers in its ability to promote the interests of participants and beneficiaries—it is far riskier. AC ¶¶ 4, 69–70, 85. Thus, Plaintiffs state a plausible claim under *Bussian* and IB 95-1 alike.

### 2. Plaintiffs plausibly allege that Defendants' process for selecting Athene was imprudent and prioritized Alcoa's profits over Plaintiffs' retirement safety.

An ERISA plaintiff states a plausible claim for breach of fiduciary duty when the alleged facts allow the court to reasonably infer that the fiduciary's decision was "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009). Although Defendants repeatedly fault Plaintiffs for not alleging details "about the process" they used to select Athene, Mot. 32, they cite no authority requiring such allegations. Courts have long held that ERISA plaintiffs cannot be expected to allege such details, which "will frequently be in the exclusive possession of the breaching fiduciary" at this stage. *Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995). "No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598. Because such "crucial" facts "tend systemically to be in the sole possession of defendants," ERISA plaintiffs need only allege circumstantial evidence from which the court can infer a flawed process. *Id.* at 596, 598; *Sweda v. Univ. of Pa.*, 923 F.3d 320, 332 (3d Cir. 2019). Thus, "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

Defendants also attempt to divide Plaintiffs' breach of fiduciary duty claims into separate

"loyalty" and "prudence" claims. Mot. 27, 30–31 & n.13. But "[a] fiduciary's duty of care overlaps the duty of loyalty," particularly when a conflict of interest is present, as here. *See Bussian*, 223 F.3d at 299. Thus, the same facts can prove that the fiduciary violated both duties. A fiduciary may neglect to conduct a genuinely prudent and diligent investigation precisely *because* it has a motive to favor itself at the beneficiaries' expense. Thus, "each duty implicates the other." *See Stegemann v. Gannett Co.*, 970 F.3d 465, 473 n.7 (4th Cir. 2020). And *either* imprudence *or* disloyalty establishes a fiduciary breach. *See Braden*, 588 F.3d at 596.

The Amended Complaint plausibly alleges both imprudence and disloyalty. A prudent investigation would entail "an objective, thorough and analytical search" to evaluate "factors relating to a potential annuity provider's claims paying ability and creditworthiness." 29 C.F.R. § 2509.95-1(c); *Bussian*, 223 F.3d at 300 (endorsing "the Bulletin's description of the nature of the investigation to be undertaken"). Yet Athene is far riskier than other providers Defendants could have selected. AC ¶¶ 4, 68–74, 85, 87. Athene was less expensive than a safer annuity, which served Alcoa's reversionary interest. By selecting an extremely risky annuity provider because it was cheaper than safer alternatives in the market, Defendants sacrificed Plaintiffs' retirement security to enhance Alcoa's corporate profits. *Id*. ¶¶ 4, 90. Thus, the alleged facts raise a plausible inference that Defendants acted from improper motives—to save Alcoa money— thereby breaching the duty of loyalty. *Bussian*, 223 F.3d at 302 ("[C]onsideration of an annuity's price, because it directly benefits the employer, can be taken as evidence that a fiduciary has placed an interest in a reversion above the interests of plan beneficiaries."); *Tussey v. ABB, Inc.*, 850 F.3d 951, 958, 962 (8th Cir. 2017) (fiduciaries acted on "improper motives" where evidence showed that they "did what they did not because they thought it was best for the plans, but because they wanted to get a better deal for themselves"). And given that numerous safer

annuities with long-standing traditional life insurers such as New York Life were available in the market, Defendants' selection of Athene could not have been the product of a thorough investigation into potential providers' claims-paying ability and creditworthiness. AC ¶¶ 4, 84–85, 87–90. Thus, Plaintiffs plausibly allege both imprudence and disloyalty.

### 3. Defendants' party-specific arguments fail.

Defendants' defendant-by-defendant arguments do not support dismissal. Mot. 28–30, 32.

