## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARTHA BRENNAN CAMIRE, CRAIG
JEFFERSON, DAVID LYN SHEPHERD, and
DANIEL SCHIPPER, individually and as
representatives of a class of participants and
beneficiaries on behalf of the Pension Plan for
Certain Salaried Employees of Alcoa USA Corp.,
the Pension Plan for Certain Hourly Employees of
Alcoa USA Corp., and the Alcoa Subsidiaries
Merged Inactive Plan,

*Plaintiffs*,

v.

ALCOA USA CORP., ALCOA CORP., THE
ALCOA BENEFITS MANAGEMENT
COMMITTEE, WILLIAM F. OPLINGER,
FIDUCIARY COUNSELORS, INC., and JOHN
DOES 1–5,

*Defendants*.

Civil Action No. 1:24-cv-01062-LLA

**[PROPOSED] SECOND
AMENDED COMPLAINT—
CLASS ACTION**

JURY TRIAL DEMANDED

1.      Plaintiffs Martha Brennan Camire, Craig Jefferson, David Lyn Shepherd, and

Daniel Schipper, individually and as representatives of a class of similarly situated participants

and beneficiaries of the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation

("Salary Plan"), Pension Plan for Certain Hourly Employees of Alcoa USA Corporation

("Hourly Plan"), and the Alcoa Subsidiaries Merged Inactive Plan (collectively, the "Plans"),

bring this action against Defendants Alcoa Corp. ("Alcoa"), Alcoa USA Corp. ("Alcoa USA"),

William F. Oplinger, the Alcoa Benefits Management Committee ("Benefits Committee"), and

John Does 1–5 (collectively, the "Alcoa Defendants"), and Fiduciary Counselors, Inc.

("Fiduciary Counselors") (collectively, "Defendants"), for breach of fiduciary duties and other

violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

**EXHIBIT 2**

2.      ERISA imposes strict fiduciary standards of conduct on pension plans. Plan fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). Fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271 (citing Restatement of Trusts 2d § 170 (1959), II Scott on Trusts §170, at 1297–99 (1967), and Bogert, The Law of Trusts and Trustees § 543 (2d ed. 1978)) (citation omitted).

3.      Through four separate transactions completed between 2018 and 2022, Defendants offloaded over $2 billion of Alcoa's pension obligations, which affected over 28,000 Alcoa retirees and their beneficiaries. Defendants offloaded these obligations to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively "Athene"), private equity-controlled insurance companies with a highly risky offshore structure. As a result of these transactions, Plaintiffs and the similarly situated participants and their beneficiaries lost their status as "participants" in the ERISA-governed Plans, and therefore, are no longer subject to ERISA's protections for employee retirement benefits. Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, ERISA requires that a fiduciary obtain the "safest annuity available." 29 CFR § 2509.95-1. Importantly, "purchasing an unsafe annuity" is "never justif[ied]." *Id*.

4.      Rather than selecting the safest possible annuity to ensure the continued financial security for Alcoa retirees and their beneficiaries, Defendants selected Athene, a substantially riskier insurer than numerous other traditional annuity providers. Annuities provided by Athene are structured to generate potentially higher expected returns. Athene invests in lower-quality,

higher-risk assets without the traditional mix of quality assets to support future benefit obligations, posing a significant risk at a great cost to retirees. Because the market accounts for such risk when pricing investments, it is likely that the Alcoa Defendants saved a substantial amount of money by selecting group annuity contracts ("GACs") from Athene over the safest annuities available. In transferring Plaintiffs' pension benefits to Athene, Defendants put Alcoa's retirees' and their beneficiaries' future retirement benefits at substantial risk of default—a risk which devalued their pensions without proper compensation. Accordingly, in addition to other remedies, Plaintiffs seek to receive the monetary value of the additional risk of their annuity as demonstrated by the marketplace.

5.    To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plans, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transactions and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

## JURISDICTION AND VENUE

7.6.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

8.7.    **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from ERISA-governed pension plans backed by an established, multi-billion-dollar corporation and one of the largest aluminum

3

producers in the United States, and then placed in the hands of a private equity-controlled insurance company with a highly risky offshore structure and asset portfolio. As a result, Plaintiffs are subject to an increased and significant risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk without appropriate compensation, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plans. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9). Plaintiffs have suffered at least five distinct injuries-in-fact traceable to Defendants' conduct that can be redressed by a decision from this Court.

8.    *First*, the annuitization created a future risk that Plaintiffs will experience harm that satisfies Article III. As set forth below, Athene is substantially likely to fail in the near future. And the annuitization—which removed Plaintiffs from the Plan—substantially increased the risk that Plaintiffs will not receive the benefits that they earned and to which they are entitled. Based on the detailed factual allegations below, once Athene fails there is a substantial likelihood that Plaintiffs will not receive their benefits, including because the safeguards that Defendants say could protect Plaintiffs' benefits in the event of a failure are in fact highly correlated with Athene's financial condition (meaning that Athene's failure would almost certainly render those safeguards ineffective). For example, upon Athene's failure, it is highly unlikely that Athene could secure alternative funding to ensure that Plaintiffs receive their benefits in accordance with the schedules set forth in the group annuity contracts.

9.      *Second*, even ignoring the probability of Athene's complete inability to pay, the annuitization created a substantial likelihood that Plaintiffs will suffer Article III injury in the future. That is because even *before* it fails, Athene will likely be subject to regulatory actions that will require it to unwind its affiliated transactions and thereby necessarily *interrupt* Plaintiffs' benefits—a pocketbook injury that itself satisfies Article III. The likelihood that Athene will be required to unwind some of its affiliated, non-arms' length transactions and that Plaintiffs will thus suffer an interruption of their benefits is even greater than the likelihood that Athene will collapse altogether, as Athene may be forced into state-supervised rehabilitation or conservation, even if it does not recognize immediate, catastrophic losses. The risk that regulatory actions will lead to a moratorium on benefits payments to Plaintiffs is real and at least substantially likely. In fact, that is exactly what happened to a similar insurer, PHL Variable discussed below, when regulators in Connecticut ordered a moratorium on certain annuitant payments in connection with rehabilitation proceedings that commenced in May 2024. As set forth in greater detail below, multiple insurers that share key characteristics with Athene (including PHL Variable) have been subject to similar regulatory action, including as recently as March 21, 2025. When an annuity provider is subject to such regulatory action and payments are delayed or reduced, massive costs are imposed on beneficiaries, including the lost time value of money during the interruption of benefits payments (which can extend for years and even decades) and the lack of access to annuity payments that are necessary for basic living expenses.

10.      *Third*, Plaintiffs have *already* been injured by having their accrued pension benefits and future retirement benefits offloaded from an ERISA-governed pension plan backed by an established, multibillion-dollar public corporation and the PBGC, to a private equity-controlled insurance company with a highly complex and opaque Bermuda-based structure and

risky asset portfolio, and with the guarantees from the federal government completely stripped away. The annuitization quantifiably and substantially impaired the value of Plaintiffs' retirement benefits the moment it occurred.

11.    That the value of Plaintiffs' benefits has already been reduced by the annuitization is a fact demonstrable by actuarial science. Plaintiffs can and will demonstrate, through the testimony of a credentialed pension actuary, that this lost value has already accrued because (i) a key factor in determining the value of an annuity replacing future pension benefits is the likelihood that the annuity provider can fulfill its obligations; (ii) it is well-settled and recognized by pension actuaries that the probability of non-fulfillment for a risky insurance company is far greater than for a PBGC-backed pension (the risk for the latter approximates 0%); and (iii) annuitization with a risky insurer thus erodes pensioners' net worth by the degree of the insurer's risk. Put simply, because the probability that Plaintiffs' PBGC-backed benefits from Alcoa would fail was negligible, and the probability that Plaintiffs will not timely receive their benefits from Athene is substantial, the annuitization deprived Plaintiffs of significant value.

12.    An annuity from a risky insurer is not only worth measurably less than a PBGC-backed pension in this actuarial sense; actual decisions made by retirees confirm the reduction in the value to them. A body of independent research predicated on empirical data, as well as experimental findings, demonstrates that retirees overwhelmingly favor smaller annuity payments with a safe insurer to larger payments from a risky insurer. When a retiree's PBGC-backed benefits are swapped for annuity payments of the same amount, the retiree has thus been deprived of the value of increased security that they had enjoyed from the pension. It follows that virtually all retirees would prefer to have their PBGC-backed pension rather than annuity payments from Athene, and a rational retiree properly informed about Athene's riskiness would,

in nearly all cases, prefer a reduction in the amount of their pension payments to avoid Athene's assuming the responsibility to pay their benefits.

13.    *Fourth*, Plaintiffs have suffered an independent Article III injury because Defendants' breaches of fiduciary duties caused Plaintiffs to suffer intangible, yet concrete injuries—namely, the invasion of legally protected interests—that were actionable at common law and thus satisfy Article III. Plaintiffs likewise have standing to seek disgorgement to remedy this breach of fiduciary duty.

14.    *Fifth*, Plaintiffs have suffered a separate and distinct Article III injury because the annuitization has deprived Plaintiffs of critical rights and benefits that they enjoyed under ERISA. Before the annuitization, the entity responsible for Plaintiffs' benefits (Alcoa) was subject to ERISA's exacting fiduciary duties, which are among the highest known to law. After the annuitization, that is not true: the entity responsible for Plaintiffs' benefits (Athene) is not subject to ERISA's fiduciary standards (or any fiduciary standards). And, if Plaintiffs' benefits are unpaid by Athene or even interrupted, the annuitization will have stripped them of (i) their right to a federal cause of action to sue the entity responsible for their benefits for breach of fiduciary duty; (ii) their right to ERISA's generous service of process, personal jurisdiction, fee-shifting, and venue provisions; and (iii) their right to receive an effective remedy through the federal class action procedure.

15.    Plaintiffs' only recourse against Athene in the event of interruption or nonpayment of their benefits would be as third-party beneficiaries to a contract that Athene and Alcoa drafted to benefit themselves without Plaintiffs' input. It is highly uncertain whether under those circumstances Plaintiffs would have (i) access to a federal forum; (ii) any cause of action other than breach of contract; (iii) access to a forum that could exercise personal jurisdiction over the

appropriate Athene entity; and (iv) the right to bring their claims collectively through an efficient class action, rather than through piecemeal actions in various state courts. The annuitization thus deprived Plaintiffs of a guaranteed effective remedy—which they enjoyed under ERISA—to sue the entity responsible for their benefits payments for any interruption or disruption of those payments, including because certain arms of Athene are based in and operate from Bermuda. Depriving a plaintiff of the effective remedy afforded to them by law alone establishes standing under Article III.