***Alcoa Defendants***. Defendants contend that any claim based on Alcoa Defendants' direct involvement in hiring Athene is foreclosed by the allegation that they hired Fiduciary Counselors.[10] Mot. 28–29, 32. But Defendants acknowledge that accepting their position would require the Court to disregard the Rule 12(b)(6) standard by refusing to credit Plaintiffs' allegation that "Alcoa Defendants 'selected Athene.'" Mot. 28 (quoting AC ¶ 105); *see also* AC ¶¶ 4, 17 ("Alcoa Defendants" selected and "agreed to purchase" Athene's annuities).

That allegation is not "fatally undermined" (Mot. 28) by the allegation that Alcoa Defendants appointed Fiduciary Counselors "as the independent fiduciary" over the PRTs. AC ¶ 20 (emphasis added). First, Plaintiffs are permitted to allege "2 or more statements of a claim . . . alternatively or hypothetically," and "*regardless of consistency*." Fed. R. Civ. P. 8(d)(2)–(3) (emphasis added). Second, the allegation that "Alcoa Defendants agreed to purchase" Athene's annuities (AC ¶ 17) suggests that Alcoa Defendants retained "final say" over the decision, and that Fiduciary Counselors' "selection" of Athene was merely advisory. *See* 29 U.S.C. § 1002(21)(A)(ii). A fiduciary cannot "rely blindly" on advice from "independent experts"—it still must use independent judgment to evaluate the advice. *Bussian*, 223 F.3d at 300–01. But even if Alcoa Defendants delegated full authority to Fiduciary Counselors to make a truly

---

[10] Defendants' argument (at 32) that Plaintiffs fail to allege imprudence in the Committee's selection of Fiduciary Counselors is another straw man—the AC contains no such claim.

"independent" decision, that still would not relieve Alcoa Defendants of responsibility unless specific statutory requirements are met, which Plaintiffs have not alleged. *See* 29 U.S.C. § 1105(c)(2). In the case cited by Defendants, it was undisputed that the company insiders had delegated "exclusive fiduciary authority and responsibility" and "sole discretion" to the outside party. *Burke v. Boeing Co.*, 42 F.4th 716, 727–28 (7th Cir. 2022). There are no similar allegations here.

Finally, because ERISA "defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan," *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993), delegating authority *on paper* would not preclude a finding that Alcoa Defendants' actual *conduct* was inconsistent with the contract. That is exactly what Plaintiffs assert in alleging that "Alcoa Defendants selected Athene." AC ¶ 105.

***Mr. Oplinger***. Although Mr. Oplinger undisputedly was a member of the Committee during the relevant period, Defendants seek dismissal due to a lack of details as to how he individually exercised "discretionary authority." Mot. 29–30. Rule 8(a)(2) does not require Plaintiffs to directly allege such details. *See supra*, p. 33. "[T]he manner in which each defendant . . . operated is for now something of a black box. To expect a plaintiff to be able to turn on the light and point to particular individuals who exercised decision making authority is simply too much to require at this stage." *Wallace v. Int'l Paper Co.*, 509 F. Supp. 3d 1045, 1052 (W.D. Tenn. 2020) (quoting *Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003)). As a high-ranking Alcoa executive and Committee member, it is reasonable to infer that Mr. Oplinger participated in the Committee's decisions. *See Sacerdote v. N.Y. Univ.*, 2022 U.S. Dist. LEXIS 251171, *17–19 (S.D.N.Y. Oct. 24, 2022) (rejecting argument that committee members were not fiduciaries).

***Fiduciary Counselors.*** Defendants' argument (at 32) that Plaintiffs need direct allegations

"about the *process*" fails for the reasons discussed. *See supra*, p. 33.