9.16.   **Venue.** This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the district in which, on information and belief, at least one of the alleged breaches took place, and where at least one Defendant resides or may be found.

## PARTIES

### I.    The Alcoa Plans

10.17.  The Plans include the Pension Plan for Certain Hourly Employees of Alcoa USA Corporation, the Pension Plan for Certain Salaried Employees of Alcoa USA Corporation, and the Alcoa Subsidiaries Merged Inactive Plan.

11.18.  The Plans are defined benefit, employee benefit pension plans under 29 U.S.C. § 1002(2)(A) and § 1002(35) covering employees of Alcoa. The Plans were established and maintained under written documents in accordance with 29 U.S.C. § 1102(a)(1).

12.19.  As of 2018, before the first buy-out transactions at issue, the Plans covered 43,400 total participants and held nearly $4 billion in combined assets.

### II.    Plaintiffs

20.     Plaintiff Jefferson resides in Newburgh, Indiana, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). Mr. Jefferson retired in 2015 after working in Alcoa's

Procurement department for approximately 24 years. Mr. Jefferson began receiving payments from Athene in 2022. Mr. Jefferson is 67 years old and receives approximately $49,000 per year in annuity payments, which, as with all Alcoa pensioners, must continue for the rest of his life.

13.21.  Mr. Jefferson's situation illustrates the losses that Plaintiffs have suffered. His state of residence, Indiana, has a $250,000 absolute cap on how much he can receive from the its state guaranty association, or SGA, in the event of an Athene default (assuming, that is, the state guaranteed funds could raise all the money required to reach the cap). This means that when Athene defaults, the SGA payments will be exhausted, when the present value of Mr. Jefferson's future payments reaches $250,000. A pension actuary has recently calculated that the present value of Mr. Jefferson's annuity payments is at least $572,000, depending on the form the payments take.  This amount greatly exceeds Indiana's $250,000 cap. Thus, an Athene default will leave Mr. Jefferson with less than half his monthly benefit – a huge and immediate loss. (That immediate loss is because SGAs which assume responsibility for insurer payments typically will immediately reduce the monthly benefit paid to the annuitant in order to fit projected lifetime payments under the $250,000 cap.)

14.22.  Plaintiff Brennan Camire resides in Richmond, Virginia, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). Ms. Brennan Camire began receiving pension payments from Alcoa in 2012 after being employed at Alcoa from 1969 to 1972, and again as a Convenience Center Supervisor in Alcoa's Recycling department from 1990 to 1994. Ms. Brennan Camire began receiving payments from Athene in 2018.

15.23.  Plaintiff Shepherd resides in Arkadelphia, Arkansas, and was a participant in the Salary Plan under 29 U.S.C. § 1002(7). In 1979, Mr. Shepherd began working for Reynolds Metals, a company that was purchased by Alcoa in 2000. Mr. Shepherd retired in 2016 after

working as an Environmental Manager at Alcoa. Mr. Shepherd began receiving pension payments from Athene in November 2022.

16.    Plaintiff Schipper resides in Northville, Michigan, and was a participant in both the Salary Plan and the Subsidiaries Merged Inactive Plan under 29 U.S.C. § 1002(7). Mr. Schipper began working for Alcoa in 1979 and retired in 2010. He was the Director of Financial Planning & Analysis in the Engineering Products & Solutions Department at the time of his retirement. Mr. Schipper began receiving pension payments from Athene in November 2022.

## III.    Defendants

17.25.  Alcoa Corporation (NYSE: AA) ("Alcoa") is a publicly traded aluminum producer headquartered in Pittsburgh, Pennsylvania. As of December 31, 2023, Alcoa employed approximately 13,600 employees in 17 countries worldwide. As of that same date, Alcoa recorded $10.55 billion in net revenue. As alleged herein, Alcoa exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.26.  Alcoa USA Corporation ("Alcoa USA") is a subsidiary of Alcoa Corp. Alcoa USA is the Plan sponsor under 29 U.S.C. § 1002(16)(B) and Plan administrator under 29 U.S.C. § 1102(a). Alcoa USA entered into four commitment agreements with Athene under which the Alcoa Defendants agreed to purchase GACs that would transfer certain of Alcoa's defined benefit pension obligations to Athene. As alleged herein, Alcoa USA exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.27.  The Alcoa Corp. Benefits Management Committee ("Benefits Committee") had fiduciary responsibility for the Plans. The Benefits Committee is made up of a group of individuals appointed by Alcoa's Board of Directors to oversee the operation of the Plans. Alcoa USA "designated the Benefits Management Committee to oversee the operation of the plan[s] and the Benefits Management Committee has… discretionary authority." Accordingly, as alleged herein, the Benefits Committee exercised discretionary authority or discretionary control

11

respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.28.  William F. Oplinger is a resident of Sewickley, Pennsylvania, and is the current President and Chief Executive Officer of Alcoa, having served in that role since September 24, 2023. Since 2018, Mr. Oplinger has been responsible for reducing Alcoa's pension liabilities through annuitizations with insurance providers. From November 2016 to February 2023, when the PRT transactions with Athene occurred, Mr. Oplinger was Executive Vice President and Chief Financial Officer of Alcoa. Mr. Oplinger currently serves on the Board of Directors of Alcoa ("Board"). And from 2013 through at least June 2021, he served as a member of the Benefits Committee. As alleged herein, Mr. Oplinger exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

21.29.  Fiduciary Counselors, Inc. ("Fiduciary Counselors") is a privately held investment consulting firm that acts as an independent fiduciary for pension fund assets, a role which usually involves reviewing one-time transactions. Fiduciary Counselors became an independent entity in 2003 and is wholly owned by its senior executives and former employees. Fiduciary Counselors is headquartered in Washington, D.C. Fiduciary Counselors was hired by the Alcoa Defendants to act as the independent fiduciary over the pension risk transfers ("PRT") at issue here. As alleged herein, Fiduciary Counselors exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control

respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

22.30. John Does 1–5 are unknown members of the Benefits Committee who exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans and are fiduciaries under 29 U.S.C. § 1002(21)(A)(i) and (iii).

23.31. Each Defendant is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. § 1002(21)(A), 1102(a).

### ERISA'S FIDUCIARY STANDARDS

24.32. ERISA's primary purpose is to protect the retirement security of plan participants and their beneficiaries. The statute achieves its protective purposes by imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably a duty of loyalty and a duty of prudence. 29 U.S.C. § 1104(a)(1). The statute states, in relevant part, that:

33. [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

25.34.  The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1, setting forth its view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, in order to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Id. Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

26.35.  The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered per se violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary may be inclined to favor at the expense of the plan beneficiaries." Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc., 530 U.S. 238, 241−42 (2000); 29 U.S.C. § 1106(a)–(b); 29 U.S.C. § 1002(14).

FACTS APPLICABLE TO ALL COUNTSFACTS APPLICABLE TO ALL COUNTS

I.IV.    **Pension Risk Transfers ("PRT")**

27.36.  "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became

the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were America's predominant retirement system when ERISA was enacted in 1974.

28.37.  Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically a monthly payment, after retirement. Generally, employers are responsible for funding the pension plan to pay their benefit obligations to employees and retirees. The amount of retirement benefits provided to employees is based on a formula that takes into account factors such as salary and years of service, among others.

29.38.  A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a pension plan, the employer (or plan sponsor) bears that risk. In the event that plan assets are inadequate to satisfy liabilities for benefit payments, the employer has an obligation to make additional contributions to the plan to meet ERISA's funding requirements. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the risk of underperformance falls to the employee rather than the employer.

30.39.  Employers have reduced their pension funding risk through PRT transactions. In a PRT transaction, an employer offloads all or part of its pension benefit obligations by purchasing GACs with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

31.40.  A plan sponsor's selection of an annuity provider to whom it transfers its pension obligations is a fiduciary function, and a critically important one. This decision will have a lasting impact on retirees and their beneficiaries for the rest of their lives. As one independent expert from NISA Investment Advisors has explained, such a selection is one of the most

consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit.

32.41.  PRT transactions can take one of two forms: (1) total buyouts, in which the plan sponsor or employer terminates the plan and transfers all of the pension obligations to an insurer through purchase of an annuity contract; or (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants. As discussed below, the Alcoa transactions at issue involved partial buyouts.

## H.V.    The Risks Associated with PRT Transactions

### A.  Lack of ERISA and PBGC Protections

33.42.  An employer that transfers its pension benefit obligations through a PRT transaction causes participants to lose protections under ERISA. With few exceptions, ERISA-governed defined benefit plans are protected by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

34.43.   ERISA-governed defined benefit plans are required to pay PBGC premiums, which fund the PBGC so that pensioners will be protected if their plan sponsor becomes insolvent. Since PRT transactions remove PBGC protections, they also remove PBGC premium obligations. Not only does this leave affected pensioners uncovered, but it poses a funding risk to the PBGC, therefore threatening the level of protection offered to those participants still protected by the PBGC.

35.44.  SGAs are not pre-funded like the PBGC and thus offer less protection compared to the PBGC. SGAs are funded by assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in

present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity provider becomes insolvent. Further limitations may be present depending on the state. For instance, in California, pensioners are subject to the so called "California haircut," in which the annuitant automatically loses 20%, as the maximum benefit is only 80% of the present value of the annuity.

### B. Risk of Insolvency and Executive Life

36.45.  The risk of insurance company failure is not merely hypothetical. The collapse of Executive Life Insurance Company ("Executive Life") in the early 1990s demonstrates the potentially catastrophic consequences of high-risk insurance practices involving pension plans. Similar to the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages, which caused employers to select Executive Life as an annuity provider.

37.46.  Over 300,000 policyholders relied on Executive Life, which held an A+ rating for financial soundness, for regular payments. Executive Life's investment strategy proved disastrous. By 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown." A significant percentage of Executive Life's assets were invested in high-risk, high-yield junk bonds sold by brokerage firm Drexel Burnham Lambert ("Drexel"). First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was one of Drexel's largest buyers of junk bonds. Drexel ultimately failed due to its risky bond investment strategy.