Defendants' assertion that Fiduciary Counselors did not benefit from or have a financial interest in selecting Athene is inaccurate. Mot. 30. Although it holds itself out as "independent," Fiduciary Counselors is a for-profit business. AC ¶ 20. Thus, its revenue depends on repeat business from clients like Alcoa. In the "highly competitive" market for retirement plan services, clients with billions of dollars under management like Alcoa have tremendous leverage. *See Braden*, 588 F.3d at 590. As an experienced consultant, Fiduciary Counselors understands its clients' motivation in making the corporate decision to offload pension obligations is to enhance profits. Accordingly, notwithstanding its self-proclaimed "independence," Fiduciary Counselors has a financial incentive to tell the client paying its bills what it "wants to hear." If Fiduciary Counselors had recommended a safer—but more expensive—annuity, that would have undermined Alcoa's financial goals and would have risked losing Alcoa's business.

*Bussian* illustrates this dynamic. The court reversed summary judgment based on evidence that a consultant's goal was "to get the best bids" instead of performing a truly objective search to identify providers that would best serve the interests of participants, and that it included Executive Life among the finalists because it was "the lowest bidder," despite evidence that it "ought not be included" because of undue risk. 223 F.3d at 303–06. Similarly, Fiduciary Counselor's selection of Athene was not truly "independent" because it prioritized Alcoa's financial interests. AC ¶¶ 89, 114. Thus, Plaintiffs state a plausible disloyalty claim.

### 4. Because the selection of an unsafe provider like Athene can *never* comply with ERISA, it is irrelevant whether any superior provider was available.

Plaintiffs allege that there was "no shortage of stable and established annuity providers" in the market that Defendants could have selected for a PRT, including traditional insurers, and reference a study evaluating the risk of several such providers. AC ¶¶ 68–71, 85, 87–90.

Defendants nevertheless contend that Plaintiffs have not adequately alleged that any superior or safer annuity provider was available. Mot. 35. But Rule 8(a)(2) does not require "heightened fact pleading of specifics." *Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1108 (D.C. Cir. 2008).

Defendants also improperly rely on extrinsic evidence (Athene's Form 10-K) to dispute Plaintiffs' allegation that New York Life would have been a viable alternative. Mot. 35–36. While a court can take judicial notice that a document filed with a government agency *contains* (or omits) a particular statement, the validity of Athene's *opinion* regarding its PRT market competition is not subject to judicial notice merely because it appears in an SEC filing. Fed. R. Evid. 201(b)(2); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (regulatory filings are judicially noticeable only "to determine what statements [the documents] contained . . . [and] not for the truth of the matters asserted"); *Fuentes-Fernandez & Co., PSC v. Corvus Grp., Inc.*, 174 F. Supp. 3d 378, 384 n.10 (D.D.C. 2016) (drawing inferences from government records in defendant's favor, "contrary to plaintiff's factual allegations," "turns Rule 12(b)(6) on its head.").

Even if Athene were the only option in the market, and hence the "safest" option by default, Defendants would have then been obligated not to proceed with the PRT. "[P]utting the benefits of annuitized participants and beneficiaries at risk by purchasing an unsafe annuity" like Athene is "never" justified, 29 C.F.R. § 2509.95-1(d), and plainly violates the duty to act "solely in the interest of the participants," 29 U.S.C. § 1104(a)(1). Just as ERISA "makes clear that the duty of prudence trumps the instructions of a plan document," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 421 (2014), it is equally clear that fiduciary duties trump an employer's instruction to select a PRT provider when the only available course would endanger participants' benefits.

Defendants' argument that Plaintiffs are required to allege "losses" relies on inapposite authority. Mot. 36. The plaintiffs in *Cunningham* sought to recover "losses to the plan" in a suit

under 29 U.S.C. § 1132(a)(2), which incorporates the remedies in § 1109(a), but failed to prove

such a loss. *Cunningham v. Cornell Univ.*, 86 F.4th 961, 981–82 (2d Cir. 2023), *cert. granted*,

No. 23-1007 (U.S. Oct 4, 2024). As discussed, Plaintiffs are not seeking to recover plan losses

under § 1132(a)(2). *See supra*, pp. 20–21. Section 1132(a)(2) provides for additional remedies

that do not require a showing of loss. *See* 29 U.S.C. § 1109(a). Other provisions under which

Plaintiffs bring suit also do not require a showing of "loss." *See id*., § 1132(a)(3) ("appropriate

equitable relief" to redress "any act or practice which violates" ERISA); *id*., § 1132(a)(9)

("appropriate relief" for annuity purchase that "constitutes a violation of part 4 of this title").