38.47.  In contrast to most insurance companies which invested in safer assets such as high-grade bonds, mortgage securities, and government obligations, Executive Life invested in

risky junk bonds with high interest rates. Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse. This risky behavior allowed Executive Life to make higher payouts to policyholders.

39.48.  By 1990, many of the Executive Life assets meant to fulfill payment obligations were trading far below their purchase price. Nevertheless, on December 27, 1990, the NAIC found that Executive Life's California and New York insurers were *not* in imminent financial danger, and thus takeovers by state insurance regulators were unnecessary. When questioned on the risky makeup of its bond portfolio, Executive Life often pointed to its "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poor's.

40.49.  On April 11, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California. Following Executive Life's seizure in 1991, Executive Life's investment portfolio was sold to Leon Black, co-head of Drexel and later co-founder of Apollo Global Management ("Apollo"), for "roughly 50 cents on the dollar." Losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion.

41.50.  Up until a week before the seizure, Executive Life maintained a contingent B-plus rating from AM Best. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, the New York insurance regulator seized Executive Life of New York on April 17, 1991. Just weeks later, parent company First Executive filed for bankruptcy.

42.51.  In 2012 Executive Life was declared insolvent and in 2013 the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. GABC

continues to make payments to annuitants to this day. However, many annuitants experienced losses of 50% or more of their annuity payments. Of note, the Executive Life Restructuring Agreement indicates that GABC is expected to make reduced annuity payments for another 50 years.

52.    Apollo was formed in 1990 by Leon Black and Marc Rowan, both of whom had major roles at Drexel Burnham Lambert, the firm that developed the junk bond market, and whose junk bond investments were the foundation for Executive Life's investments. Executive Life had promoted itself and its $6 billion portfolio of junk bonds as extremely safe for individuals who purchased its annuities. The Drexel firm collapsed in 1990, after which Black and Rowan formed Apollo.

53.    Purchase of these distressed assets led to Apollo forming Athene and guiding its investment process, though not initially owning Athene. The very formation of Athene was based on the use of high risk distressed insurance assets as the foundation for annuities held by individuals.

## C.  Response to Executive Life and Interpretative Bulletin 95-1

43.54.  In response to the financial collapse of Executive Life, Congress passed the Pension Annuitants Protection Act of 1994. *See* Pub. L. No. 103-401 (Oct. 22, 1993). Through the amendment, Congress created a right of action to obtain appropriate relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," including "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

44.55.  As noted, in 1995, the Department of Labor's Interpretive Bulletin 95-1 establishes a framework for ERISA compliance when choosing an annuity provider in a PRT

19

transaction. The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." At a minimum, fiduciaries must "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities."

45.56. In order to determine the safest available annuity, Interpretive Bulletin 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and guarantees supporting it; and (6) the availability of additional protection through state guaranty associations. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to properly evaluate these factors.

### D. Private Equity Firms

46.57. Traditional players in the PRT market include established life insurance and annuity providers such as New York Life Insurance Company ("New York Life"). However, a new class of annuity providers, backed by private equity firms, has recently taken on a growing role in the PRT landscape. In fact, private equity firms have heightened their influence over the life and annuity industry significantly by purchasing life insurers and serving as their third-party asset managers. Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, but they can also generate significant investment management fees from managing portfolios of their affiliated insurers. As a result, their mission does not align

20

with the best interests of policyholders because they focus on maximizing their immediate financial returns over protecting the long-term retirement assets promised to policyholders.

47.58.  The United States Department of the Treasury expressed concerns of a potential misalignment between "the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests." The Department of Labor also conducted a review of Interpretive Bulletin 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans (the "Council"). During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

48.59.  Private equity firms primarily began purchasing insurance companies to finance their expanding operations. As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015.

49.60.  In the wake of the recent surge in life insurer liabilities and annuity sales spurred on by PRT transactions, many life insurers "report razor-thin surpluses relative to the size and risk profile of their balance sheets." The increased use of complex investment strategies has led to a greater use of high-risk assets held in insurers' portfolios, a stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yielding investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem competitively attractive.

## III.VI.    Athene and its Financial Risks

50.61.  Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. The company was founded in 2009 by Apollo executives as an insurance affiliate. Apollo was founded in 1990 by Drexel alumni Leon Black, Josh Harris, and Marc Rowan. This was the same year Drexel collapsed, entered into bankruptcy, and caused the insolvency of Executive Life. Athene Annuity & Life Assurance Company of New York, a wholly owned subsidiary of Athene Annuity and Life Company, conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

51.62.  On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. At thethat time, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo.

63.    Industry professionals recognize that there are four prevalent factors in the insurance industry that are assessed to evaluate the risk profile of an annuity provider. These factors include: (1) adequate surplus relative to the carrier's size and risk profile; (2) the magnitude of the carrier's use of affiliated reinsurance relative to the surplus maintained by the carrier; (3) excessive growth rates of liabilities relative to surplus; and (4) the magnitude of higher-risk, less-liquid investments held in the portfolio relative to the surplus maintained by the carrier. The first two factors are particularly recognized as driving factors leading to an insurer's insolvency.

64.    Athene and Apollo's interdependence is a cause for serious concern and poses substantial risk to retirees who are dependent on Athene's ability to pay, not only at the present time, but for decades into the future. This interdependence has become much more alarming as a

22

result of a recent financial analysis of Apollo's portfolio companies. **Moody's recently reported that nearly 25% of Apollo-owned companies have defaulted since 2022**. This is largely because private equity firms, such as Apollo, rely on the use of large amounts of debt to finance purchases of companies for their portfolios, producing heavily indebted companies. In times of ultra-low interest rates, as was the case for many years until recently, this heavy debt load could be managed by the companies. However, the recent dramatic rise in interest rates has made repayment of debt a staggering problem for many of these companies, leading to defaults.[1] Because of that high debt load, private equity-owned companies, including those owned by Apollo, are now defaulting at alarming rates. Between January 2022 and August 2024, private equity owned companies defaulted at a rate of 17% according to Moody's.  This is double the default rate of non-private equity-owned companies. Apollo's portfolio companies' default rate is much higher. Apollo's default rate since 2022 is three times the rate of companies not owned by private equity firms. And since the end of 2020, two-thirds of all corporate defaults came from private equity-backed firms.

65.    The importance of this extraordinary rate of Apollo portfolio companies to Athene annuity holders can be seen from Athene's 2024 publicly available statutory filings. Those filings show that almost 50% of Athene's second quarter 2024 investments had some affiliation with Apollo. Thus, Apollo companies' recent ominous default rates directly affect Athene's risk of default. One of these investments, a massive $4 billion bond purchase from a third party (AP Grange) as part of an $11 billion Apollo acquisition of an Intel chip fabrication plant, is

---

[1] *See, e.g.*, Matt Wirz and Miriam Gottfried, *Private Equity World Engulfed by Perfect Storm*, WALL ST. J., Apr. 17, 2025, *available at* https://www.wsj.com/finance/investing/private-equity-world-engulfed-by-perfect-storm-2a2da2ad; Jason Zweig, *Don't Buy Into This Easy Fix for Stock-Market Craziness*, WALL ST. J., Apr. 18, 2025, *available at* https://www.wsj.com/finance/investing/stock-market-craziness-alternative-funds-7df17b9c.

particularly troublesome. While such a large purchase alone is a red flag, it is more concerning because Intel's chip fabrication strategy is in clear trouble, as evidenced by the removal of their CEO, subsequent ratings downgrades, and stock price collapse of almost 50%.

66.    Additionally, in the second quarter of 2024, over 75% of Athene's investments were of volatile illiquid assets. This means that if there is a severe correction in the financial marketplace, as has very recently begun within recent weeks, the market value of these illiquid assets will greatly decline in value. These illiquid, volatile assets will suffer more than traditional insurance companies' conservative, fixed-income investments, which have a definitive market value. Thus, Apollo's troubled assets, so heavily owned by Athene, rather than being a source of strength, are in fact a serious impending risk for Athene's insolvency. Because Athene and Apollo's assets are so highly interconnected, Athene will continue to suffer from Apollo's defaulting companies and be financially exposed.

67.    Risky investments are a defining characteristic of private equity owned insurers like Athene, who move investments from conservative "plain vanilla" fixed income investments such as U.S. Treasuries into high risk and illiquid assets immediately upon the acquisition of an insurance company.[2] In its 2024 Annual Report, the Financial Stability Oversight Council noted that, of all industries, the life insurance sector has experienced the most structural change, including "the adoption of alternative investment strategies, shifts in the composition of liabilities, growth in the use of offshore reinsurers, and an influx of private equity firms… into the sector."[3] A 2021 AM Best study found that private equity-owned insurers redeployed assets

[2] *Risky Business: Private Equity's Life Insurance Gambit*, AMERICANS FOR FIN. REFORM EDUC. FUND, at 10, Dec. 2023, *available at* https://ourfinancialsecurity.org/wp-content/uploads/2023/12/Private-Equitys-Life-Insurance-Gambit-02.pdf.
[3] *2024 Annual Report*, FIN. STABILITY OVERSIGHT COUNCIL, Dec. 2024, *available at* https://home.treasury.gov/system/files/261/FSOC2024AnnualReport.pdf.

"from traditional, safe insurance investments to higher-risk investments that increased the overall portfolio risks and raised the risk-based capital profile risks by 57 percent."[4] Additionally, the risks of these non-traditional investments grow over time, "especially in the higher interest rate environment that makes repaying leveraged loans more expensive and makes these loans more prone to default."[5] Turning to Athene to illustrate this risk, the authors observe that in 2022, when Apollo took over Athene, it "redeployed its assets from a 'squeaky clean' portfolio of government bonds and highly rated financial instruments to far riskier investments in subprime mortgages, payments from vacation timeshares, and even a railroad in Kazakhstan."[6]

68.    Approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its pension risk transfer liabilities are reinsured through Bermuda-based affiliates, not through third party reinsurers. This is in contrast with traditional life insurance companies, which ordinarily purchase re-insurance from third-party traditional reinsurance companies, thereby diversifying risk. By forming an in-house reinsurer and then basing it in Bermuda, Athene is not diversifying risk at all. Further, as of September 30, 2023, approximately 35% of Athene's holdings of Collateralized Loan Obligations ("CLOs") were ranked in the unfavorable BBB category, a much higher ratio than most other U.S. life industry participants.