### B.    Plaintiffs plausibly allege co-fiduciary and non-fiduciary liability (Counts I–III).

Even if Alcoa Defendants did not directly select Athene, they remain subject to potential

liability on two additional grounds. First, any fiduciary "shall be liable for a breach of

responsibility of another fiduciary" under the circumstances described in ERISA's "co-fiduciary"

liability provision. 29 U.S.C. § 1105(a). Second, any non-fiduciaries are potentially subject to

liability for participating in an ERISA violation. *See Harris Tr. & Sav. Bank v. Salomon Smith

Barney Inc.*, 530 U.S. 238, 246, 248–51 (2000).

Defendants' suggestion (at 38) that ERISA does not authorize knowing participation claims

against non-fiduciaries flies in the face of *Harris Trust. See Diduck v. Kaszycki & Sons

Contractors, Inc.*, 974 F.2d 270, 281–82 (2d Cir. 1992) (discussing "well-settled elements" of

knowing participation claim); *Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, 2024 U.S. Dist.

LEXIS 97679, at *16–31 (S.D.N.Y. May 31, 2024) (denying motion to dismiss such claims).

Defendants' assertion (at 38) that Fiduciary Counselors did not violate ERISA fails for

reasons previously discussed. Having hired Fiduciary Counselors to select a PRT provider, Alcoa

Defendants necessarily had "actual or constructive knowledge of the circumstances that

rendered" Fiduciary Counselors' conduct unlawful. AC ¶ 111; *Harris Tr.*, 530 U.S. at 251.

It is irrelevant whether Defendants had "knowledge of the legal conclusion that the transaction was unlawful," *Carfora*, 2024 U.S. Dist. LEXIS 97679, at *30, which is an untenable standard that would make liability hinge on the defendant's legal acumen. Thus, Plaintiffs state a plausible non-fiduciary liability claim. Because the elements of a § 1105(a) claim are similar (though the remedies are different, *see* 29 U.S.C. § 1109(a) (remedies against "a fiduciary" only)), the same facts also state a plausible co-fiduciary claim. *See* 29 U.S.C. § 1105(a).

### C.    Plaintiffs plausibly allege prohibited transactions (Count IV).

Congress supplemented the general fiduciary duties by categorically barring certain "prohibited transactions" with a high potential for abuse. *Harris Tr.*, 530 U.S. at 241–42. The alleged facts show that Defendants caused prohibited transactions between (1) the Plans and a "party in interest" (Athene), 29 U.S.C. § 1106(a), and (2) the Plans and a "fiduciary," 29 U.S.C. § 1106(b). AC ¶¶ 117–27. Defendants' arguments for dismissal fail.

The term "party in interest" includes an entity "providing services to [a] plan." 29 U.S.C. § 1002(14)(B). Defendants contend that Athene is not a party in interest because it is a "seller of goods," not a provider of "services" to the Plans. Mot. 40–41. But the two are not mutually exclusive. While Defendants contend that "[a]nnuities are . . . investment products," *Nationsbank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 259 (1995), nothing in that opinion suggests that the manager of an investment product is not *also* providing a "service."

Defendants also rely on a DOL opinion letter, which lacks the force of law. *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000). DOL specifically warns that "*[o]nly the parties described in the request for opinion may rely on the opinion*," and only to the extent of the specific facts therein. *See* Filing Requests for ERISA Advisory Ops.: ERISA Proc. 76-1, "Section 10. Effect of Advisory Opinion" (emphasis added), https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/filing-requests-for-erisa-aos.