69.    The level of an insurance company's surplus to its liabilities is a critical measure of impending risk. As of year-end 2023, Athene's surplus-to-liability ratio had declined to only **1.44%**. In contrast, a traditional insurer, New York Life, maintained a surplus-to-liability ratio of

---

[4] *Risky Business: Private Equity's Life Insurance Gambit*, AMERICANS FOR FIN. REFORM EDUC. FUND, at 10, Dec. 2023, *available at* https://ourfinancialsecurity.org/wp-content/uploads/2023/12/Private-Equitys-Life-Insurance-Gambit-02.pdf.
[5] *Id*. at 10–12.
[6] *Id*. at 12.

12.24%. New York Life is a particularly relevant comparison because both insurers have approximately the same amount of total liabilities. As of December 31, 2023, Athene had $199.1 billion in total liabilities, and New York Life had $206.6 billion. Against that level of almost $200 billion of liabilities, Athene had a minuscule amount of only 1.44% in surplus. Athene also has only a fraction of the surplus-to-liabilities ratio of other life insurers. For example, Teachers Insurance & Annuity Association ("TIAA") had a 13.83% surplus-to-liability ratio with approximately $304 billion in total liabilities during that time. Athene's surplus-to-liability ratio is only one-tenth that of TIAA's.

70.    Moreover, the impending danger posed by this meager ratio of surplus-to-liabilities is heightened by the trend line of the growth rate of Athene's liabilities. A high growth rate of liabilities is an indication that an insurer is investing in high risk, high return investments to meet policyholder obligations because when an insurer's liabilities grow at an increasing pace, it must employ methods to generate adequate assets either through investment returns or *other means* to meet policyholder demands. The growth rate of Athene's liabilities, which grew at an astonishing rate of **251%** from 2019–2023, has significantly surpassed the national average growth rate in the insurance industry of 29.90% during that same time. In contrast, New York Life's liabilities grew at the national average rate (29.92%) from 2019–2023. Other peer insurers have a dramatically lower growth rate in liabilities than Athene: TIAA (15%) and Nationwide (25%). Athene's extreme growth rate in liabilities was over 800% of these traditional insurers.

71.    When considering the surplus-to-liabilities ratios of the universe of insurance carriers as of December 31, 2023, Athene carries almost the absolute lowest of any insurance company. **More than 99% of insurance carriers have a higher ratio of surplus-to-liabilities than Athene**. Of the 695 active insurance carriers (*i.e.,* those active carriers reporting liabilities),

Athene's surplus-to-liabilities ratio ranked 689th. Just five carriers had a lower (or worse) ratio than Athene. When focusing on the largest insurance carriers with $100 billion in liabilities, Athene ranked 21 of 22 (or in the 95th percentile). Again, just one large carrier had a lower surplus-to-liabilities ratio than Athene. As shown, Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers and, as such, annuitants whose pensions have been transferred to Athene are at an enormously heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer, much less the "safest annuity available" as required by ERISA. 29 CFR § 2509.95-1 (Interpretive Bulletin 95-1). Further, Athene's staggeringly low surplus-to-liabilities ratio is evidence of its risk not only as compared to peer insurers but also in absolute terms: a surplus-to-liabilities ratio that low reflects that Athene poses an enormous risk to Plaintiffs.

72.    Athene touts a claimed ample surplus, but this is misleading. When Athene discusses its surplus, it refers only to that of Athene Holding Ltd., the holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which, as set forth above, is among the tiniest of all insurers.

73.    Moreover, Athene's substantial investment in affiliated assets also illustrates the high level of risk it poses. When an annuity provider is subjected to a regulatory event such as "rehabilitation" or "conservation," its affiliated investments suffer a more significant and rapid asset value write-down compared to unaffiliated investments. In the case of Athene, these investments are highly dependent on affiliated carriers (Athene Annuity Re Ltd.) for operating cash flow. The carriers are not independent of Athene, and are therefore correlated with Athene's overall health. And these affiliated investments of Athene are exploding. From 2019 through 2023, Athene went from $4 billion to $19 billion in affiliated investments, while New York Life's

affiliated investments increased from $17 billion to $23 billion during that same time. The percentage increase among these carriers illustrates the dramatic increase in affiliated assets of Athene relative to New York Life. Over the five-year period 2019–2023, Athene's growth in affiliated assets was 368%, whereas New York Life's growth rate was 33%. Athene's growth rate in affiliated assets was therefore 1100% of New York Life's.  And in 2024, Athene's use of affiliated investments soared to an alarming $40.5 billion, representing an over 100% increase in affiliated investments in just one year. In stark contrast, New York Life's use of affiliated investments decreased by approximately 1% in 2024 when compared to 2023.

74.     In 2024, Athene also increased its level of funding agreement-backed notes (FABNs) to nearly $40 billion, a nearly 100% increase in a single year compared to 2023, when Athene had approximately $21.7 billion in FABNs. The underlying credit in FABNs is doubtful because risk-free matched funding for risky assets does not exist. In testimony to the National Association of Insurance Commissioners, Stéphane Verani, Principal Economist in the System Financial Institutions and Markets section of the Federal Reserve Board, has observed that FABNs increase the connection and thus the correlation between insurers and the financial sector, that maturity and liquidity transformation increases vulnerabilities, and that FABNs are even more vulnerable as their maturity date nears.

75.     Moreover, as of the end of 2023, **Athene's ratio of higher risk assets to reported surplus was an astonishing 2,519%** compared to New York Life, whose ratio of higher risk assets to reported surplus was only 11% that of Athene. At that time, Athene had approximately $72 billion invested in high-risk assets. However, by the end of 2024, Athene had approximately $121 billion invested in high-risk assets, marking a nearly 70% increase from the end of 2023. Athene's investments in high-risk assets were an astonishing 3099% of Athene's

28

surplus in 2024.  In contrast, New York Life's investment in high-risk assets at the end of 2024 was approximately 339% of its surplus. Athene's percentage of high-risk assets relative to its surplus was nearly ten times the percentage of New York Life's at the end of 2024. Even a minor write-down of Athene's higher-risk assets increases the likelihood of a regulatory event. Given the dramatic downturn in the financial markets in March and April, 2025, such a write-down is likely imminent. When that occurs, regulators will step in. Regulatory action triggers a decrease in valuation of illiquid assets, leading to the placement of insurance companies in rehabilitation. This is what occurred with Executive Life Insurance Company due to its risky assets, causing its ultimate demise.

76.    Athene's dramatically inadequate surplus relative to its liabilities, its ownership of Athene's portfolio companies and dependence upon Apollo, its prolific use of affiliated investments, and investment in high risk assets at an excessive and increasing rate relative to its surplus, coupled with the present market and interest rate environment that is further exposing the vulnerabilities of its private equity parent, Apollo, is evidence that Athene is currently at imminent risk of default or a delay in annuity payments to Plaintiffs.

**VII.    Very Recent Developments Have Greatly Increased the Imminent Risk of Athene Delay in Annuity Payments or Default**

77.    Jamie Tucker, head of U.S Life Insurance for Fitch Ratings, stated in early 2025 that his biggest fear for 2025 was "a severe downturn in credit markets."[7] "Given the increased allocation to less liquid and increasingly complex securities, many of which have not been truly tested by a downturn, we have questions on how some of these assets will perform."[8] Others,

---

[7] Aaron Smith, *The Industry's Biggest Fears for 2025: Worries about the potential for market shocks, heightened mortality and technological struggles top the list*, LIFE ANNUITY SPECIALIST, Jan. 15, 2025.
[8] *Id.*

including Tim Zawacki, S&P Global Market Intelligence analyst, echoed Mr. Tucker's worries "about how carriers' new investment strategies will fare in the face of an economic shock" or "economic black swan event."[9] Michael Leonard, chief economist and data scientist at the Insurance Information Institute, expressed concern about "a drop in profitability and income from [life insurers'] assets under management."[10] These are concerns about life insurers with risky assets generally. Athene's actions exacerbate these increasing industry risks, and the downturn in the credit markets referenced by Messrs. Tucker and Zawacki—the "economic shock" or "black swan event"—is currently unfolding in 2025.

78.     Starting in February 2025, the financial markets have produced dramatic losses due to a variety of factors, including, among others, much higher interest rates than the ultra-low interest rates of the past, international instability, and United States tariff policies. These factors have had an enormous negative impact on private equity companies in general, and Athene and its parent Apollo specifically. As a result, the national financial press has raised increasing alarms about the impending private equity crisis within the period of February to mid-April 2025.

79.     The Wall Street Journal ("WSJ") reported on April 17, 2025 that the shares of Athene's parent, with whom Athene investments are invested and intertwined, "are down 20% or more this year, far worse than the S&P 500's sharp losses."[11] The chairman of private equity at Bain Capital stated therein: "We aren't even in a recession now, and we're already at a point where things are incredibly challenging."[12]

---

[9] *Id.*
[10] *Id.*
[11] Matt Wirz and Miriam Gottfried, *Private Equity World Engulfed by Perfect Storm*, WALL ST. J., Apr. 17, 2025, *available at* https://www.wsj.com/finance/investing/private-equity-world-engulfed-by-perfect-storm-2a2da2ad.
[12] *Id.*

80.     A WSJ article the next day on April 18, 2025 raised the alarm that private equity firms own 29,000 companies "that they can't unload" because of market conditions and high interest rates, and that "a party may be winding down."[13] Even more recently, on April 22, 2025, the WSJ addressed the fact that the illiquidity in private equity investments in the current financial environment and high interest rates is forcing sales of assets in a down market.

81.     What makes this general concern surrounding private equity even more ominous in the case of Athene and its parent, Apollo, is that even before these recent developments, Apollo's default rate since 2022 for the companies it owns was almost 25%, according to Moody's. *See supra* ¶64.

82.     Coupled with the fact that about 50% of Athene's investments are in Apollo companies, including the $4 billion Intel debt Apollo placed on Athene set forth above, the heavy debt of Apollo companies now operating in a high interest rate environment, the inability to sell many of Apollo's investments, and very recent market conditions, Athene is at grave risk of default or delay in annuity payments to Plaintiffs.