Indeed, the cited opinion letter was based on different facts: it involved an "insurance policy," not an annuity. DOL Op. Letter No. 76-36, 1976 ERISA LEXIS 92, at *1 (Jan. 15, 1976). Defendants' own case holds that "annuities are properly classified as investments, not 'insurance.'" *Nationsbank*, 513 U.S. at 261. Thus, *Marshall v. Carroll*, which addressed "an insurance company provid[ing] insurance" to a plan, is also inapposite. 1980 U.S. Dist. LEXIS 17767, at *27 (N.D. Cal. Apr. 18, 1980). Defendants cite no authority suggesting that an investment manager is not a service provider. *Cf. Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 137 (D. Mass. 2021) (concluding that consultant and investment manager became "party in interest" by providing "services to the Plan").

Moreover, while the sale of a single policy "would not *alone* cause the insurance company to become a party in interest," DOL acknowledged that the insurer *would* be a party in interest if it also "provides services to the plan." 1976 ERISA LEXIS 92, at *1. In contrast to an isolated insurance sale, Defendants repeatedly hired Athene for *seven* PRTs. AC ¶¶ 80–82. Thus, even if Athene was not a party in interest initially, Athene's repeated dealings with the Plans made it the type of entity "that a fiduciary might be inclined to favor at the expense of the plan's beneficiaries," and hence a party in interest. *Harris Tr.*, 530 U.S. at 242.

Defendants also contend that the transactions qualify for exemptions under § 1108. Mot. 42. The question of whether a complaint must anticipate and rebut potential § 1108 exemptions to state a plausible § 1106(a) claim is pending before the Supreme Court. *See Cunningham v. Cornell Univ.*, 86 F.4th 961, 975 (2d Cir. 2023), *cert. granted*, No. 23-1007 (U.S. Oct 4, 2024). The better view is that § 1108 "exemptions are affirmative defenses for pleading purposes, and so the plaintiff has no duty to negate any or all of them." *Allen*, 835 F.3d at 676; *Braden*, 588 F.3d at 601–02 ("It would be perverse to require plaintiffs bringing prohibited transaction claims

to plead facts that remain in the sole control of the parties who stand accused of wrongdoing.").

Even if it were proper to reach an affirmative defense at this stage, the claimed exemptions provide no basis for dismissal. Section 1108(b)(17) does not even apply to § 1106(a)(1)(C). *See* 29 U.S.C. § 1108(b)(17)(A) (referring to "[t]ransactions described in subparagraphs (A), (B), and (D) of section 1106(a)(1)" only). The fiduciary bears the burden of proving that the plan paid no more than "adequate consideration." 29 U.S.C. § 1108(b)(17)(A). "This burden is a heavy one." *Brundle v. Wilmington Trust, N.A.*, 919 F.3d 763, 770 (4th Cir. 2019) (construing "adequate consideration" in § 1108(e)). "Whether the transaction is exempted under § 1108 by adequate consideration depends in part on whether [defendant] performed sufficient due diligence" and its investigative process. *Fish v. Greatbanc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014). Plaintiffs' allegation that Defendants failed to prudently investigate Athene negates any inference that they satisfied § 1108(b)(17). Although Athene was the "lowest-cost provider," Mot. 42–43, that did not make its compensation reasonable under § 1108(b)(2)(A). Given the risk that Athene posed to participants' benefits, it was unreasonable to pay any amount for an unsafe annuity. AC ¶ 122; *see* 29 CFR § 2509.95-1(d) (lower costs "could *never* justify . . . purchasing an unsafe annuity"). That allegation also defeats the regulatory exemption cited by Defendants, which likewise contains a "reasonable compensation" requirement. 71 Fed. Reg. 5887, 5889 (Feb. 3, 2006).