## VIII.    Athene Shares Common Characteristics with Failed Insurers

83.     Athene has similarities to other large insurance companies that failed around the same time as Executive Life, First Capital and Fidelity Bankers. A study as to the causes of these failures by the United States General Accounting Office ("GAO") found a common thread: highly aggressive practices of poorly controlled growth and investment in high-risk assets. The assets of the failed insurers grew at a rate six to ten times faster than the life insurance industry's overall asset growth rate, in part due to sales of high-risk investment products. Losses of only

---

[13] Jason Zweig, *Don't Buy Into This Easy Fix for Stock-Market Craziness*, WALL ST. J., Apr. 18, 2025, *available at* https://www.wsj.com/finance/investing/stock-market-craziness-alternative-funds-7df17b9c.

8.3% to 11.7% in these insurers' high-risk investments were enough to eliminate their surplus and reserves. The insurers artificially inflated their surplus through a heavy reliance on reinsurance transactions. In short, highly aggressive growth, high-risk holdings coupled with very thin surplus, and reliance on high levels of risk in reinsurance were driving factors in the failures of Executive Life, First Capital, and Fidelity Bankers. Athene engages in the same high-risk practices which the GAO study found were responsible for the collapse of these insurers.

**A. Recently Failed Insurers Engaged in Similar Higher-Risk Practices and Demonstrate the Imminent Risk of Default by Athene or Delay in Payments**

84.  Athene's practices also closely resemble those of recently failed insurers in several critical respects, further illustrating the immediacy of the risk to Plaintiffs. These practices have been recognized by industry professionals as having both caused past failures and creating a substantial likelihood of default or insolvency today.

85.  A common theme among collapsing insurers is the pursuit of higher returns through high risk, less liquid, more volatile assets and the use of opaque, affiliated reinsurance transactions. These strategies can generate short-term profits but expose insurers, like Athene, to substantial risk if market conditions change, leaving them unable to liquidate assets to meet policyholder demands.

86.  In 2024, four life insurance companies failed: Columbian Life Insurance Company ("Columbian Life"), Columbian Mutual Life Insurance Company ("Columbian Mutual"), PHL Variable Insurance Company ("PHL Variable"), and 777 Reinsurance Ltd. ("777 Re"). Their failures demonstrate that the same practices that caused Executive Life's failure persist, including surplus inadequacy, risky financial practices and investments, and inadequate risk management, among others.

87.     Columbian Life was a wholly owned subsidiary of its parent company Columbian Mutual. Like Athene, Columbian Life relied heavily on affiliated reinsurance with the parent corporation. Ultimately, these circular and affiliated transactions, coupled with the company's declining financial health and inadequate reserves, led to its insolvency. Columbian Mutual's affiliated transactions allowed the company to disguise its growing financial strain until regulatory intervention became necessary. Prior to its collapse at year end 2023, Columbian Life had only $9.5 million in total surplus, yet it was relying on its direct parent, Columbian Mutual, for $590 million in affiliated reinsurance. Columbian Life's surplus, not even 2% of the amount of the affiliated reinsurance it received from Columbia Mutual, is entirely too thin relative to its amount of affiliated reinsurance.

88.     Before its takeover by regulators, an independent actuarial analysis by the New York Department of Financial Services found Columbian Life's reserves to be significantly deficient. The company needed to increase its reserves by $104 million. Shortly thereafter, Columbian Life was placed into rehabilitation by the Illinois Department of Insurance. The rehabilitator assigned to Columbian Life is currently evaluating the feasibility of a rehabilitation plan and is coordinating with state insurance guaranty associations in the event of a future liquidation. The Illinois rehabilitator has the authority to issue a moratorium on the payment of policy benefits to Columbia Life. In August 2024, Columbian Mutual was placed into rehabilitation in New York as well, and their policyholders remain at substantial risk.

89.     Also in mid-2024, PHL Variable faced financial challenges similar to those faced by Columbian Life, including, among other things, underperforming investments and taking on debt in an ultra-low interest rate environment (an environment which has now changed decisively). PHL Variable attempted to stabilize itself through reinsurance transactions, including

with its captives. When these efforts proved futile, regulators took over PHL Variable and initiated rehabilitation proceedings to attempt to protect policyholders and stabilize the company. As part of the rehabilitation proceedings, in June 2024 the court ordered a moratorium on certain policy payments and set a maximum payment of $250,000 in the aggregate for an annuitant even if that annuitant was originally entitled to a higher payment under their contract with PHL.  As discussed, Athene is engaged in the same risky practices, including underperforming and extremely risky investments in Apollo, having a dangerously low level of surplus relative to liabilities, and relying on in-house affiliated reinsurers.

90.     Another recent failed insurer is an ominous example of impending danger for Athene annuitants. Much like other failed insurers, 777 Re, a Bermuda-based reinsurance entity, engaged in complex and opaque financial arrangements with affiliates. Through these transactions, 777 Re's parent company ("777 Partners") shifted liabilities off its balance sheet, creating the false impression with regulators and investors that it was financially sound. In reality, the affiliated reinsurance transactions obscured 777 Partner's significant exposure and perilous financial status. Similar to Columbian Mutual, policyholders remain exposed. In addition to having set up an in-house offshore reinsurance entity, as Athene has done, 777 Re developed a portfolio containing high levels of risky and illiquid assets in an attempt to obtain higher returns. This strategy proved unsustainable when interest rates and market conditions shifted and contributed greatly to 777 Re's insolvency.

91.     After 777 Re ceased insurance activities in mid-2024, its rating was withdrawn by AM Best. When this happened, two insurance firms, Atlantic Coast Life Insurance and Sentinel Security Life Insurance, owned by Advantage Capital Partners ("A-Cap"), had to reclaim assets

34

previously ceded to 777 Re to reduce their exposure to the dissolved 777 Re.[14] In 2023, A-Cap and its subsidiaries sold approximately $1.7 billion in annuity contracts, and 777 Re held approximately $1 billion of A-Cap insurers' business.[15] As is the case with A-Cap and 777 Re, when an "insurer's reinsurance partner fails, there's 'the potential for contagion,' since the insolvency could leave the insurer short of the assets it needs to support its own liabilities."[16] Just last month, on March 21, 2025, the Utah Insurance Commissioners requested a court enter a rehabilitation order for Sentinel Security, after already having banned the insurer from writing new life insurance as of the end of 2024.[17] The Utah insurance commissioner said, "[t]his Petition results from a years-long history of self-dealing, conflicts of interest, and obfuscation" by A-Cap. The obfuscation, among other things, resulted from A-Cap's dealings with an opaque offshore reinsurer in 777 Re, and now A-Cap must deal with the fall out of having those liabilities back on its books because of 777 Re's insolvency and the ensuing rehabilitation proceedings that leave its policyholders exposed.

### B.  Athene's Alarming Similarities to Failed Insurers

92.      Athene's surplus-to-liability ratio is actually *below* two of these recently failed insurers[18]: Columbian Life and Columbian Mutual. As of year-end 2023, Athene had a surplus-to-liability ratio of 1.44%. Columbian Life and Columbian Mutual in fact had *higher* surplus-to-

---

[14] Jacob Adelman, *Annuities Are Soaring in Popularity. They're Not All as Safe as They Seem.*, BARRONS, June 7, 2024, *available at* https://www.barrons.com/articles/annuities-risks-retirement-sentinel-atlantic-coast-a-cap-ec9dbba5?mod=bol-social-tw.
[15] *Id.*
[16] *Id.*
[17] John Hilton, *Utah regulators ask court to place Sentinel Security Life into rehab*, INS. NEWSNET, March 26, 2026, *available at* https://insurancenewsnet.com/innarticle/utah-regulators-ask-court-to-place-sentinel-security-life-into-rehab.
[18] 777 Re does not file statutory statements with the US, so its surplus-to-liabilities ratio is not calculable.

liability ratios, 3.01% and 2.10%, respectively. Thus, Columbia Life's ratio was over twice that of Athene's, and Columbian Mutual's was almost one and a half times as great as Athene's. Only PHL Variable's surplus-to-liability ratio was lower than Athene's, at 1.03% as of year-end 2022, the last year that PHL Variable reported a positive surplus. As set forth above, all three of these insolvent insurance companies and Athene share surplus-to-liabilities ratios which are far below the national average of 7.49%.

93.     Additionally, similar to these failed insurance companies, Athene engages in affiliated reinsurance – which does not diversify risk – that far exceeds its surplus. As of December 31, 2023, Athene's use of affiliated reinsurance was over $155 billion, an astounding *fifty-four* times the amount of its surplus. This is ominously comparable to Columbian Life's use of affiliated reinsurance, which was *sixty* times the amount of its surplus. In contrast with an example of a traditional life insurer, New York Life does not engage in *any* affiliated reinsurance; it and other traditional long standing life insurance companies diversify their risk by utilizing reinsurers who are unaffiliated third parties.

A.IX.    **Athene's Offshore Practices**

52.94.  Athene's use of a complex and high-risk investment structure under lax regulatory standards has contributed to its higher risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both headquartered in Hamilton, Bermuda.

53.95.  In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have

36

greater downside risk than bonds with the same credit rating. Private equity-owned insurance companies like Athene hold some of the riskiest portions of CLOs issued by their own affiliated asset managers.

54.96.  The reinsurance of PRT liabilities in Bermuda poses unique risks to pensioners. Financial statements must be reported using Statutory Accounting Principles ("U.S. SAP") in the United States, which are the reporting standards applicable to all U.S.-based insurers. that are not captives. Bermuda does not follow the same reporting standards. Under U.S. SAP, insurers must file detailed statutory financial statements that report all purchases and sales of securities. By contrast, under Bermuda accounting standards, Athene's affiliated reinsurers do not report individual securities transactions but rather only in the aggregate. Further, Bermuda accounting standards allow insurers to invest in assets that would not qualify as suitable under U.S. SAP.