Plaintiffs also state plausible § 1106(b) violations because they allege that Defendants' selection of a riskier annuity provider to increase corporate profits resulted in the use of plan assets in Alcoa's interest and in conflict with the participants' interests. AC ¶ 123.[11] Defendants assert that this claim fails because Fiduciary Counselors caused the transaction, and there is no allegation that the transaction benefited Fiduciary Counselors. Mot. 41–42. That argument fails

---

[11] In contrast to § 1106(a), the § 1108 exemptions are unavailable for § 1106(b) violations. *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 94–95 (3d Cir. 2012).

for two reasons, First, the fact that Alcoa Defendants hired Fiduciary Counselors did not negate Alcoa Defendants' own role in selecting Athene. *See supra*, pp. 35–36. Second, the statute prohibits not only self-dealing, but also acting *on behalf* of a party "whose interests are adverse to . . . the interests of" the plan participants. 29 U.S.C. § 1106(b)(2). As discussed, Alcoa's reversionary interest is adverse to Plaintiffs' interest in maximizing the security of their benefits. By selecting a high-risk provider to benefit Alcoa, Fiduciary Counselors acted on behalf of a party whose interests are adverse to Plaintiffs' interests. Alcoa Defendants are liable for knowingly participating in that violation. AC ¶ 127.

### D.    Plaintiffs plausibly allege imprudent monitoring (Count V).

Under ERISA, '[a]n appointing fiduciary's duty to monitor his appointees is well-established.'" *Whetstone*, 2024 U.S. Dist. LEXIS 164095, at *27 (quoting *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 477 (S.D.N.Y. 2005)); *see also Leigh v. Engle*, 727 F.2d 113, 135 (7th Cir. 1984) (appointing fiduciary must exercise "appropriate prudence and reasonableness in overseeing" appointee); Restatement (Third) of Trusts § 80 cmt. d(2) (an appointing fiduciary must "act with prudence in supervising or monitoring the agent's performance and compliance with the terms of the delegation."). When the monitoring claim "is predicated on the existence of an underlying breach of fiduciary duty, the claims rise and fall together." *Russell v. Harman Int'l Indus., Inc.*, 945 F. Supp. 2d 68, 72 n.2 (D.D.C. 2013). Because Plaintiffs adequately allege an underlying breach for the reasons discussed, the duty to monitor claims survives to the same extent. *Whetstone*, 2024 U.S. Dist. LEXIS 164095, at *28.

Defendants merely repeat their argument against the underlying claims for breach of fiduciary duty, but it fares no better the second time. Mot. 43–44. They contend that because Plaintiffs have not alleged factual details "about the *process* used by Fiduciary Counselors," Alcoa Defendants could not have breached any monitoring duty. But as discussed, Plaintiffs

need not directly allege how "the process" was flawed, where the facts otherwise raise a plausible inference of fiduciary breach, as they do here. *See supra*, p. 33. Fiduciary Counselors' selection of Athene violated ERISA's standards, yet Alcoa Defendants stood idly by and allowed the selection of an unsafe annuity for Alcoa's benefit and at Plaintiffs' expense. AC ¶¶ 86, 131–32. Accordingly, Count V states a claim for failure to monitor.

## III.    Plaintiffs have statutory standing under 29 U.S.C. §§ 1132(a)(2) and (3).

Defendants' attempt to draw a distinction between "current" and "former" participants misunderstands the law. Mot. 44–45. Defendants are essentially arguing for a legal loophole; they contend that equitable remedies such as disgorgement, which are available under § 1132(a)(3), become unavailable when the very events at issue—an employer removing employees from an ERISA plan against their will—make the plaintiff a "former" participant. Defendants' position is contrary to both common sense and ERISA's text.

Nothing in ERISA distinguishes between "current" and "former" participants. Congress simply authorized a "participant" or "beneficiary" to commence a civil action (along with the Secretary of Labor and plan fiduciaries). 29 U.S.C. §§ 1132(a)(2), (a)(3). Section 1132(a)(9) is not to the contrary. Although it initially refers to an "individual who was a participant or beneficiary at the time of the alleged violation*,*," it then refers to that person as "*the participant or beneficiary*" in the *present* tense, making clear that the plaintiff remains a "participant" or "beneficiary" for purposes of civil enforcement. 29 U.S.C. § 1132(a)(9) (emphasis added).