97.    These actions mean that Athene today is at substantial risk of default or of regulatory intervention leading to an interruption in policyholder payments. That is because although Bermuda received qualified jurisdiction reciprocal status from the NAIC in 2019, both U.S. regulators and the NAIC still consider insurers' reliance on offshore reinsurance as a current and substantial threat to policyholders. In 2024, the NAIC and regulators scrutinized the escalating trend of life insurance and annuity reserves being ceded offshore because such practices lack sufficient regulatory oversight and result in a substantial credit risk to the offshore reinsurance sector. By the end of 2023, offshore reinsurers were providing almost twice the amount of reserve credit to US life insurers compared to the total reserve capital of those insurers. The NAIC's Life Actuarial Task Force emphasized the need for improved governance and transparency in these offshore transactions because these transactions lower the transparency of reserves held and the risks associated with the assets supporting the reserves. An industry

participant, based on firsthand experience, emphasized during this examination that, when reinsurance moves offshore, the amount of assets backing policyholder obligations declined significantly. This is due to the lax regulatory standards in Bermuda and other offshore jurisdictions.

98.     Moody's recently found that the movement of reinsurance offshore is a "credit negative" for life insurers because of the increase in counterparty risk and a lack of transparency around financial assumptions and disclosures in the reinsurance sector compared to regulations in the US.[19] A state insurance regulator who is also an NAIC actuary voiced concerns with offshore reinsurance because, compared to reserves regulated by U.S. SAP, offshore reserves can be substantially lower, can disappear entirely, or in the worst cases, can even be negative. According to the assistant commissioner of New Jersey's Office of Solvency Regulation, the recent increase in the use of offshore reinsurance is due in large part to the fact that offshore reinsurance provides life insurers the ability to greatly reduce their reserves.[20] When states periodically examine insurance companies, they do not even consider offshore reinsurers that are often under-reserved.[21]

~~55.~~99.  Life insurance and annuity companies maintain surpluses to ensure long-term solvency. The amount of an insurer's surplus is critically important. An insurer's surplus, or the difference between its assets and liabilities, acts as the only buffer between solvency and insolvency. In order to determine whether an insurer is able to pay out policyholder claims, the

---

[19] *Offshore reinsurance goes mainstream, raising counterparty risk*, MOODY'S RATINGS, Feb. 4, 2025, *available at* https://rgb-prod-public-pdfs.s3.us-east-2.amazonaws.com/TlbgpoLBMQaM2eCNaR9IRkZ205s.pdf.
[20] John Hilton, *Regulators look to tighten the reins on reinsurance deals*, INS. NEWSNET, Feb. 14, 2024, *available at* https://insurancenewsnet.com/innarticle/regulators-look-to-tighten-the-reins-on-reinsurance-deals.
[21] *Id.*

industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities.

56.100.    Athene's surplus-to-liabilities ratio is among the thinnest in the country when compared to that of its peer insurers. As of 2023, Athene's surplus-to-liabilities ratio was 1.4%. In contrast, New York Life's was 12.24% and the national average was over 7%. Despite its staggeringly low surplus-to-liabilities ratio, Athene's total liabilities dramatically increased by 250% between 2018 and 2023. In contrast, one traditional insurer, New York Life, increased its liabilities as a percentage of assets by 30%. Although Athene's total liabilities increased by more than 250%, the amount of surplus maintained to support its liabilities has not kept pace. Athene's dramatic increase in liabilities further adds to the risk assumed by Plaintiffs and similar Alcoa retirees.

57.101.    Rather than reinsuring through a third-party reinsurer to diversify risk, Athene chooses to cede liabilities to captive reinsurance affiliates. While reinsurance with a third-party reinsurer can increase protections against default, the same is not true when an insurer engages in offshore affiliated reinsurance. Those insurers with captive reinsurance arms use them to back their liabilities with assets that would not be accepted by insurance examiners in their own domiciles. As of year-end 2023, Athene reported over $15 billion in assets reinsured with affiliates. Conversely, New York Life had no offshore affiliated reinsurance and ceded only $3.58 billion to third party arm's length reinsurance companies.

58.102.    Beyond traditional reinsurance, Athene engages in modified co-insurance ("ModCo") arrangements with its offshore affiliates. ModCo is a type of reinsurance. ModCo arrangements are those in which an insurer (the ceding carrier) that is transferring risk to a

reinsurer retains assets related to the reinsured policies while transferring the regulatory capital requirements associated with the asset risks to the reinsurer.

59.103.        Here, the ceding carrier (Athene) transferred its regulatory capital requirements or sufficient capital to pay claims of policyholders to its offshore affiliate (Athene Annuity Re Ltd.). For 2022, Athene reported $104 billion in ModCo compared to only $2 billion in surplus. For 2023, Athene reported over $141 billion in ModCo while only maintaining $2.9 billion in surplus. Other insurers, including New York Life and TIAA, reported zero in ModCo with offshore affiliates as of year-end 2022 and 2023.

60.104.        ModCo arrangements allow Athene to remove risky assets from its own reported Risk Based Capital ("RBC") ratio. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. Athene's use of ModCo arrangements has the effect of artificially inflating the RBC ratio, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. This is because, in Bermuda, insurers who hold riskier assets with higher credit spreads (or higher returns) are able to value their liabilities at a lower rate. In offloading capital requirements and asset risks to a captive reinsurer through ultimately circular ModCo transactions, Athene obscures the actual risks associated with the assets involved and is enabled to maintain a lower level of surplus.

61.105.        Athene also has a very high concentration of risky assets relative to its surplus. For example, Athene reports $21 billion in "other loan-backed and structured securities" as of 2022 against only $2 billion in surplus—*ten times its surplus*. New York Life, on the other hand, reported $11.7 billion in that category—*less than half of its surplus*, which stood at $23.88 billion as of 2022. All of Athene's other loan-backed and structured securities were originated by

Apollo. In addition, as of 2022, Athene also held $18 billion in "deposit type contracts," which are effectively funding agreement-backed loans. Because they are callable by institutional investors, Athene may experience a liquidity crisis to satisfy its pension obligations. Accordingly, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

62.106.	The International Monetary Fund issued a Global Financial Stability note in December 2023, warning of portfolio liquidation challenges due to the increased use of structured investments. "Greater investment in structured and private credit worsens liquidity mismatches between assets and liabilities, which could make liquidating portfolios more challenging if facing margin calls on derivatives or repurchase agreement contracts or policy surrenders should interest rates continue to rise rapidly."

63.107.	Athene's complex structure has also led to pensioners' increased exposure to higher risk investments. Financial entities that combine U.S. life insurers, offshore captive reinsurers, and affiliated asset managers employ what is called a "Bermuda Triangle Strategy." The insurer (*e.g.,* Athene) firsts builds a block of annuity business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer (*e.g.,* Athene Life Re), which frees up capital for use in the organization's private debt business. The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt.

64.108.	The interdependence among Athene and its in-house reinsurer exposes each of these entities to a heightened risk of failure. That Athene's separate account and then general account would be insufficient to cover its liabilities, forcing Athene to seek payment from its affiliated reinsurer for a portion of the annuity liabilities, are closely correlated events that are tied to Athene's weak financial condition relative to other insurers. Because Athene is dramatically under-reserved relative to peers, as shown through its thin surplus and dramatic

41

increase in liabilities, in a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurer. An inability to satisfy Athene's general account obligations would cause a downgrade in its credit and prevent it from raising funds in the credit markets.

65.109.    The true risk resulting from Athene's circular transactions with captive affiliated reinsurers is further illustrated when examining the amount of such reinsurance. Athene Annuity Re Ltd of Bermuda had $87 billion on its books in 2020, and circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If a fraction of that reinsurance transferred in 2021 was disallowed, "Athene would face a funding shortfall." A funding shortfall for Athene would detrimentally impact Apollo because Athene insurance companies represent 40% of Apollo's value.

110.    Defendants have publicly represented that Plaintiffs will not suffer a monetary harm from the transfer of their benefits to Athene unless (i) Athene suffers catastrophic losses; (ii) Athene fails to mitigate any such losses to preserve Plaintiffs' benefits; and (iii) Athene is unable to secure alternative funding following a downturn.

111.    Those factual assertions are incorrect. As alleged above, Plaintiffs are substantially likely to suffer harm in the form of *interrupted* benefits payments, even if Athene does not recognize catastrophic losses. That is because there is today a substantial risk that Athene will face regulatory action such as conservation or rehabilitation that will require a moratorium on benefits payments. And once Athene either defaults or is subject to a moratorium on payments, it would be unable to mitigate Plaintiffs' losses or secure alternative funding, much less at the extreme speed required to prevent any interruption of Plaintiffs' monthly payments.

66.112. Further, Athene's separate accounts used to first pay pension benefits of Alcoa retirees are not truly "ring-fenced" or insulated from Athene's general liabilities. According to the GACs issued by Athene with Alcoa, the separate accounts hold assets supporting the contracts. However, the separate account assets may be —and in fact are—used by Athene to support payment obligations for other GACs issued by Athene. Periodically, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GACs. Upon either a default or regulatory action, Athene will be unable to pay Plaintiffs' benefits without *at least* an interruption of payments.

67.113. Apollo specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies. "Such PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities[.]" Although there are efforts that can be taken to mitigate these conflicts, Apollo has not done so.

68.114. Athene's transition out of the life insurance business further contributes to its high risk as an annuity provider. Provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

## ~~B.~~X.    Athene's Creditworthiness

~~69.~~115. On October 13, 2022, NISA Investment Advisors ("NISA") reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene. The report found that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk. To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding "the range of credit risk costs reaching as high as 14%."[22] As shown below, NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last, and among "Questionable Candidates" for an annuity provider.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

---

[22] David Eichorn, ~~David,~~ *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA, 2022, *available at* https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | |
| (B) Prudential | 76 | 7.6% | 0.2% | CLEAR CANDIDATES |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

116. The NISA report demonstrates that Athene is a much riskier annuity provider than traditional providers. This is evident because the measurement of economic loss to beneficiaries choosing Athene is 14%. This figure is significantly larger than the same measure for New York Life, and thus, Athene cannot be considered the "safest available" annuity.

117. The NISA report noted that Athene had the highest reported spread of 214 basis points ("bps"). The bond market uses spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. All else equal, an investor demands additional compensation for taking more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. Based on the range of the reported spreads among issuers, the market price of Athene's bond risk is 21.4% higher than U.S. Treasuries, as compared to the safest annuity provider analyzed (New York Life), whose market price is 7.4% higher than U.S. Treasuries—a 14% gap.