Indeed, § 1132(a)(9) was intended to "clarify" that a PRT does *not* deprive a participant of statutory standing. Several cases predating § 1132(a)(9) had held that "annuitants are not plan participants and therefore lack standing under ERISA," but such cases were "wrongly" decided. *See Kayes*, 51 F.3d at 1455 (quoting 130 Cong. Rec. H 10621 (Oct. 3, 1994)). Section 1132(a)(9) was not "a change" in the law, but a "clarification." *Id.* Thus, if the plaintiff was a "participant"

at the time of the ERISA violation, the employee does not lose statutory authority to pursue a civil action arising from the violation merely because subsequent events will remove ERISA's protections on a *prospective* basis. When Defendants selected Athene, each of the Plaintiffs was certainly a "participant" to whom Defendants owed statutory duties of loyalty and prudence. Defendants cannot erase liability for certain remedies by the simple expedient of ejecting Plaintiffs from the Plans. To hold otherwise would allow an employer to steal pension funds with impunity while terminating a plan, thereby depriving the "former" participants of standing.

Defendants' view that § 1132(a)(9) excludes "disgorgement" as a remedy is also wrong. Mot. 45. The remedies available under § 1132(a)(9) are not limited to "only the benefits they were entitled to receive," as Defendants argue. Rather, it broadly allows the plaintiff "to obtain appropriate relief," *i.e.*, any remedy that the court deems appropriate to remedy the "violation of part 4 of this title," which includes the fiduciary responsibility provisions in §§ 1101–14. 29 U.S.C. § 1132(a)(9). The "posting of security" to assure receipt of benefits is one example of such relief. If the annuity purchase involved a breach of the duty of loyalty—among the duties in "part 4 of this title," 29 U.S.C. § 1104(a)(1)(A)—in which the employer wrongfully retains plan assets for its own benefit and at the expense of the transferees' retirement security, disgorgement of the sums derived from the breach is "appropriate relief." When Congress intended to limit the remedies available under other subsections of § 1132(a), it modified the term "relief" accordingly. *See, e.g.*, 29 U.S.C. § 1132(a)(2), incorporating § 1109(a) (remedies include "other *equitable or remedial* relief"); § 1132(a)(3) (limiting remedies to an injunction or "other appropriate *equitable* relief") (emphases added). In contrast, the unmodified "appropriate relief" in § 1132(a)(9) broadly covers the full range of remedies needed to rectify the ERISA violations.

## CONCLUSION

For the above reasons, Defendant's motion to dismiss should be denied.

October 24, 2024                           Respectfully submitted,

                                           /s/  Jerome J. Schlichter
                                           SCHLICHTER BOGARD LLP
                                           Jerome J. Schlichter*
                                           Sean E. Soyars*
                                           Kurt C. Struckhoff*
                                           100 South Fourth Street, Suite 1200
                                           St. Louis, Missouri 63102
                                           Phone: (314) 621-6115, Fax: (314) 621-5934
                                           jschlichter@uselaws.com
                                           ssoyars@uselaws.com
                                           kstruckhoff@uselaws.com

                                           *admitted *Pro Hac Vice*

                                           *Counsel for Plaintiffs*

                                           Lawrence M. Mann (D.C. Bar ID: 43703)
                                           ALPER & MANN, P.C.
                                           9205 Redwood Avenue
                                           Bethesda, Maryland 20817
                                           Telephone: (202) 298-9191
                                           LM.Mann@verizon.net

                                           *Local Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2024, the foregoing document was electronically

filed with the Clerk of the Court using the CM/ECF system, which will send notice of electronic

filing to counsel of record.

                                           /s/  Jerome J. Schlichter
                                           Jerome J. Schlichter