45

72.118.Interpretive Bulletin 95-1 also makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an appropriate annuity provider." The NISA analysis separately compared the agency rating of Athene to its market-adjusted implied rating based on the bond market. The analysis found that although Athene had an A+ rating (just as Executive Life had before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported annuity providers.

**FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness**

|  | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

73.119. The reported range in Figure 1 is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

74.120.    An A+ rating for Athene noted above should not be interpreted as suggesting that Athene is on par with safer annuity providers. As shown, there are levels of safety above A, including AA and AAA. Other insurers maintain higher credit ratings due to their stronger creditworthiness. In light of Athene's market-adjusted implied rating, fiduciaries should not rely on Athene's credit ratings because they are insufficient to appropriately evaluate whether Athene offered the safest annuity available.

75.121.    The differences in credit ratings among insurers have a material impact on their likelihood of default. Athene has a Moody's rating of A1 (or A+ for S&P) in contrast to New York Life which maintains a credit rating of Aaa (or AAA for S&P). Moody's reported the average cumulative issuer-weighted default rates by issuer credit rating from 1970 through 2021. Over a 20-year time horizon, the default rates for riskier issuers are apparent. The default rates are only 0.7% for Moody's Aaa ratings compared to the default rate of 5.0% for its A ratings. Over a 20-year time horizon, the approximate default rate of Athene's bonds demonstrates that they are over seven times riskier than those of a high-credit quality issuer. And the differential among default rates for them would be exponentially greater over a 30-year time horizon. This differential is yet another indicator of the risk that pensioners have assumed with Athene.

76.122.    Overall, Athene is the least safe annuity provider according to objective measures. The Alcoa Plans' participants whose benefits have been offloaded to Athene receive none of the upside of Athene's inherently risky strategies. The risk posed by Athene could be

worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of failure. But that is not the case for Plan participants.

### C.XI.    Athene's Use of Private Letter Ratings

77.123.        Athene depends on private letter ratings ("PLRs") from smaller private credit rating agencies to rate certain of its securities. These private rating agencies apply less stringent standards for ratings than are applied to public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies. There are also significant discrepancies among securities ratings provided by private ratings agencies— Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. In fact, PLRs issued by these small, private ratings agencies averaged 2.4 notches (or grades) higher than ratings provided by the SVO for the same security. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

78.124.        In 2019, the Wall Street Journal ("WSJ") identified examples of these discrepancies among structured security ratings, including CLOs. The WSJ found that smaller private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. As a result, a bond that would be classified as "junk" by major ratings agencies could be classified as "very safe," and even be assigned an AAA rating by the smaller, private ratings agencies. This resulted in the classification of a bond as "junk" by major rating agencies while the smaller private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. PLRs that carry a higher credit rating than their

SVO designation, for example, result in lower RBC charges, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolio.

79.125.    Both KBRA and DBRS have been the subject of investigation by the SEC regarding their inaccurate rating practices, which resulted in millions of dollars in fines. One investigation found that KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

## D.XII.    Athene's Regulatory Investigation

80.126.    Athene's PRT business has also been subject to regulatory investigation. In January 2019, the New York State Department of Financial Services initiated an investigation into Athene Annuity and Life Company and Athene Holding Ltd. regarding their pension risk transfer business in New York state. The investigation concerned Athene's unlicensed solicitation of insurance business in New York involving 14 PRT transactions that affected New York policyholders.[23] Relative to other states, New York state maintains some of the strictest standards on insurers. As a result of the investigation, Athene was ordered to pay a $45 million civil monetary penalty and meet other provisions.

---

[23] *DFS Superintendent Linda A. Lacewell Announces Athene Holding Ltd. to Pay $45 Million to New York State for Unlicensed Pension Risk Transfer Business*, N.Y. DEPT. OF FIN. SERV., Apr. 20, 2020, *available at* https://www.dfs.ny.gov/reports_and_publications/press_releases/pr202004132.

IV.XIII.    **Defendants' PRT Transactions with Athene**

81.127.        Through a series of seven PRTs with Athene, Defendants transferred Alcoa's pension liabilities to Athene Annuity and Life Company or Athene Annuity & Life Assurance Company of New York. For purposes of the GACs at issue, these entities are collectively referred to as Athene. The Alcoa Defendants therefore no longer guarantee the pension benefits covered by the transactions. As a result, Defendants caused the Plans' participants to lose the stringent protections provided by ERISA and placed their retirement assets at risk of Athene's insolvency.

82.128.        The Benefits Committee appointed Fiduciary Counselors as the independent fiduciary over the PRTs. The Plans paid Fiduciary Counselors $227,835 in 2018, $134,399 in 2021, and $115,000 in 2022 for acting in this role. Recognizing that the selection of an insurer in a PRT transaction is a fiduciary act, Fiduciary Counselors admits that plan fiduciaries must take steps to obtain the safest available annuity in accordance with the DOL's Interpretive Bulletin 95-1.[24] Importantly, when serving as a plan's independent fiduciary over the selection of an annuity provider in a PRT transaction, Fiduciary Counselors agrees that it must comply with that guidance to satisfy its fiduciary obligations under ERISA.

83.129.        The seven PRT transactions are summarized as follows:

a.    Effective August 7, 2018, Alcoa USA and Athene entered into a GAC under which Athene assumed $290 million of Alcoa's pension obligations for 10,500 participants. Alcoa USA entered into the GAC, and all other GACs with Athene, as the named fiduciary of the Plans. Fiduciary Counselors was not a party to any

---

[24] Annuities, Fiduciary Counselors, https://www.fiduciarycounselors.com/services/annuities/.

GAC at issue. The GAC was executed on January 29, 2019, and assets were transferred to Athene on that date.

b. Effective November 23, 2021, Alcoa USA and Athene entered into two GACs under which Athene collectively assumed approximately $1 billion of Alcoa's pension obligations for 11,200 participants. The GACs were executed on May 31, 2022, and assets were transferred to Athene on that date.

c. Not even one month later, effective December 16, 2021, Alcoa USA and Athene entered into two more GACs under which Athene assumed approximately $500 million of Alcoa's pension obligations for 2,600 participants. The GACs were executed on May 31, 2022, and assets were transferred to Athene on that date.

d. Finally, effective August 11, 2022, Alcoa USA and Athene entered into the final two GACs under which Athene assumed an additional $1 billion of Alcoa's pension obligations for 4,400 participants. The GACs were executed on March 17, 2023, and assets were transferred to Athene on that date.

84.130.    Overall, between August 2018 and August 2022, the Alcoa Defendants' PRTs affectedeliminated nearly 30,000 Alcoa Plan participantsparticipants' pensions, offloading approximately $2.79 billion of Alcoa's pension liabilities to Athene.

## V.XIV.    Defendants Unlawfully Used Athene as the Annuity Provider

85.131.    The circumstances then prevailing to Defendants demonstrate that they selected or caused to retain Athene as the annuity provider in the PRTs in violation of their strict fiduciary responsibilities by failing to conduct a thorough and independent investigation of available annuity providers for the Plans. Had Defendants conducted an impartial investigation

of available annuity providers, they would have discovered that Athene was not the safest available option.

86.132.     In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of dollars in participants' retirement benefits to Athene. There were numerousmassive red flags and factors that would lead a fiduciary to conclude that Athene was not the safest annuity available, as required by the Department of Labor, including Athene's complex investment structure, focus on private equity, questionable creditworthiness, minuscule surplus-to-liabilities ratio, and use of untrustworthy credit rating agencies. Relative to traditional annuity providers, Athene also invests in far riskier assets. This risk is compounded by Athene's reinsurance of annuities with offshore affiliates.affiliated entities.

87.133.     Although the Alcoa Defendants hired Fiduciary Counselors as an independent fiduciary to select Athene, the Alcoa Defendants maintained full responsibility as appointing fiduciaries to monitor Fiduciary Counselors to ensure that it carried out its fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective action to protect the plan and its participants when the delegate fails to discharge its duties. The Alcoa Defendants also had a duty to prevent any fiduciary breach by Fiduciary Counselors in the selection of Athene as the annuity provider and to ensure that Fiduciary Counselors was performing its delegated tasks in accordance with ERISA's fiduciary standards. The Alcoa Defendants failed to prudently discharge its fiduciary duties in monitoring Fiduciary Counselors.

88.134.     Despite clear evidence set forth above that Athene was substantiallyenormously riskier than traditional annuity providers, Defendants placed Alcoa retirees' and their beneficiaries' future retirement benefits at substantialvery serious risk of

52

default—a risk for which they were not compensated. Given these facts, it is evident that Defendants either did not solicit bids from a large number of providers or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Had they done so, they would not have placed retirees' and beneficiaries' retirement assets at risk of Athene's insolvency. In doing so, Defendants failed to place Alcoa participants in the safest available annuity as ERISA requires.

89.135.        Defendants' decision to choose or cause Athene to be retained as the annuity provider in the transactions harmed, and will continue to harm, participants and beneficiaries over an extended period through uncompensated risk. The financial market measures Athene as up to 14% riskier than traditional annuity providers, and requires that level of higher yield for Athene debt. The financial marketplace is the true measure of value of a bond or annuity because part of the value of the obligation to pay is based on the risk of failure of payment. This demonstrates that Plaintiffs have already suffered a loss of value of their retirement assets, and that Athene is not even close to the safest available annuity provider. Investors in the market demand a risk premium in exchange for exposure to higher risk. Plan participants and beneficiaries receive no additional compensation for taking on the additional risk associated with the transfer of their pension benefits to Athene.

90.136.        Given the numerous factors that would lead a prudent fiduciary to reject Athene, it is evident that Defendants selected or caused to retain Athene without conducting a sufficiently independent and objective evaluation of available annuity providers. Without such an investigation, Defendants could not determine whether the use of Athene as the Plans' annuity provider was prudent or in the best interest of the Plans' participants.

91.137.    Interpretive Bulletin 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." On information and belief, the Alcoa Defendants received an economic benefit from using Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life. Even if Athene's pricing was not more favorable to Alcoa than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with Interpretive Bulletin 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity.

92.138.    As the number of PRT transactions has dramatically increased during due to more firms entering the space, Milliman reported that the spread between average and lowest-cost bids has widened, emphasizing the important role of fiduciaries to ensure that low bidders are not taking undue risks.



93.139.    Other sources confirm the trend of employers in PRT transactions selecting the lowest-cost annuity provider. Among partial buyouts completed in 2022, Aon

reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. ~~As previously noted, the transactions at issue were partial buyouts.~~

**~~VI.~~XV.    The PRT Transactions Diminished the Value of Alcoa Retirees' Pension Benefits.**

~~94.~~140.        The PRT transactions to Athene immediately diminished the present value of Plaintiffs' and other Alcoa retirees' pension benefits. The market for annuities sets the value for the same or similar future stream of payments issued by different annuity providers. If an annuitant receives the same payments, but from an issuer of lower creditworthiness, it is a loss for the annuitant. This is because the market will assign a lower price to an annuity issued by a riskier annuity provider to cover a similar stream of future payments to compensate the annuitant for the additional risk. The price or present value of the future annuity payments is determined by the rate of return or discount rate. The higher the discount rate to compensate the annuitant for assuming additional risk, the lower the present value of the annuity.

~~95.~~141.        Accordingly, Alcoa retirees' pension benefits transferred to Athene are worth far less than they would be worth if issued by a traditional insurer of high credit quality. Because of these providers' high credit quality, they ensure a greater likelihood for retirees to receive their full pension. If the Athene annuity were purchased on the open market, any rational annuitant, if offered an identical annuity at the same price from these alternative issuers, would choose one from them, rather than the one from Athene—or, equivalently, would insist on paying a lower price for the annuity bought from Athene because of its lesser value. The amount of this decline in value of the pensions of the Alcoa retirees whose pensions have been transferred to Athene is real and substantial in dollar terms.

~~96.~~142.        For instance, the Athene 10- and 20-year annuities had a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher

credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. A higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume. Thus, a rational investor—let alone a prudent and loyal fiduciary—if offered an identical annuity from a traditional insurer, would not select Athene.

97.143.    After the PRT transactions, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantialnow imminent. Because of the transactions, Plaintiffs are no longer members of the Plans and their retirement benefits are not backed by the Plans, Alcoa, or the PBGC. Other than this case involving the selection of the insurer, they have no more ERISA protection as annuitants. Their pension benefits were safer when they had these protections under ERISA. Based on Athene's current and future financial position, there is a substantialan imminent probability that it will fail to make good on its obligation to pay retirees' pension benefits.

98.144.    The PRT transactions thus greatly increased the risk—and indeed created a substantial risk—that Plaintiffs and other Alcoa retirees will not receive the retirement benefits that they have earned for their careers, and which they are owed. The selection of Athene injured Plaintiffs the moment the transactions were executed because, at that moment, the present value of Plaintiffs' promised benefits was substantially and quantifiably diminished.

## CLASS ACTION ALLEGATIONS

99.145.    Plaintiffs seek class action certification on behalf of all participants in the Plans and their beneficiaries since August 7, 2018, for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

100.146.      This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

     a.      The proposed class includes approximately 30,000 members and is so large that joinder of all its members is impracticable.

     b.      There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

     c.      Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plans and were subjected to Defendants' conduct in transferring Alcoa's benefit payments to the Athene entities.

     d.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action; have engaged experienced and competent attorneys to represent the class; and have no conflicts of interest with members of the proposed class.

     e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plans and members of the proposed class, and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plans would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and

beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

       f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

       g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

~~101.~~147.     Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are*

*Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

## COUNT I

### Breach of Fiduciary Duties Against the Alcoa Defendants Regarding Athene

~~102.~~148.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

~~103.~~149.    Each of the Alcoa Defendants acted as a "fiduciary" as defined by ERISA with respect to the Plans and the transactions at issue.

~~104.~~150.    ERISA's fiduciary duties apply to the selection of service providers. *See* 29 U.S.C. § 1104(a)(1)(A)–(B). As such, fiduciaries are required to discharge their duties with respect to a plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the plan's participants and beneficiaries and defraying reasonable expenses of administering the plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.*

105.151.　　Interpretive Bulletin 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 CFR § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

106.152.　　The Alcoa Defendants breached their fiduciary obligations. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity provider available. On information and belief, the Alcoa Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving the Alcoa Defendants money and enhancing corporate profits. These Defendants therefore breached their duty of loyalty by favoring their own corporate interests over the participants' interests in a secure retirement. Because the Alcoa Defendants' goal and motivation was to save the company money, their search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

107.153.　　The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

108.154.    The Alcoa Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings pocketed by these Defendants by virtue of purchasing Athene annuities instead of the safest possible annuities, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

109.155.    Each of the Alcoa Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Alcoa Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

### The Alcoa Defendants' Knowing Participation in a Fiduciary Breach

110.156.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

111.157.    An individual whose status as a participant or beneficiary is terminated in a plan through the purchase of an insurance contract or annuity may bring action to obtain appropriate relief when such purchase constitutes a violation of 29 U.S.C. § 1104. 29 U.S.C. § 1132(a)(9). Section § 1132(a)(9) places substantive duties on certain nonfiduciaries and imposes liability on nonfiduciaries who knowingly participate in a fiduciary breach under § 1104.

112.158.    Plaintiffs allege, in the alternative to Count I, that, even if any of the Alcoa Defendants are deemed nonfiduciaries for the purpose of the PRT transactions, any such

Defendants are liable under Section 1132(a)(9). Each of these Defendants knew of the circumstances that rendered their co-defendants' conduct a breach of fiduciary duties. These Defendants hired Fiduciary Counselors for the purpose of selecting an annuity provider; knew that Fiduciary Counselors' investigation of available annuity providers was not objective or sufficiently thorough; knew that the deficient selection of Athene instead of a prudent alternative annuity provider would generate a massive corporate benefit for Alcoa; and knowingly accepted that benefit by entering into the PRT transactions with Athene.

## COUNT III

**Breach of Fiduciary Duties Against Fiduciary Counselors for Selecting Athene**

113.159.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

114.160.    Fiduciary Counselors acted as a "fiduciary" as defined by ERISA with respect to the Plans and the transactions at issue.

115.161.    As the Plans' independent fiduciary for the PRT transactions, Fiduciary Counselors breached its fiduciary duties in selecting Athene as the Plans' annuity provider by failing to comply with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(B) and Interpretive Bulletin 95-1. Fiduciary Counselors failed to conduct an objective and analytical search for an annuity provider relative to alternative annuity providers of high credit quality. It failed to conduct an independent and thorough investigation of the many deficiencies of Athene that would have led a prudent fiduciary to reject Athene as an annuity provider for the Plans. Based on objective criteria and relative to other providers in the market for plans of the character and size of the Plans, Athene was not the safest annuity available.

116.162.     Fiduciary Counselors' fiduciary breaches in selecting Athene resulted in harm to Plaintiffs and class members from an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

117.163.     Fiduciary Counselors knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, Fiduciary Counselors is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT IV

### Prohibited Transactions—29 U.S.C. § 1106—Against all Defendants

118.164.     Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

119.165.     ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

120.166.     Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 242 (2000), such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

63

121.167.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

122.168.    Athene was a party in interest because it provided services to the Plans. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plans to engage in transactions resulting in a direct or indirect sale or exchange of property between the Plans and Athene; furnishing of services between the Plans and Athene; or transfers of Plan assets to or for the use by or benefit of Athene. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

123.169.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plans.

124.170.    By using pension trust assets to purchase Athene annuities instead of the safest available annuities so as to increase Alcoa's corporate profits, the Alcoa Defendants dealt with the assets of the Plans in their own interest or for their own account; and acted on behalf of a party (Alcoa) whose interest in using a riskier, lower-cost annuity provider were adverse to the interests of the Plans' participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

125.171.    The harm suffered by Plaintiffs and class members from these prohibited transactions includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

126.172.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings pocketed by Alcoa by

virtue of purchasing Athene annuities instead of the safest possible annuities, and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

127.173.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

128.174.    Even if the Alcoa Defendants did not act as fiduciaries over the selection of Athene in the PRT transactions, they are still liable as nonfiduciary parties-in-interest, who knowingly participated in prohibited transactions committed by another Defendant. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. The Alcoa Defendants had actual or constructive knowledge that the Plans' PRT transactions with Athene were unlawful, and thus, knew or should have known that another Defendant was engaged in unlawful transactions by causing the Plans to transfer billions of dollars of pension obligations to Athene.

## COUNT V

### Failure to Monitor Fiduciaries Against the Alcoa Defendants

129.175.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

65

130.176.    The Alcoa Defendants had a fiduciary responsibility for overseeing the Plans, which included monitoring any other fiduciaries appointed or hired to manage the Plans on a day-to-day basis, including Fiduciary Counselors.

131.177.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards.

132.178.    The Alcoa Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A) and (B) and Interpretive Bulletin 95-1.

133.179.    Had the Alcoa Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or the Alcoa Defendants would have decided not to proceed with the transactions. As a result of these monitoring failures, Plaintiffs and class members suffered harm including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

134.180.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury and alternatively an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transactions;

- Order Defendants to compensate class members for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

July 2, 2024April 25, 2025                                    Respectfully submitted,

                                                              /s/ Kurt C. Struckhoff*Sean E. Soyars*
                                                              SCHLICHTER BOGARD LLP
                                                              Kurt C. Struckhoff*
                                                              Jerome J. Schlichter*
                                                              Sean E. Soyars*
                                                              100 South Fourth Street, Suite 1200
                                                              St. Louis, Missouri 63102
                                                              Phone: (314) 621-6115, Fax: (314) 621-5934
                                                              kstruckhoff@uselaws.com
                                                              jschlichter@uselaws.com
                                                              ssoyars@uselaws.com

                                                              *Admitted *Pro Hac Vice*

                                                              *Attorneys for Plaintiffs*

                                                              ALPER & MANN
                                                              Lawrence M. Mann (D.C. Bar ID: 43703)
                                                              9205 Redwood Ave.
                                                              Bethesda, Maryland 20817
                                                              Phone: (202) 298-9191
                                                              Lm.mann@verizon.net

                                                              *Local Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, ~~Kurt C. Struckhoff~~Sean E. Soyars, hereby certify that on ~~July 2, 2024,~~April 25, 2025 I caused the foregoing to be filed electronically using the Court's CM/ECF system, which will send notification of such filing to all parties via their counsel of record in the above-captioned case.

/s/ ~~Kurt C. Struckhoff~~*Sean E. Soyars*

~~Kurt C. Struckhoff~~Sean E. Soyars

69